## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | § § § | |
| *Plaintiff,* | § | |
| v. | § § | No. 4:18-CV-01547 |
| | § | |
| MICHAEL K. YOUNG, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF TEXAS A&M UNIVERSITY, | § § § | |
| *Defendant.* | § § | |

### DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant
Attorney General

JAMES E. DAVIS
Deputy Attorney General
for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

ANNE MARIE MACKIN
Attorney-in-Charge
Texas Bar No. 24078898
Southern District No. 2627567
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
TEL: (512) 475-4074
FAX: (512) 320-0667
anna.mackin@oag.texas.gov

**ATTORNEYS FOR DEFENDANT**

# TABLE OF CONTENTS

Table of Citations ................................................................................................... ii

Nature and Stage of the Proceeding .......................................................................... 1

Issue and Standard of Review .................................................................................... 2

Summary of the Argument .......................................................................................... 2

Argument ..................................................................................................................... 3

    I.    Factual Background ........................................................................................ 3

        a.  TAMU operates an official Facebook page to enable public access to University-related information and services ............................................ 3

        b.  PETA engages in a prolonged, wide-ranging campaign against TAMU's Muscular Dystrophy research .................................................................. 4

        c.  TAMU allegedly begins filtering PETA's content from the University's official Facebook page ............................................................................ 7

    II.    Applicable Law ............................................................................................. 9

        a.  Standard for dismissal under Rule 12(B)(6) ......................................... 9

        b.  Forum analysis provides two First Amendment standards, depending upon the forum at issue ........................................................................ 10

            i.  In traditional and designated public fora, government may limit the time, place, and manner of speech.  Further restrictions must be tailored to the government's interest ........................... 11

            ii.  In limited and nonpublic fora, speech restrictions need only be viewpoint neutral and reasonable given the government's purpose in establishing the forum ............................................. 13

    III.    PETA has not pled a viable First Amendment claim ................................. 15

        a.  PETA's pleadings make clear that TAMU's official Facebook page is a limited or nonpublic forum ................................................................. 16

        b.  TAMU's alleged actions are viewpoint neutral and reasonable given the purpose of the University's official Facebook page ........................ 19

        c.  The developing caselaw applying the First Amendment to the modern internet further emphasize this this result ......................................... 21

Conclusion ................................................................................................................. 24

TABLE OF CITATIONS

Cases

*Am. Freedom Def. Initiative v. King Cty., Wash.*,
  136 S. Ct. 1022 (2016) ................................................................ 14

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666, 118 S. Ct. 1633 (1998) ................................... 11, 12

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009) ......................................... 9

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007) ...................................... 5, 9

*Chiu v. Plano Indep. Sch. Dist.*,
  260 F.3d 330 (5th Cir. 2001) ............................................... 10, 16

*Christian Legal Soc'y Ch. of the Univ. of Cal. v. Martinez*,
  561 U.S. 661, 130 S. Ct. 2971 (2010) ................................. passim

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ...................................................... 5

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
  473 U.S. 788, 105 S. Ct. 3439 (1985) ................................. passim

*Davison v. Loudoun Cty. Bd. of Supervisors*,
  267 F. Supp. 3d 702 (E.D. Va. 2017) ....................................... 23

*Funk v. Stryker Corp.*,
  673 F. Supp. 2d 522 (S.D. Tex. 2009) ........................................ 9

*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98, 121 S. Ct. 2093 (2001) ................................... passim

*Greer v. Spock*,
  424 U.S. 828, 96 S. Ct. 1211 (1976) ....................................... 18

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
  505 U.S. 672, 112 S. Ct. 2701 (1992) ........................... 14, 17, 18

*Kitty Hawk Aircargo, Inc. v. Chao*,
  418 F.3d 453 (5th Cir. 2005) ...................................................... 5

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
  302 F. Supp. 3d 541 (S.D.N.Y. 2018) ................................. 22, 23

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*,
  508 U.S. 384, 113 S. Ct. 2141 (1993) ........................... 13, 17, 18

*Lehman v. City of Shaker Hts.*,
  418 U.S. 298, 94 S. Ct. 2714 (1974) .................................. 11, 14

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) ................................................................................. 11

*Minn. Voters All. v. Mansky,*
    138 S. Ct. 1876 (2018) ............................................................................ passim

*Morgan v. Bevin,*
    298 F. Supp. 3d 1003 (E.D. Ky. 2018) .................................................... 23

*Packingham v. North Carolina,*
    137 S.Ct. 1730 (2017) ................................................................................. 15

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37, 103 S. Ct. 948 (1983) ........................................................ passim

*Pleasant Grove City v. Summum,*
    555 U.S. 460, 129 S. Ct. 1125 (2009) ..................................................... passim

*Reed v. Town of Gilbert, Ariz.,*
    135 S. Ct. 2218 (2015) ............................................................................... 13

*Rosenberger v. Rector & Visitors of Univ. of Va. Sys.,*
    515 U.S. 819, 115 S. Ct. 2510 (1995) ...................................................... 13

*United States v. Kokinda,*
    497 U.S. 720, 110 S. Ct. 3115 (1990) ...................................................... 12

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
    135 S. Ct. 2239 (2015) ............................................................................ passim

*Widmar v. Vincent,*
    454 U.S. 263, 102 S. Ct. 269 (1981) ......................................... 12, 20, 21

*Zantiz v. Seal,*
    602 F. App'x 154 (5th Cir. 2015) ............................................................... 5

## Other Authorities

*Aggie Code of Honor*, TEXAS A&M UNIVERSITY,
    available at http://www.tamug.edu/studentrules/Aggie_Code_of_Honor.html (last
    accessed 22 July 2018) ................................................................................. 7

*Duchenne Muscular Dystrophy*, Genetic & Rare Disease Information Center,
    NATIONAL INSTITUTE OF HEALTH, *available at*
    https://rarediseases.info.nih.gov/diseases/6291/duchenne-muscular-dystrophy ..... 4

https://investigations.peta.org/french-dog-laboratory-animal-testing/ ........................ 5

https://www.peta.org/blog/activists-bring-protest-tamu-dog-experiments-gridiron/ .. 6

https://www.peta.org/blog/banners-fly-target-tamu-dog-lab/ ...................................... 6

https://www.peta.org/blog/dog-defenders-deliver-heart-felt-valentine-texas-
    luncheon/ ..................................................................................................... 7

https://www.peta.org/blog/lily-tomlin-calls-texas-am-cruelty/ ................................... 7

https://www.peta.org/blog/no-texas-event-off-limits-peta-activists-crash-graduation-ceremony/ ............................................................................................................. 6

https://www.peta.org/blog/peta-crashes-texas-dinner-message-president/ ................. 6

https://www.peta.org/blog/peta-denied-ad-space-near-texas-heres-got-around/ ......... 6

https://www.peta.org/blog/peta-exposes-tamu-dog-lab-cruelty-at-sxsw-panel/ ........... 7

https://www.peta.org/blog/peta-protesters-disrupt-texas-board-regents-meeting/ ..... 5

https://www.peta.org/blog/ryan-tannehill-tamu-cruel-dog-experiments/ ................... 5

https://www.peta.org/blog/texas-university-caught/ ..................................................... 6

https://www.peta.org/blog/video-protesters-disrupt-meeting-demand-end-to-texas-am-dog-torment/ .......................................................................................................... 6

https://www.peta.org/features/bill-maher-takes-on-tamu/ ........................................... 5

https://www.peta.org/features/buckley-spaniels-life-death-laboratory/ ...................... 6

https://www.peta.org/media/news-releases/isle-dogs-style-video-highlights-texas-ams-island-lab-cruelty/ ............................................................................................... 7

https://www.peta.org/media/news-releases/protesters-keep-dogs-suffering-spotlight-texas-board-meeting/ ................................................................................................... 6

https://www.peta.org/media/news-releases/texas-am-graduation-to-face-protest-over-dog-experiments ................................................................................................... 7

https://www.youtube.com/watch?v=zFE0NvVk6l4 ...................................................... 5

## Rules

Fed. R. Civ. P. 12(b)(6) .................................................................................... 1, 2, 9

## NATURE AND STAGE OF THE PROCEEDING

On May 14, 2018, Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") filed its Original Complaint for declaratory and injunctive relief, Doc. 1, Original Complaint ("Compl."). Defendant Michael K. Young, in his official capacity as President of Texas A&M University ("TAMU" or "University"), moved for dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief may be granted. Doc. 16. On August 2, 2018, PETA filed its First Amended Complaint, Doc. 17 ("Am. Compl."). The Amended Complaint seeks the same relief as the Original Complaint based upon the same factual allegations, and adds a small number of additional factual allegations.

PETA alleges that TAMU violated its First Amendment rights "by deleting comments PETA posted to the TAMU Facebook page, and blocking PETA from posting additional comments." Am. Compl. ¶1; Compl. ¶1. PETA seeks a declaration "that TAMU's restrictions of PETA's speech on TAMU's Facebook Page are unconstitutional." Am. Compl. at 25 ¶1; Compl. at 23 ¶1. PETA also requests "an injunction requiring TAMU to allow PETA to re-post its content" on the University's Facebook Page "and prohibiting TAMU from future use of automated filtering technology to limit PETA's speech" on TAMU's Facebook page. Am. Compl. at 25 ¶2; Compl. at 23 ¶2.

Defendant President Young now moves for dismissal of PETA's First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6).

1

## ISSUE AND STANDARD OF REVIEW

The issue is whether PETA's allegation that TAMU filtered and/or removed its posts from the University's official Facebook page states a violation of the First Amendment. To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," assuming that the allegations are true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## SUMMARY OF THE ARGUMENT

TAMU has established an official Facebook page for the express purpose of enabling public access to University information and services. The page, therefore, is a nonpublic or limited forum set aside for TAMU to communicate information about the University. PETA has mounted an attack campaign against Muscular Dystrophy research at TAMU. PETA pursues this campaign on many fronts, including by flooding TAMU's official Facebook page with posts that characterize the research as cruelty and torture. PETA alleges that TAMU has filtered and/or removed such posts.

Even if these allegations are true, PETA has not stated a First Amendment claim. PETA alleges only that TAMU has filtered or removed posts that undermine the purpose for which its official Facebook page is set aside. PETA does not dispute that it can (and does) express its criticisms of TAMU's research in numerous other fora, both on and off Facebook. And, in a limited or nonpublic forum, restrictions on expressive conduct need only be reasonable and viewpoint-neutral to pass First Amendment review. Because that standard is satisfied here, PETA has not stated a valid First Amendment claim, and this case should be dismissed under Rule 12(b)(6).

ARGUMENT

## I.   FACTUAL BACKGROUND

### a. TAMU operates an official Facebook page to enable public access to University-related information and services.

Governmental entities such as TAMU "use various social media platforms to disseminate important information to the public . . . in a rapid and freely accessible manner." Am. Compl. ¶7. In this spirit, the purpose of TAMU's "online presence" is to "enable[] full public access to Texas government information and services." Doc. 17-1 at 2.[1] Under TAMU's social media policy, "user-generated posts" on the University's social media platforms "may be rejected or removed if possible when the content," among other things, "is threatening, harassing or discriminatory[;] incites or promotes violence or illegal activities[;] contains information that reasonably could compromise public safety[;] advertises or promotes a non-affiliated commercial product or service, or any entity or individual[; or] violates trademark, copyright, or other law." Doc. 17-1 at 4-5. Plainly, TAMU's official Facebook page is set aside as a tool for the University to communicate information about its educational programs and services to members of the University community in a controlled environment.

Facebook's functionality allows TAMU page administrators to post content to the page (under "Home"), and allows third parties to post on the page (under "Visitor Posts")—either by placing the content on the page directly, or by tagging TAMU in their own public posts. Am. Compl. ¶¶17; 38 (citing Doc. 17-2 as the "Facebook settings" for TAMU's official page). Facebook users can comment on both

---

[1] Citations to PETA's exhibits are to the page number from the ECF-generated stamp.

3

organizational and visitor posts. Am. Compl. ¶24. To ensure users have control over their pages, Facebook provides page administrators with various page moderation tools. *See* Am. Compl. ¶18. Among these—according to the Amended Complaint—TAMU uses a profanity filter, blocks posts in multiple languages, and filters certain words from its official page. Doc. 17-2; Am. Compl. ¶18.

### b. PETA engages in a prolonged, wide-ranging campaign against TAMU's Muscular Dystrophy research.

In December 2016, PETA began an "advocacy campaign" attacking TAMU for its research into Duchenne Muscular Dystrophy ("DMD"), the most common form of Muscular Dystrophy. Am. Compl. ¶33. In DMD patients (who are primarily young boys), a genetic mutation causes progressive weakening of skeletal and heart muscles.[2] Symptoms are typically recognized when a child is between one and six years old, followed by a steady decline in muscle strength that confines most to a wheelchair by age thirteen.[3] There is no cure, and even the most advanced treatment might extend life into the late teens or early twenties, at best.[4] TAMU's research includes studying potential therapies for DMD, and it is currently conducting one such study on dogs with the disease. *See generally* Am. Compl.

"Social media is a critical tool in PETA's advocacy campaigns," and its campaign against TAMU's DMD research is no different. Am. Compl. ¶34. The

---

[2] *Duchenne Muscular Dystrophy*, Genetic & Rare Disease Information Center, NATIONAL INSTITUTE OF HEALTH, https://rarediseases.info.nih.gov/diseases/6291/duchenne-muscular-dystrophy (visited July 15, 2018). This background information is taken from a government website of which the Court may take judicial notice. *E.g.*, *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005).
[3] *Id.*
[4] *Id.*

campaign centers around a publicly available YouTube video of dogs with DMD in a research lab. PETA's website acknowledges that some of the video was shot in a lab in France,[5] but the video's title ("Dogs at Texas A&M Bred to Suffer") and description ("behind the closed doors of a laboratory at Texas A&M University") suggest that the entire video was shot at TAMU.[6] [7] According to PETA's press releases, the "advocacy campaign" surrounding its video has included the following actions, none of which PETA alleges TAMU did anything to prevent:

- April 27, 2017: PETA protester disrupts TAMU Board of Regents meeting.[8]

- May 22, 2017: Ryan Tannehill sends letter urging TAMU to close the lab.[9]

- June 1, 2017: PETA ad with Bill Maher calls TAMU "dog's worst enemy."[10]

- June 20, 2017: PETA displays "huge banners" at College World Series that say, "Cruel Texas A&M Dog Lab Must Go".[11]

---

[5] Behind the Locked Doors of U.S. and French Dog Laboratories, https://investigations.peta.org/french-dog-laboratory-animal-testing/.

[6] People for the Ethical Treatment of Animals, Dogs at Texas A&M Bred to Suffer (March 14, 2017), https://www.youtube.com/watch?v=zFE0NvVk6l4.

[7] A plaintiff's allegations are presumed true and "'matters outside the pleadings' must be excluded by the court in deciding a motion to dismiss under Rule 12(b)(6)." *Zantiz v. Seal*, 602 F. App'x 154, 161 (5th Cir. 2015); *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 570. Documents attached "to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (citation omitted). Defendants have attached press releases detailing the "advocacy campaign" that PETA has placed at issue in this case. Am. Compl. ¶33. In attaching such materials, a "defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Id.* at 499.

[8] PETA Protesters Disrupt Texas A&M Board of Regents Meeting, https://www.peta.org/blog/peta-protesters-disrupt-texas-board-regents-meeting/.

[9] Ryan Tannehill Throws a Flag on TAMU's Cruel Dog Experiments, https://www.peta.org/blog/ryan-tannehill-tamu-cruel-dog-experiments/.

[10] Bill Maher Goes Apolitical to Save Dogs in Distress at Texas A&M University, https://www.peta.org/features/bill-maher-takes-on-tamu/.

[11] Huge Banners at College World Series Target Texas A&M Dog Laboratories, https://www.peta.org/blog/banners-fly-target-tamu-dog-lab/.

- July 12, 2017: PETA protesters disrupt University of Texas System Board of Regents meeting.[12]

- July 24, 2017: PETA accuses TAMU researcher of adopting a dog for the purpose of conducting cruel experiments on it.[13]

- September 6, 2017: PETA purchases large shopping mall ads and billboards in Houston stating that TAMU is crippling and killing dogs.[14]

- November 13, 2017: PETA displays large protest banner at TAMU's final home football game, then claims "Texas A&M University now knows that it can't hold any public events without animal rights protesters charging in."[15]

- November 21, 2017: PETA files complaint with Texas Attorney General accusing Texas A&M Foundation of improper fundraising tactics.[16]

- December 1, 2017: PETA protesters disrupt TAMU Past President's Dinner.[17]

- December 15, 2017: PETA protesters disrupt TAMU commencement exercises.[18]

- February 7, 2018: PETA protests TAMU Board of Regents meeting.[19]

- February 13, 2018: PETA protesters disrupt a speech by President Young.[20]

---

[12] Video: Protesters Disrupt Meeting, Demand End to Texas A&M Dog Torment, https://www.peta.org/blog/video-protesters-disrupt-meeting-demand-end-to-texas-am-dog-torment/.

[13] No Dogs Should Have to Live Like This, https://www.peta.org/features/buckley-spaniels-life-death-laboratory/.

[14] Michelle Kretzer, PETA Was Denied Ad Space Near Texas A&M—Here's How We Got Around It, https://www.peta.org/blog/peta-denied-ad-space-near-texas-heres-got-around/.

[15] Activists Bring Protest Against TAMU Dog Experiments to the Gridiron,  https://www.peta.org/blog/activists-bring-protest-tamu-dog-experiments-gridiron/.

[16] PETA Asks Attorney General to Investigate Texas A&M Foundation, https://www.peta.org/blog/texas-university-caught/.

[17] Zachary Toliver, PETA Crashes Texas A&M Dinner With a Message for the President, https://www.peta.org/blog/peta-crashes-texas-dinner-message-president/.

[18] Zachary Toliver, No Texas A&M Event Is Off-Limits, PETA Activists Crash Graduation Ceremony, https://www.peta.org/blog/no-texas-event-off-limits-peta-activists-crash-graduation-ceremony/.

[19] Protesters to Keep Dogs' Suffering in the Spotlight at Texas A&M Board Meeting, https://www.peta.org/media/news-releases/protesters-keep-dogs-suffering-spotlight-texas-board-meeting/.

[20] Dog Defenders Deliver 'Heart-Felt' Valentine at Texas A&M Luncheon, https://www.peta.org/blog/dog-defenders-deliver-heart-felt-valentine-texas-luncheon/.

- February 26, 2018: Five thousand TAMU employees receive robocalls from Lily Tomlin urging them to tell President Young to close the lab.[21]

- March 13, 2018: PETA protesters disrupt SXSW panel featuring President Young and two ambassadors.[22]

- March 26, 2018: PETA releases another video accusing TAMU of "cruel experiments" and referring to TAMU's DMD research lab as "trash island."[23]

- May 9, 2018: PETA protests TAMU commencement.[24]

PETA has also posted (and encouraged others to post) criticisms of TAMU's research on platforms including Facebook, Instagram, and Twitter. Am. Compl. ¶¶33, 34.

### c. TAMU allegedly begins filtering PETA's content from the University's official Facebook page.

TAMU has had little occasion to step in and moderate comments or visitor posts on its official Facebook page, instead relying upon its strong honor code[25] and culture of mutual respect. But TAMU remains free to ensure that its official page maintains its fundamental purpose. PETA alleges that, in December 2017, some of its attempted posts to TAMU's official page, "as well as content "tagging" TAMU, failed to appear on TAMU's Facebook [p]age." Am. Compl. ¶35. As a result, at an unspecified time, PETA claims that it conducted "tests" revealing "that a post containing any of the following words" would be "automatically hidden from public

---

[21] Michelle Kretzer, Lily Tomlin Calls 5,000 Texas A&M Staffers: Close the Dog Laboratory, https://www.peta.org/blog/lily-tomlin-calls-texas-am-cruelty/.
[22] Katherine Sullivan, MUST-WATCH: PETA Supporters Disrupt SXSW Panel Featuring Texas A&M President, https://www.peta.org/blog/peta-exposes-tamu-dog-lab-cruelty-at-sxsw-panel/.
[23] 'Isle of Dogs'-Style Video Highlights Texas A&M's Own Island of Lab Cruelty, https://www.peta.org/media/news-releases/isle-dogs-style-video-highlights-texas-ams-island-lab-cruelty/.
[24] Texas A&M Graduation to Face Protest Over Dog Experiments, https://www.peta.org/media/news-releases/texas-am-graduation-to-face-protest-over-dog-experiments/.
[25] *Aggie Code of Honor*, TEXAS A&M UNIVERSITY, *available at* http://www.tamug.edu/studentrules/Aggie_Code_of_Honor.html (visited July 22, 2018).

view on the TAMU Facebook Page: PETA, Cruel, Cruelty, Abuse, Torture, MD, Shut, Close, Stop, Lab, Testing, [and] Tests." Am. Compl. ¶37.

PETA also asserts that a January 2018 public information request to TAMU revealed that the following words "about PETA and its message" are filtered from the University's official Facebook page: "abuse, abusers, lab, md, and peta." Am. Compl. ¶¶38, 39. PETA alleges that this public information act request also revealed that the following words are filtered from TAMU's official Facebook page: "$, a$$, aggy, apartment, ass, bastard, bastards, bit card, giftcard, hook, hook em, hookem, hell, illuminati, ipaad, ipad2, ipadss, jersey, jetblue, job, ms, pad, padds, penis, sale, and shit." Am. Compl. ¶¶38, 39. PETA characterizes these words as "most[ly] profanity or commercial speech" Am. Compl. ¶39. PETA further claims that TAMU "manually removes other visitor posts and comments that are not captured by the word filter in order to prevent PETA and other critics of TAMU's dog lab from posting any information or opinions to the TAMU Facebook Page about their campaign to end canine muscular dystrophy experiments." Am. Compl. ¶45.

Based on the foregoing, PETA alleges that "[a]part from certain profane terms and terms closely related to automated spam, TAMU's blocked words are closely related to PETA's campaign and are designed to prevent speech critical of the dog laboratory from reaching the Facebook Page's audience." Am. Compl. ¶41. PETA does not, however, allege facts to support the conclusion that TAMU prevents all posts critical of its DMD research. Its factual allegations, at most, support only the conclusion that posts related to PETA's campaign against TAMU have been limited.

8

## II.   APPLICABLE LAW

### a.  Standard for dismissal under Rule 12(b)(6)

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper when a complaint fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 570. Though courts accept well-pleaded facts as true and construe them in favor of the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion, a complaint must provide "more than labels and conclusions, and a formulaic recitation of a cause of action's elements." *Funk v. Stryker Corp.*, 673 F. Supp. 2d 522, 525 (S.D. Tex. 2009), *aff'd* 631 F.3d 777 (5th Cir. 2011) (citing *Bell Atlantic v. Twombly,* 550 U.S. at 555). Rather, the factual allegations must be enough to "raise a right of relief above the speculative level," on the assumption that those factual allegations are true. *Twombly,* 550 U.S. at 555.

### b.  Forum analysis provides two First Amendment standards, depending upon the forum at issue.

The Supreme Court has emphasized that "[e]ven protected speech is not equally permissible in all places and at all times." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799 (1985) (citation omitted). Indeed, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the

speaker's activities." *Cornelius v. NAACP*, 473 U.S. at 799-800. "For First Amendment purposes, '[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.'" *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)).

Thus, "[t]he Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius*, 473 U.S. at 800. Though this case does not involve physical property, the Supreme Court "has employed forum analysis to determine when a governmental entity, *in regulating property in its charge*, may place limitations on speech." *Christian Legal Soc'y Ch. of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 (2010) (emphasis added). TAMU can moderate and filter (that is, regulate) content on its official Facebook page and has dedicated its social media presence to providing "full public access to Texas government information and services" related to the University. Am. Compl. ¶¶17, 18; Doc. 17-1 at 2. Thus, TAMU assumes for purposes of this motion[26] that forum analysis is the appropriate framework.[27]

---

[26] TAMU makes this assumption on the pleadings, but factual development may alter this analysis.
[27] *Compare, e.g., Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (forum principles apply when "government creates [] a forum, in either a literal or 'metaphysical' sense") *and Lehman v. City of Shaker Hts.*, 418 U.S. 298, 300 (1974) (where party sought access to ad space on city busses, ad spaces rather than busses was forum at issue) *with Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 675 (1998) ("Although public broadcasting as a general matter does not lend itself to scrutiny under the forum doctrine, candidate debates present the narrow exception to the rule.").

The Supreme Court has recognized four categories of fora: the traditional public forum, designated public forum, limited forum, and nonpublic forum. *Christian Legal Soc'y v. Martinez*, 561 U.S. at 679 n.11. Restrictions on First Amendment protected conduct in a traditional or designated forum are subject to strict scrutiny. Restrictions on First Amendment protected conduct in a limited or nonpublic forum, on the other hand, need only be reasonable and viewpoint neutral to pass constitutional muster. As explained below, TAMU's official Facebook page is a nonpublic or limited forum, as it has been set aside as a tool for TAMU to provide public access to University information and services. *E.g.*, Doc. 17-1.

> ### i. In traditional and designated public fora, government may limit the time, place, and manner of speech. Further restrictions must be tailored to the government's interest.

The <u>traditional</u> public forum exists—as the name suggests—by tradition, and includes public streets and parks "'which have immemorially been held in trust for the use of the public and, time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (citations omitted). To be a traditional public forum, it is not enough that a space is open to the public—it also must be "traditionally open to expressive activity." *United States v. Kokinda*, 497 U.S. 720, 727 (1990) (plurality op.) (sidewalk between Post Office and its parking lot was not a traditional public forum).[28]

---

[28] Though PETA has not argued that TAMU's official page is a traditional public forum, Am. Compl. ¶31, this discussion is included to provide a complete picture of forum jurisprudence.

A <u>designated</u> public forum "may be created by government designation of a place or channel of communication for use by the public at large." *Cornelius*, 473 U.S. at 802 (citing *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. at 45, 46 n.7). "To create a forum of this type, the government must intend to make the property 'generally available,' to a class of speakers." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. at 678 (quoting *Widmar v. Vincent*, 454 U.S. 263, 264 (1981)). "The government does not create a public forum by . . . permitting limited discourse, but only by *intentionally* opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802 (emphasis added). Importantly, "selective access does not transform government property into a public forum," it must be subject to "indiscriminate use" for its designated purpose. *Perry*, 460 U.S. at 47.

"In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (citing *Pleasant Grove City v. Summum*, 555 U.S. at 469). "The same standards apply in designated public forums." *Id.* A restriction survives strict scrutiny if it "furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2231 (2015) (citations omitted).

### ii. In limited and nonpublic fora, speech restrictions need only be viewpoint neutral and reasonable given the government's purpose in establishing the forum.

The government creates a <u>limited</u> forum when it opens property for expression "limited to use by certain groups" or "discussion of certain subjects." *Christian Legal Soc'y*, 561 U.S. at 679 n.11. "Recognizing a State's right 'to preserve the property under its control for the use to which it is lawfully dedicated,' the Court has permitted restrictions on access to a limited public forum" so long as "[a]ny access barrier [is] reasonable and viewpoint neutral." *Id.* at 679 (quoting *Cornelius*, 473 U.S. at 800 (quotation marks omitted in original)) (citing *Rosenberger v. Rector & Visitors of Univ. of Va. Sys.*, 515 U.S. 819, 829 (1995) (student activities fund available to registered student groups for activities related to University's purpose was a limited forum); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–107 (2001) (parties agreed and Court assumed school buildings made available outside school hours for educational activities and social, civic, or recreational meetings were limited forum); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392–393 (1993) (school district that permitted after-hours use of school facilities to display films about certain topics created limited or nonpublic forum); *Perry*, 460 U.S. at 46).

Finally, a <u>nonpublic</u> forum "exists '[w]here the government is acting as a proprietor[.]'" *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2251 (2015) (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–679 (1992)). Examples of nonpublic fora include airport terminals, polling places, school district internal mail systems, ad space on city busses, and a charitable

fundraising program targeting public employees. *Int'l. Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672; *Minn. Voters All. v. Mansky*, 138 S. Ct. at 1885; *Walker v. Sons of Confederate Veterans*, 135 S. Ct. at 2252 (citing *Perry*, 460 U.S. at 48-49; *Lehman v. Shaker Hts.*, 418 U.S. at 299; *Cornelius*, 473 U.S. at 804-06).

The jurisprudence leaves some ambiguity about whether and to what extent the limited and nonpublic forum differ. In *Walker v. Sons of Confederate Veterans*, the Court discussed the four types fora above (later rejecting all of them and articulating a doctrine of "government speech" not subject to the First Amendment). 135 S. Ct. at 2250-52. But in its most recent discussion of forum jurisprudence— *Minnesota Voters Alliance v. Mansky*—the Court stated that "[g]enerally speaking, our cases recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." 138 S. Ct. at 1885. Justice Thomas provided a similar characterization when, joined by Justice Alito, he dissented from denial of certiorari in *American Freedom Defense Initiative v. King County*,136 S. Ct. 1022 (2016) (("if the government creates a limited public forum (also called a nonpublic forum)—namely, 'a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects'—then speech restrictions need only be 'reasonable and viewpoint neutral.'") (citation omitted).")

But whatever the distinction—if any—between limited and nonpublic fora, the same standard of reasonableness and viewpoint neutrality applies in both. *See, e.g., Good News Club v. Milford Cent. Sch.*, 533 U.S. at 106–07 (in a limited forum,

14

restrictions on First Amendment protected activity "must not discriminate against speech on the basis of viewpoint, and the restriction must be 'reasonable in light of the purpose served by the forum[.]'") (citations omitted); *Minnesota Voters All.*, 138 S. Ct. at 1885 (in nonpublic forum, "[t]he government may reserve such a forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.") (citations and quotation marks omitted).

### III.    PETA has not plead a viable First Amendment claim.

The Supreme Court has recognized the need for caution in applying First Amendment law in the context of the modern internet. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736, 1734 (2017) ("[t]he forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow."); *id.* at 1743 (recognizing that, in the First Amendment context, "there are important differences between cyberspace and the physical world.") (Alito, J., concurring in the judgment).

With this caution in mind, the first step in forum analysis is to identify the relevant forum. *E.g., Cornelius*, 473 U.S. at 800 ("[t]o determine whether the First Amendment permits the Government to exclude respondents from the [charitable fundraising drive for public employees], we must first decide whether the forum consists of the federal workplace. . .or the [fundraising drive]." Here, PETA seeks unfettered ability to post to TAMU's official Facebook page. Am. Compl. at 25. The

page is the forum. "Having defined the relevant forum," the court "then determine[s] whether it is public or nonpublic in nature." *Cornelius*, 473 U.S. at 800.

### a. PETA's pleadings make clear that TAMU's official Facebook page is a limited or nonpublic forum.

In determining what type of forum the government created, courts look to "the government's intent with respect to the forum, and [] 'the nature of the [forum] and its compatibility with the speech at issue.'" *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d at 346 (citation omitted). The intent of TAMU's official Facebook page appears on the face of PETA's pleadings: to "enable[] full public access to Texas government information and services." Doc. 17-1 at 2. In the context of TAMU, this includes "information about educational opportunities, research advances, and University athletics." Am. Compl. ¶19. The page is further subject to TAMU's express policy that "user-generated posts…may be rejected or removed" for failure to meet TAMU's requirements—a policy plainly intended to ensure TAMU maintains control over its official page. *See* Am. Compl. ¶¶14-18, 25; Doc. 17-1 at 4 (noting TAMU's control over the content and audience of its page, including its right to remove user generated posts). Even PETA acknowledges that TAMU has a right to maintain control over its page to the extent necessary "to disseminate important information to the public…in a rapid and freely accessible manner." Am. Compl. ¶19.

Thus, PETA's allegations demonstrate that TAMU's official Facebook page is a forum "'[w]here the government is acting as a proprietor[.]'" *Walker*, 135 S. Ct. at 2251) (quoting *Int'l Soc'y for Krishna Consciousness,* 505 U.S. at 678–679). *Perry Education Association v. Perry Local Educators Association,* 460 U.S. 37, is

instructive in this regard. There, the Court concluded that a school district's internal mail system was a nonpublic forum because the district had not "opened its mail system for indiscriminate use by the general public." 460 U.S. at 48. As such, the Court held that the teachers' union could exclude a rival union from using that mail system. *Id.* at 52-55. Similarly here, TAMU has not opened its official Facebook page for anyone to share any content, whether not related to or consistent with the University's mission. Like the school district's mail system in *Perry*, TAMU's official Facebook page is a nonpublic forum.

Even if this Court were to conclude that TAMU's official Facebook page is not a nonpublic forum, it is at least a *limited* forum dedicated to "to the discussion of certain subjects." *Christian Legal Soc'y*, 561 U.S. at 679 n.11. Those subjects are topics of import to the University community, that are consistent with the purpose of providing public access to University information and services, and which comply with the requirements of the University's social media policy. Doc. 17-1. Indeed, if not subject to TAMU's direct control as a nonpublic forum, TAMU's page is at least analogous to the limited forum created when a school district allows members of the community to use its facilities after hours for civic meetings and educational endeavors. *E.g., Good News Club v. Milford Cent. Sch.*, 533 U.S. at 106; *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. at 390.

The page is not a public forum. PETA agrees at least that the page is not a *traditional* public forum, but nevertheless alleges that it "is a designated public forum" open to "all speech by all speakers." Am. Compl. ¶31. This argument is

incorrect on the face of PETA's Amended Complaint. Indeed, "[t]he government does not create a public forum by…permitting limited discourse," and "selective access does not transform government property into a public forum." *Cornelius*, 473 U.S. at 802; *Perry*, 460 U.S. at 47. Rather, "the government-like other property owners-'has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. at 679 (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)). Because PETA recognizes that TAMU's official Facebook page is focused on and limited to TAMU's efforts to maximize public access to information about University programs and services, it is not a forum "for *all* speech by *all* speakers." Am. Compl. ¶31.

Indeed, absurd results would follow from a finding that TAMU's official page is a designated public forum, because it would then be "open for indiscriminate public use for communicative purposes." *Lamb's Chapel*, 508 U.S. at 392. TAMU would have to allow anyone to post anything to its page, even posts wholly unrelated to TAMU (for example, spam advertisements for free iPads or designer sunglasses). PETA freely admits that TAMU does not allow this, and has instead created filters that *automatically* block posts containing certain (apparently frequently used) words that have nothing to do with PETA, but that communicate content that does not further the purpose of TAMU's official page. Am. Compl. ¶39 (listing additional filtered words including "apartment," "hook, hook em, [and] hookem," "illuminati," "jersey," "job," "pad," and "sale"). This content filtering affirmatively demonstrates that TAMU has created at most a limited forum for speech consistent with its articulated purpose.

### b. TAMU's alleged actions are viewpoint neutral and reasonable given the purpose of the University's official Facebook page.

In limited and nonpublic fora, the Supreme Court "[r]ecogniz[es] a State's right 'to preserve the property under its control for the use to which it is lawfully dedicated,'" so long as "[a]ny access barrier [is] reasonable and viewpoint neutral[.]") *Christian Legal Soc'y*, 561 U.S. at 679 (citations omitted). That standard is satisfied.

Reasonableness under the First Amendment is considered "'in light of the purpose served by the forum[.]'" *Good News Club v. Milford Cent. Sch.*, 533 U.S. at 106–07. In assessing reasonableness, courts consider whether alternative means of communication are available. *E.g., Perry*, 460 U.S. at 52. Here, PETA can (and as its press releases demonstrate, does) use numerous other channels to share its views on TAMU's DMD research. These include robo-calls, protests on and off campus, protests that PETA live-streams on Twitter, disrupting prominent University events, and using parts of Facebook other than TAMU's official page to express its views. *See supra* pp.5-7; Am. Compl. ¶¶33, 34. The alleged filters are particularly reasonable considering these myriad other avenues for PETA to pursue its advocacy campaign. *See, e.g., Christian Legal Soc'y*, 561 U.S. at 690-91 ("when access barriers are viewpoint neutral, our decisions have counted it significant that other available avenues for the group to exercise its First Amendment rights lessen the burden created by those barriers.") (collecting cases).

Particularly in the academic context, courts evaluating reasonableness have noted that educational institutions' "mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations

compatible with that mission upon the use of its campuses and facilities." *Widmar v. Vincent*, 454 U.S. at 268 n. 5; *see also, e.g., Perry*, 460 U.S. at 52 ("exclusion of the rival union may reasonably be considered a means of insuring labor-peace within the schools," which "serves to prevent the District's schools from becoming a battlefield for inter-union squabbles."). Here, as in *Perry*, any "differential access" PETA alleges would reasonable because it is "consistent with [TAMU's] legitimate interest in 'preserv[ing] the property...for the use to which it is lawfully dedicated.'" *Id.* at 50-51 (citation omitted). PETA's protest campaign posts are not "the forum's official business." *Id.* at 53. Thus, excluding such posts is reasonable given that the page's primary purpose is to allow TAMU to share information about its programs and services with the University community. Even if PETA's allegations are true, its posts were only excluded *after* they disrupted the use of the forum for that purpose. *See* Am. Compl. ¶¶35-38.

TAMU's alleged actions are also viewpoint neutral. Viewpoint neutrality is a simple concept—it forbids "an effort to suppress expression *merely* because public officials oppose the speaker's view." *Minnesota Voters All.*, 138 S. Ct. at 1885 (emphasis added). PETA fails this standard because it does not state that *all* posts criticizing TAMU's DMD research are filtered from the University's official Facebook page. PETA claims only that "PETA content that criticizes TAMU's dog labs" is filtered. Am. Compl. ¶43. This is not viewpoint discrimination.[29]

---

[29] It is worth noting that the Supreme Court's "decisions have long recognized that the government may impose some content-based restrictions on speech in [limited or] nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy." *Minn. Voters All.*, 138 S. Ct. at 1886 (collecting cases).

Indeed, even filtering the words "PETA, Cruel, Cruelty, Abuse, Torture, MD, Shut, Close, Stop, Lab, Testing, Tests" and "abusers" would leave a poster free to write—for example—"TAMU must end inhumane muscular dystrophy research on dogs." Am. Compl. ¶37, 39. This phrase surely expresses the same viewpoint PETA wishes to publicize. The allegedly filtered words also leave open a plethora of other ways to express disagreement with the use of canines in TAMU's DMD research, *even on the University's official page*. This is amply sufficient to satisfy the requirement of viewpoint neutrality.[30]

### c. The developing caselaw applying the First Amendment to the modern internet further emphasizes this result.

It is worth mentioning that courts across the country are making their first forays into forum analysis in the social media context. In part because of the nascent state of the law, no on-point, controlling caselaw has emerged. Cases that wade into this arena are primarily from other district courts and have distinct facts. They are therefore of limited use here.

Perhaps the best-known is the Southern District of New York's recent decision in *Knight First Amendment Institute. v. Trump*, 302 F. Supp. 3d 541, 549 (S.D.N.Y. 2018). There, the court considered "whether a public official may, consistent with the First Amendment, 'block' a person from his Twitter account in response to the political views that person has expressed, and whether the analysis differs because

---

[30] PETA's claim of speaker-based discrimination does not save this case. TAMU disputes that it has engaged in speaker-based discrimination, but even if it had, "[i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity." *Perry*, 460 U.S. at 49. And, to the extent that there is a distinction between the two, the same is true of a limited forum. *See, e.g.*, *Widmar*, 454 U.S. at 268 n. 5.

that public official is the President of the United States." *Id.* The Court answered both questions in the negative. *Id.*

Even if it were controlling (it is not), *Knight* is distinguishable on multiple grounds. Most glaringly, in *Knight*, "the individual plaintiffs were indisputably blocked as a result of viewpoint discrimination," because "shortly after" posting "tweets ... in which they criticized the President or his policies, the President blocked each of the Individual Plaintiffs." 302 F. Supp. 3d at 575. Here, PETA alleges only that posts are being filtered after PETA engaged in a prolonged campaign designed to disrupt TAMU's operations. Moreover, TAMU's alleged filtering is contemplated by the University's social media policy, and PETA has boasted of the disruption its campaign continues to cause the campus community. And, PETA has not alleged that all posts critical of TAMU's DMD research on canines are filtered. Thus, in contrast to *Knight*, PETA alleges no facts to support its unsubstantiated speculation that TAMU's filters are based upon a disagreement with PETA's views. The fact that TAMU is a governmental institution—while President Trump is an individual— further distinguishes *Knight*.[31]

In fact, another district court reached the opposite conclusion when presented with similar facts. In *Morgan v. Bevin*, the United States District Court for the Northern District of Kentucky declined to issue an injunction that would require

---

[31] *See also Davison v. Loudoun Cty.*, 267 F. Supp. 3d 702, 715, 717-18 (E.D. Va. 2017) (appeal dkt'd, 4th Cir. No. 17-2002) (where "no policy...played any role in Defendant [County Chair]'s decision to ban Plaintiff from her 'Chair Phyllis J. Randall' Facebook page" and Defendant "prohibit[ed] Plaintiff from participating in her online forum because she took offense at his claim that her colleagues in the County government had acted unethically," Defendant violated First Amendment).

Kentucky's governor to un-block users on Twitter and Facebook and refrain from blocking them in the future. 298 F. Supp. 3d 1003 (E.D. Ky. 2018). The court concluded that the Governor's social media accounts were subject to the government speech analysis set out in *Summum* and *Walker*. *Morgan v. Bevin*, 298 F. Supp. 3d at 1012 (citing *Summum*, 555 U.S. at 479 (permanent monuments in city park were government speech not subject to First Amendment); *Walker*, 135 S. Ct. at 2251 (State-issued specialty license plates were government speech not subject to First Amendment)). Under the government speech doctrine, the government is not subject to the First Amendment when selecting the expressive conduct it wishes to be associated with. *See id.* The district court in *Bevin* concluded that the Governor's expressive conduct on social media is not subject to the First Amendment, but instead, that "Governor Bevin is permitted to cull his desired message through his Facebook and Twitter page," and "is not required to allow the public to speak for him." 298 F. Supp. 3d at 1013.

Thus, even though they arise in the context of limiting speech on the modern internet, the Court need not tarry long on these distinguishable and non-controlling cases. Rather, straightforward application of mandatory authority is all that is required to dismiss this case for failure to state a claim. TAMU's official page is a nonpublic or limited forum, where the University may exclude speech that is not germane to the forum's purpose of enabling the public to access its information and services. This is all that PETA has accused TAMU of doing here.

## CONCLUSION

For these reasons, Defendant respectfully requests dismissal of this case for failure to state a claim upon which relief may be granted. *See* FED. R. CIV. P. 12(b)(6).

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

*/s/Anne Marie Mackin*
ANNE MARIE MACKIN
Attorney-in-Charge
Texas Bar No. 24078898
S.D. Tex. No. 2627567
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4074 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov

**ATTORNEYS FOR DEFENDANT**

24

**CERTIFICATE OF SERVICE**

I certify that on this 16th day of August 2018 the foregoing document was filed

via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General

25