UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL K. YOUNG, in his official capacity as President of Texas A&M University,<br><br>Defendant. | Civil Action No. 18-cv-1547 |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff in the above-captioned action, People for the Ethical Treatment of Animals, Inc. ("PETA"), respectfully moves the Court to enter summary judgment in its favor and against defendant Michael K. Young, in his official capacity as president of Texas A&M University ("TAMU"), and to grant the relief requested in the Amended Complaint (ECF Dkt. 17):

1.      Declare that TAMU's restrictions of PETA's speech on TAMU's Facebook Page are unconstitutional;

2.      Enter an injunction requiring TAMU to allow PETA to re-post its content in the forum and prohibiting TAMU from future use of automated filtering technology to limit PETA's speech from the forum; and

3.      Award PETA its costs, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988(b).

In support, Plaintiff files herewith

1

- Plaintiff's Memorandum Supporting Their Motion for Summary Judgment

- Plaintiff's Appendix of Undisputed Material Facts

- Attorney Declaration from Gabriel Walters, with exhibits, and

- Plaintiff's Proposed Order.

Plaintiffs respectfully request oral argument on this motion.

DATED:  March 27, 2019

Respectfully submitted:

*/s/ David Greene*
DAVID GREENE*
*Attorney-in-Charge for Plaintiff*
California Bar No. 160107
ADAM SCHWARTZ*
California Bar No. 309491
CAMILLE FISCHER*
Maryland Bar No. 201612130192
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
415.436.9333 telephone
415.436.9993 facsimile
davidg@eff.org
*Admitted *pro hac vice*
*Attorney-in-Charge for Plaintiff*

OF COUNSEL:

ADAM SCHWARTZ*
California Bar No. 309491
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
415.436.9333 telephone
415.436.9993 facsimile
adam@eff.org

CAMILLE FISCHER*
Maryland Bar No. 201612130192
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
415.436.9333 telephone
415.436.9993 facsimile
cfischer@eff.org

2

GABRIEL WALTERS*
District of Columbia Bar No. 1019272
U.S. District Court for D.C. No. 1019272
PETA Foundation
1536 16th Street NW
Washington, DC 20036
202.483.7382 telephone
gabew@petaf.org

LOCAL COUNSEL:

CHRISTOPHER W. ROTHFELDER
Texas State Bar No. 2408470
Southern District I.D. 2449594
Rothfelder & Falick, L.L.P.
1201 Louisiana St., Suite 550
Houston, TX 77002
713.220.2288 telephone
crothfelder@rothfelderfalick.com

*Motions for admission *pro hac vice* forthcoming

*Attorneys for Plaintiff*
*People for the Ethical Treatment of Animals, Inc.*

# EXHIBIT 1





THE PARTNERSHIP FOR

*A More Perfect Union*

at the

CONGRESSIONAL MANAGEMENT FOUNDATION

CongressFoundation.org

Made possible by grants from

**Blue Cross Blue Shield Association**
**DCI Group**
**VoterVoice**



# #SocialCongress 2015

Written by
**Bradford Fitch and Kathy Goldschmidt**

with assistance from
**Nicole Folk Cooper, James Vaughn, Jaime Werner,
Dylan Wulderk and Camille Mendoza**

## Special Thanks

We are grateful to our sponsors, Blue Cross Blue Shield Association, DCI Group, and VoterVoice, who have generously enabled us to produce this report. Their contributions further the important work of CMF's *Partnership for a More Perfect Union* and help promote a more effective and meaningful democratic dialogue.







© 2015, Congressional Management Foundation. All rights reserved.

This content is the intellectual property of the Congressional Management Foundation (CMF), and is protected by Title 17 of the United States Code covering copyright law. By copying and using this material, you are breaking federal law, and are subject to legal action as defined in Title 17, Chapter 5 of the United States Code. You have one way to prevent this level of action: **refrain from reproducing the mentioned works in any manner without the prior express written permission of CMF.** Federal law provides severe civil and criminal penalties for the unauthorized reproduction or distribution of copyrighted content. Criminal copyright infringement, including infringement without monetary gain, is investigated by the FBI and may constitute a felony punishable by up to five years in federal prison and/or a $250,000 fine.

The Partnership for a More Perfect Union at the Congressional Management Foundation

710 E Street SE
Washington, DC 20003
202-546-0100
CongressFoundation.org
@CongressFdn

# Table of Contents

**Methodology** ............................................................ **6**

**Introduction** ............................................................ **7**

**Key Findings** .......................................................... **9**

    Figure 1 ............................................................ 9

    Figure 2 ............................................................ 11

    Figure 3 ............................................................ 12

    Figure 4 ............................................................ 13

    Figure 5 ............................................................ 15

**About the Congressional Management Foundation** ...... **18**

**About the Partnership for a More Perfect Union** ......... **19**

# Methodology

This report is based on two online surveys conducted between July and August 2014, one of House and Senate Communications Directors and the other of House and Senate Legislative Directors and Legislative Assistants. CMF received a total of 116 responses. Of these respondents: 53% were communications staffers while 47% were legislative and policy staffers; 55% were employed by Democratic Members and 45% by Republican Members; 83% were employed in the House while 17% were employed in the Senate.

| ANALYSIS OF RESPONDENTS | |
|---|---|
| Total Responses | 116 |
| Party | 55% Democrat; 45% Republican |
| Chamber | 83% House; 17% Senate |
| Position/Title | 53% communications staffers;<br>47% legislative and policy staffers |
| Member Tenure | 56% were in office 11 years or more;<br>44% were in office 10 years or less |

Note: Surveys were in the field between July-August 2014.
Source: *#SocialCongress 2015*, Congressional Management Foundation.

# Introduction

"Social media is the ultimate equalizer. It gives a voice and a platform to anyone willing to engage." That statement by Internet entrepreneur Amy Jo Martin has profound implications in a democracy. Prior to the introduction of the Internet, the process of engaging elected officials was viewed as cumbersome and intimidating, perhaps only available to wealthy campaign donors. And prior to social media, email interactions with lawmakers were viewed by many as formal and robotic – mostly consisting of mass campaigns drafted by special interest lobbyists, forwarded to a congressional office by citizens who barely read the message, resulting in a bland form letter sent back by the legislator. (Sadly, this remains the most ubiquitous form of communication in our democracy.)

Yet social media is different, and is affecting the democratic dialogue in unexpected ways. The authenticity of a tweet or Facebook post, whether by a citizen or lawmaker, has the inescapable power to change minds. This report by the Congressional Management Foundation shows a glimpse at how that process happens. Through surveys of congressional staff, this research opens a window into the perceptions and motivations of how social media influences public policy decisions on Capitol Hill. For Members of Congress and congressional staff, the research offers a benchmark to compare their practices and attitudes with those of their colleagues. For citizens and advocacy groups, it offers exciting new ways to communicate with Congress.

Perhaps the most surprising and significant finding is how a relatively few number of citizens can affect Congress using social media. Eighty percent of congressional staff responding to these surveys noted that less than 30 posts to their office's social media platform would cause them to "pay attention." While the metric captured – getting an office to "pay attention" – may sound unimportant, it is not. It represents a conduit to the lawmaker and staff: access to policy decision-makers. And access is power. But on some levels the numbers shouldn't be surprising. Members of Congress, staff, and professional advocates (i.e., lobbyists) know full well that a small number of people, strategically positioned to engage a legislator, can make a difference. Any lawmaker would readily agree that two dozen like-minded citizens showing up at a town hall meeting would definitely get their attention. Social media allow for similar interactions. What's changed, though, is that now one can engage instantly from almost anywhere in the world with nothing more than a smartphone.

The other surprise to readers outside the Washington Beltway might be how much Congress seems to care about constituents' opinions. Regrettably, negative (and inaccurate) portrayals of Congress permeate all forms of media. A 2015 national public survey asked Americans whether

*Perhaps the most surprising and significant finding is how a relatively few number of citizens can influence Congress using social media.*

*"For those not regularly tuned in to what's going on in Washington, social media gives us the ability to share and engage with those people."*

—House Communications Director

they agreed with this statement: "My representative in Congress cares what I think."[1] Only 31 percent of respondents agreed. Yet in the CMF surveys of congressional staff, only three percent said "We don't review comments" on their social media platforms – suggesting a whopping 97 percent *do* review comments. Congress *is* listening and *does* care what constituents think. Countless CMF surveys and research projects with Members of Congress and staff over more than three decades confirm this surprising truth. (For an education on how Congress actually works, CMF recommends readers skip the third season of *House of Cards* and re-watch a few segments of *Schoolhouse Rock*.)

While the primary purpose of this research is to provide some practical insight into how congressional offices and citizens can use social media to build stronger relationships, a welcome secondary outcome might be to chip a few bricks from the wall of cynicism that separates people from politicians. To quote Margaret Mead, "Never doubt that a small group of thoughtful, committed citizens can change the world; indeed, it's the only thing that ever has." As this report shows, "a small group of thoughtful, committed citizens" can influence public policy. While we're still at the dawn of the marriage between social media and Congress, it's rather exciting to wonder about the potential this partnership could have for American democracy.

---

[1] The survey of 1,000 likely voters was conducted on September 8-9, 2015 by Rasmussen Reports. http://www.rasmussenreports.com/public_content/politics/mood_of_america/congressional_performance

# Key Findings

## 1. Senators and Representatives are more inclined to use social media than they were in the past.

Both communications and legislative staffers indicated that their bosses have become more open to social media in recent years. As Figure 1 shows, most of the respondents (84%) said Members of Congress have become more inclined to use social media while only 1% said their bosses had become less inclined to use it. This may seem an obvious statement, given the ubiquitous nature of social media in American society. However, Congress historically has been slow to adopt technology and integrate it into its operations. As noted in the 2011 CMF report, *#SocialCongress: Perceptions and Use of Social Media on Capitol Hill,* "[T]he legislative branch has adopted social media much more quickly than it adopted other technologies, such as fax machines, email and websites."[2]

> *"It gives us a way to let people back home see behind the scenes."*
>
> —Senate Legislative Staffer

**FIGURE 1.**



During the past few years, how has your Member/Senator's attitude towards social media changed?

- 84% — Become more inclined to use it
- 16% — Remained the same
- 1% — Become less inclined to use it

(n = 116)
Source: *#SocialCongress 2015*, Congressional Management Foundation.

**Implications:**

This finding suggests the trend to integrate social media into congressional office operations will continue. As natural turnover occurs, with new Members of Congress and staff coming to Congress from other business and government sectors, they will bring their workplace habits and expectations with them. Congressional institutional offices will continue to

---

[2] Congressional Management Foundation, 2011. *#SocialCongress: Perceptions and Use of Social Media on Capitol Hill.* http://www.congressfoundation.org/cwc-social-congress

> *"[Social media] is real-time feedback, amplification of message, interaction with multiple view-points, and the ability to share different content via different platforms."*
>
> —House Communications Director

feel pressure from Members and staff to provide support for technologies and platforms in common use outside Capitol Hill. Congressional offices will need to look for ways to integrate social media comments into their processes and decision-making. And citizen groups increasingly will include social media strategies as part of any effort to influence public policy.

## 2. Staff generally feel social media have improved relationships between constituents and Congress.

As Figure 2 shows, more than three-quarters (76%) of the respondents "agree" or "strongly agree" with the statement "social media enabled us to have more meaningful interactions with constituents," and nearly as many (70%) agreed that "social media have made Members/Senators more accountable to constituents." Additionally, 63% of staff feel that social media will surpass email and other forms of communications (in volume) in the next five years.

There appears to be a sense among staff that most of the comments they observe on social media are authentic. However, in their answers to open-ended questions, staff express some frustration with anonymous or angry rants that interfere with a thoughtful policy discussion. Nevertheless, staff value the immediacy and realism of these virtual public forums. This contrasts with staff views of mass email campaigns, which are viewed somewhat skeptically on Capitol Hill, in that they are usually facilitated by third party organizations, such as an association, nonprofit, or company. It is important to note, while congressional staff may view identical email form campaigns with skepticism, congressional staff also report that the results of these campaigns are tabulated and communicated to lawmakers, and therefore have some degree of influence over public policy discussions.[3]

### Implications:

At this time, social media appear to be avenues for citizens and Congress to have honest and (sometimes) thoughtful conversations about public policy. For those lawmakers who embrace these forums, they offer another way to gauge public opinion on issues, albeit an unscientific one. For citizens represented by public officials who are regularly engaged in social media, these platforms offer inexpensive, convenient, and genuine methods for having their voices heard in Washington.

---

[3] Congressional Management Foundation, 2011. *Communicating with Congress: Perceptions of Citizen Advocacy on Capitol Hill.* http://www.congressfoundation.org/cwc-perceptions

**FIGURE 2.**



Please indicate the extent to which you agree or disagree with the following statements.

| Statement | Strongly Agree | Agree |
|---|---|---|
| Social media enabled us to have more meaningful interactions with constituents | 23% | 53% |
| Social media have made Members/Senators more accountable to constituents | 20% | 50% |
| In the next 5-10 years more constituent communications will come in via social media than email, phone, and other means | 32% | 31% |
| Most of the social media postings to our platforms provide us enough information and context to determine if the post is from a constituent | 3% | 33% |

(n = 115)
Source: *#SocialCongress 2015*, Congressional Management Foundation.

# Outstanding Use of Social Media in Congress

**113TH CONGRESS GOLD MOUSE AWARDS FOR CITIZEN ENGAGEMENT ON SOCIAL MEDIA**

In 2014, CMF extended its research into best practices in online communications to congressional use of social media. CMF recognized 17 Members of Congress for their efforts in using these tools in specific ways to further transparency, accountability, and constituent service. For congressional staff, CMF summarized the common characteristics of winners and documented examples of legislators and staff using social media to connect with constituents and make Congress more understandable to the public.

Find out more at: http://www.congressfoundation.org/projects/gold-mouse-project/

*"With budget cuts, social [media] gives us a space outside of our Congressional website to share the Congressman's thoughts and stance on important issues, as well as gauge constituents' opinions."*

—House Communications Director

### 3. Thirty or fewer similar comments on a social media post are enough to get an office's attention, but they need to be posted quickly or they may not be seen.

Legislative staffers and communications staffers were aligned on how many comments it takes for their offices to pay attention. As Figure 3 shows, about one-third (35%) of the respondents said it takes fewer than 10 similar comments for their offices to pay attention, and nearly half (45%) said their offices will pay attention to between 10 and 30 similar comments. Interviews with congressional staff and observations of congressional social media use suggest that respondents are primarily referring to reactions to *their own* posts. In essence, Congress appears to be using Facebook and Twitter as instantaneous means to receive feedback on legislators' statements.

However, as Figure 4 shows, the more time that passes after an office posts on social media, the less likely it will be that staff will review the response. One-quarter (25%) of the respondents indicated their offices will review comments no matter how long it has been since they posted, but most said their offices will be less likely to see comments to older posts as time goes on.

**FIGURE 3.**



How many similar comments on a social media post is enough for your office to pay attention to?

- Less than 10: 35%
- 10-30: 45%
- More than 30: 21%

(n = 110)
Source: *#SocialCongress 2015*, Congressional Management Foundation.

**FIGURE 4.**



**How long after posting an office/Member comment will you review reactions?**

| | |
|---|---|
| Up to 6 hours | **54%** |
| Up to 24 hours | **40%** |
| Up to 72 hours | **32%** |
| Up to 1 week | **23%** |
| Up to 2 weeks | **6%** |
| Up to 1 month | **4%** |
| It doesn't matter how old the reactions are, we'll still review them | **25%** |

(n = 114)
Note: Answers do not equal 100% because respondents were asked to "check all that apply."
Source: *#SocialCongress 2015*, Congressional Management Foundation.

## Implications:

Prior to social media, in order to gain the attention of lawmakers and staff, individuals and groups either had to: organize small cadres to attend in-person events where lawmakers and staff were present; generate significant numbers of constituent comments through postal, email and phone campaigns; or develop long-term relationships with the staff and Member through repeated interactions and/or involvement in the legislator's election campaigns. These other methods are still available to citizens, and research by CMF and other organizations show they remain successful strategies for getting heard by lawmakers. Social media now offer an alternative, with significant efficiency and effectiveness benefits.

However, facilitating grassroots advocacy via social media also presents a challenge. The average citizen doesn't have two dozen advocates ready to act on a moment's notice. And grassroots experts at associations, nonprofits, and companies often remark that mobilizing their supporters on social media is extremely hard. Therefore, this suggests that organized groups with access to constituent lists employ strategies to *anticipate* a lawmaker's social media postings. Consider when a lawmaker will make a statement at a committee hearing or introduce a new bill. They must also train and prepare their network *before* they need them. (Said another way by communications experts, once you hear the thunder it's too late to build the ark.) By encouraging supporters to build social media relationships

> *"Because of the high number of Internet users who maintain some level of anonymity on social media, the level of dialogue can devolve and inter-actions can seem counterproductive at times."*
>
> —House Communications Director

with Congress as an ongoing practice, citizens and groups will be in position to offer comments and reactions to legislators' posts when it is most relevant.

## 4. Social media posts by constituents can influence undecided Senators and Representatives, but staff generally do not feel social media posts provide enough information to identify constituents.

Though few of the respondents said constituent input via social media would have "a lot" of influence on their boss if he/she had not arrived at a firm decision on an issue, many felt it would have "some" influence (see Figure 5).[4] Legislators' constituents using social media clearly can get the attention of a congressional office, particularly if they self-identify, which increases their influence.

However, as previously shown in Figure 2, congressional staff indicated that they have a hard time identifying when social media posts are from constituents. Just over one-third (36%) of the respondents indicated they "agree" or "strongly agree" with the statement, "Most of the social media posts to our platforms provide us enough information and context to determine if the post is from a constituent."

### Implications:

Despite overwhelming cynicism as to whether Congress "listens" to citizens, this finding supports previous CMF research indicating that constituents can have an impact on lawmakers' decisions.[5] For Congress, this finding could help to reaffirm citizens' trust in their democratic institutions, knowing that their elected officials actually care about what they think.

Additionally, unlike other forms of communications (email, letters, phone calls), social media appear to be the only communications platforms in which *non-constituents* can influence lawmakers. Since the age of the modern Congress – established in the 1970s, when offices were accorded staff and resources enough to manage and respond to growing amounts of correspondence – lawmakers have used both human and technological filters to ensure only constituent messages get through. Yet no such filters exist for Facebook and Twitter. Therefore, while lawmakers value the authenticity of comments in social media, they cannot be certain the messages are from constituents *unless* the constituent identifies

---

[4] This question is based on and is similar to a question posed in previous CMF surveys: "If your Member of Congress has not arrived at a firm decision on an issue, how much influence might the following advocacy strategies directed to the Washington office have on his or her decision?"

[5] Congressional Management Foundation, 2011. *Communicating with Congress: Perceptions of Citizen Advocacy on Capitol Hill.* http://www.congressfoundation.org/cwc-perceptions

themselves as such. According to this data, those individuals who do confirm their constituent status are more likely to influence decision-making than those who do not.

Finally, it seems important to note that 59% of the survey respondents indicated that "a constituent" could have some or a lot of influence. One constituent. Through CMF's work with Congress during the last 38 years we have regularly heard stories from lawmakers about the "one constituent" who told them a story or made a personal plea regarding public policy that moved them to action. They may have encountered that person during an organized fly-in to Washington, at a town hall meeting, in the grocery store, or at their child's baseball game. The power of that single person's story or argument could influence a tie-breaking vote in committee, lead to the introduction of legislation, or become the human face that symbolizes the impact of policy on an entire community of Americans. This finding suggests that one voice now has another way to influence public policy: social media.

> *"It's an opportunity to have an unfiltered view of the member's stance on a particular issue or reaction to a news story."*
>
> — House Communications Director

**FIGURE 5.**



**If your Member of Congress has not arrived at a firm decision on an issue, how much influence might social media posts directed to your office (including posts on your office/Member platforms) from the following have on his/her decision?**

| | |
|---|---|
| Multiple constituents affiliated with a specific group or cause | 78% |
| A leader or representative of a constituent group | 75% |
| Multiple constituents not affiliated with a specific group or cause | 71% |
| The official account of a group that represents constituents | 69% |
| A constituent affiliated with a specific group or cause | 69% |
| A constituent not affiliated with a specific group or cause | 59% |
| Social media comments in general | 56% |
| More than one person with unclear constituent status | 25% |
| A person with unclear constituent status | 21% |

■ Some or A Lot of Influence

(n = 114)
Source: *#SocialCongress 2015*, Congressional Management Foundation.

# When Social Media Tipped the Scales in Congress: The SOPA-PIPA Debate 2011-2012

While analysts, reporters, and researchers have sought to identify clear examples where social media changed the outcome of a legislative debate, nothing comes remotely close to the case study involving the Stop Online Piracy Act (SOPA) and the Protect Intellectual Property Act (PIPA) that raged from late 2011 to early 2012. As the debate unfolded, CMF initiated a research study on the topic. In real time, we collected data on the activity of proponents and opponents, interviewed congressional staff on the impact of advocacy efforts, and assessed how this campaign compared to other campaigns.

In part through the effective use of social media, the anti-SOPA-PIPA coalition won the day after then-Senate Majority Leader Harry Reid pulled the bill from the floor and cancelled a vote due to lack of support for the legislation. Prior to that decision, 18 Members of Congress who had cosponsored the bills took the unusual action of "un-cosponsoring" the bills. Politicians reversing themselves on positions and legislation are rare – and the number who actually removed their names as cosponsors of the bills is likely the largest number to do so in the history of the Congress.

## BACKGROUND

The Stop Online Piracy Act (SOPA) and the Protect Intellectual Property Act (PIPA) were introduced respectively by the chairs of the House and Senate Judiciary Committees, Representative Lamar Smith (R-TX) and Senator Patrick Leahy (D-VT). According to bill sponsors, the legislation was intended to restrict access to pirated material online and "expand the ability of U.S. law enforcement to fight online trafficking in copyrighted intellectual property and counterfeit goods."

Initially, the bills had bipartisan support and the backing of a wide swath of businesses with a stake in protecting their interests and content including: Comcast, Wal-Mart, the AFL-CIO, Disney, the Motion Picture Association of America, and the U.S. Chamber of Commerce. However, in the summer of 2011 opposition started to coalesce under a "free speech" and "anti-censorship" banner. Eventually, opponents included: Google, Yahoo, Facebook, Wikimedia, Mozilla, ACLU, and Human Rights Watch. (Despite the "internet grassroots" versus "big media businesses" appearance of the battle, according to lobbyist disclosure forms, opponents actually hired more paid lobbyists than proponents.)

## THE BATTLE

While the bills moved through committee in 2011, the American Censorship coalition (opponents) didn't officially form until November of 2011. The rapid rise of this coalition, primarily using social media, was one of the unique hallmarks of this debate. In December 2011 through January 2012, legislators, outside groups, and especially Internet-related organizations and companies quickly began to voice opposition. On January 13, 2012, a group of Republican Senators sent a letter to Senator Reid asking him to delay the vote. On January 14, the White House announced

its opposition. And the climax occurred on January 18 when major internet companies including Google, WordPress, Wikipedia, Tumblr, Craigslist, and Twitter "blacked-out" their websites in protest of SOPA-PIPA. (Note: only Wikipedia actually denied access – others used graphics to denote their protest.)

When the campaign was tallied the numbers told an incredible story. More than 4 million emails were sent to Congress in protest through three major websites. More than 10 million petition signatures were collected by five organizations. Twitter logged 2.4 million PIPA-related tweets on blackout day. And on January 18 blackout day was the lead story on nearly every major media outlet in the U.S.

## CONGRESSIONAL RESPONSE

In early November 2011, 37 Senators had announced support for the bill, while one was opposed. By January 18, 2012, 30 Senators supported the bill and 33 opposed. But the numbers don't provide a complete picture of Congress' reaction to this campaign. In CMF interviews with congressional staff, some staffers felt that the anti-SOPA-PIPA campaign used misleading tactics, exaggerating or misrepresenting the impact the bill would have on "Internet freedom." On blackout day, Wikipedia was inaccessible, except for a message asking visitors to "Imagine a world without free knowledge" and declaring that the legislation "could fatally damage the free and open Internet."

Neither bill has been considered in the 114th Congress.

## ANALYSIS

After the campaign, some technology experts heralded it as the "political coming of age of the tech industry." Another said it would "reinvent how we carry out democratic politics." While these predictions still may come to pass, they have not yet. Congress has not seen a social media campaign approaching the scope and impact of the SOPA-PIPA debate.

Congressional staff reported that this episode did contain aspects different from traditional campaigns. They noted the demographic of constituents contacting Congress was younger. Additionally, many legislators were caught by surprise that a relatively arcane issue (intellectual property) could catch fire, with events changing so rapidly. Both of these observations suggest that social media was a key contributor to these aspects of the campaign.

However, the SOPA-PIPA debate also had the fundamental components of any successful organic grassroots campaign, irrespective of the social media component. Proponents used a powerful word, "censorship," which has an emotional appeal connecting to citizens' values and beliefs. They had a specific "ask": "don't cosponsor" or "vote no," which provided clear means for holding legislators accountable. And there was a deadline: a vote was to be held in January 2012. These same elements have been seen before, including the immigration debate of 2006, which resulted in the demise of bipartisan legislation backed by President George W. Bush and powerful economic interests in Washington. The emotional word used then was "amnesty," but it had the same effect: tens of thousands of Americans petitioned their Congress to do their bidding … and the Congress obeyed.

# About the
# Congressional Management Foundation

*Established 1977*

## Who We Are

Citizen trust in an effective and responsive Congress is essential to democracy. Since 1977, the Congressional Management Foundation (CMF) has advanced this goal by working directly with Members of Congress and staff to enhance their operations and interactions with constituents. CMF also works directly with citizen groups to educate them on how Congress works, giving constituents a stronger voice in policy outcomes. The aspirations are: a Congress more accountable, transparent, and effective; and an informed citizenry with greater trust in their democratic institutions.

## What We Accomplish

CMF enhances the effectiveness of congressional offices, enabling them to provide better services for their constituents and create better policy outcomes for all Americans.

CMF promotes transparency and accountability in Congress, affording citizens data and tools to become more informed about decisions that affect them, their families, and communities.

CMF educates and motivates individuals to become active and informed citizen-advocates, providing them with an understanding of Congress, the skills to influence public policy, and the value of citizen engagement.

CMF enhances the public's understanding of how the Congress really works, providing a window into our democratic institutions through its unique relationship with lawmakers and staff.

### Quick Facts

- More than 350 congressional offices participated in the 80 training programs CMF conducted in 2014.

- In 2014, CMF conducted 67 educational sessions with groups involving thousands of citizens on effective interactions with Congress.

- Since CMF has been assessing congressional websites and urging more transparent practices, the percentage of Members of Congress who post their voting record online has doubled.

- Since 2000, CMF has conducted more than 500 strategic planning or other consulting projects with Members of Congress and their staffs.

## How We Do It

CMF conducts professional development training and consultations for all levels of congressional staff to strengthen their office operations and management. CMF provides research, training, and publications to citizens and groups so they can better to enhance their interactions with Congress. CMF critiques and explains Congress—demystifying its operations. CMF conducts primary research on Congress and provides best practices guidance on office operations.

For more information, contact CMF at 202-546-0100 or visit **www.CongressFoundation.org**.

THE PARTNERSHIP FOR

# A More Perfect Union

at the

CONGRESSIONAL MANAGEMENT FOUNDATION

"We in America do *not* have government by the majority. We have government by the majority who participate."

—Thomas Jefferson

## *Become a Partner in Enriching the Relationship Between Citizens and Congress*

The *Partnership* is a subscription program within CMF that seeks to further our nation's progress toward "a more perfect union" by fostering the genuine and effective exchange of ideas between Members of Congress and citizens.

We conduct communications best practices research and help forge relationships between congressional staff, advocates, and citizens through presentations, webinars and videos based on CMF research.

### Topics of Presentations

- "Screaming Monkeys, Roaring Lions: Making Noise vs. Making a Difference on Capitol Hill"
- "Use Social Media to Build Relationships with Lawmakers"
- "Build an Event in the State Members of Congress Will Attend"
- "Turn a 10-Minute Meeting with a Legislator into a Life-Long Relationship"
- "Tell a Story to Win the Hearts, Minds, and Votes of Lawmakers"
- "Build Relationships with Freshmen Lawmakers"

*"Our members were buzzing about the CMF presentation! The facts, charts, and anecdotes not only engaged them but captured them. They left the session knowing that their work in member advocacy is more important than ever."*

—Laura Vogel, Manager of Federal Member Advocacy, National Association of REALTORS®

CMF's *Partnership for a More Perfect Union* is dedicated to enhancing the relationship, understanding, and communications between citizens and Congress.

All *Partnership* content is protected by copyright laws and cannot be reproduced without the expressed authorization of a CMF representative.

For more details on the *Partnership*, visit **CongressFoundation.org** or contact CMF at 202-546-0100.



THE PARTNERSHIP FOR

*A More Perfect Union*

at the

CONGRESSIONAL MANAGEMENT FOUNDATION

CongressFoundation.org

SPONSORED BY







# EXHIBIT 2

## Facebook Reports First Quarter 2018 Results

MENLO PARK, Calif. – April 25, 2018 – Facebook, Inc. (Nasdaq: FB) today reported financial results for the quarter ended March 31, 2018.

"Despite facing important challenges, our community and business are off to a strong start in 2018," said Mark Zuckerberg, Facebook founder and CEO. "We are taking a broader view of our responsibility and investing to make sure our services are used for good. But we also need to keep building new tools to help people connect, strengthen our communities, and bring the world closer together."

### First Quarter 2018 Financial Highlights

| In millions, except percentages and per share amounts | Three Months Ended March 31, | | Year-over-Year % Change |
|---|---|---|---|
| | 2018 | 2017 | |
| Revenue: | | | |
| Advertising | $ 11,795 | $ 7,857 | 50 % |
| Payments and other fees | 171 | 175 | (2)% |
| Total revenue | 11,966 | 8,032 | 49 % |
| Total costs and expenses | 6,517 | 4,705 | 39 % |
| Income from operations | $ 5,449 | $ 3,327 | 64 % |
| *Operating margin* | *46%* | *41%* | |
| Provision for income taxes | $ 622 | | |
| *Effective tax rate* | *11%* | | |
| Net income | $ 4,988 | $ 3,064 | 63 % |
| Diluted Earnings per Share (EPS) | $ 1.69 | $ 1.04 | 63 % |

### First Quarter 2018 Operational and Other Financial Highlights

- **Daily active users (DAUs)** – DAUs were 1.45 billion on average for March 2018, an increase of 13% year-over-year.
- **Monthly active users (MAUs)** – MAUs were 2.20 billion as of March 31, 2018, an increase of 13% year-over-year.
- **Mobile advertising revenue** – Mobile advertising revenue represented approximately 91% of advertising revenue for the first quarter of 2018, up from approximately 85% of advertising revenue in the first quarter of 2017.
- **Capital expenditures** – Capital expenditures for the first quarter of 2018 were $2.81 billion.
- **Cash and cash equivalents and marketable securities** – Cash and cash equivalents and marketable securities were $43.96 billion at the end of the first quarter of 2018.
- **Headcount** – Headcount was 27,742 as of March 31, 2018, an increase of 48% year-over-year.

In April 2018, we increased the amount authorized under our share repurchase program by an additional $9.0 billion. Our board of directors originally authorized repurchases of up to $6.0 billion of our Class A common stock under the repurchase program, and this increase is incremental to the original authorization.

## Webcast and Conference Call Information

Facebook will host a conference call to discuss the results at 2 p.m. PT / 5 p.m. ET today. The live webcast of Facebook's earnings conference call can be accessed at investor.fb.com, along with the earnings press release, financial tables, and slide presentation. Facebook uses the investor.fb.com and newsroom.fb.com websites as well as Mark Zuckerberg's Facebook Page (https://www.facebook.com/zuck) as means of disclosing material non-public information and for complying with its disclosure obligations under Regulation FD.

Following the call, a replay will be available at the same website. A telephonic replay will be available for one week following the conference call at +1 (404) 537-3406 or +1 (855) 859-2056, conference ID 6068418.

## About Facebook

Founded in 2004, Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them.

## Contacts

Investors:
Deborah Crawford
investor@fb.com / investor.fb.com

Press:
Vanessa Chan
press@fb.com / newsroom.fb.com

**Forward Looking Statements**

This press release contains forward-looking statements regarding our future business expectations, which are subject to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are only predictions and may differ materially from actual results due to a variety of factors including: our ability to retain or increase users and engagement levels; our reliance on advertising revenue; our dependency on mobile operating systems, networks, and standards that we do not control; risks associated with new products and changes to existing products as well as other new business initiatives; our emphasis on user growth and engagement and the user experience over short-term financial results; maintaining and enhancing our brand and reputation; our ongoing safety, security, and content review efforts; competition; litigation and government inquiries; privacy and regulatory concerns; risks associated with acquisitions; security breaches; and our ability to manage growth and geographically-dispersed operations. These and other potential risks and uncertainties that could cause actual results to differ from the results predicted are more fully detailed under the caption "Risk Factors" in our Annual Report on Form 10-K filed with the SEC on February 1, 2018, which is available on our Investor Relations website at investor.fb.com and on the SEC website at www.sec.gov. Additional information will also be set forth in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2018. In addition, please note that the date of this press release is April 25, 2018, and any forward-looking statements contained herein are based on assumptions that we believe to be reasonable as of this date. We undertake no obligation to update these statements as a result of new information or future events.

**Non-GAAP Financial Measures**

To supplement our condensed consolidated financial statements, which are prepared and presented in accordance with generally accepted accounting principles in the United States (GAAP), we use the following non-GAAP financial measures: revenue excluding foreign exchange effect, advertising revenue excluding foreign exchange effect and free cash flow. The presentation of these financial measures is not intended to be considered in isolation or as a substitute for, or superior to, financial information prepared and presented in accordance with GAAP. Investors are cautioned that there are material limitations associated with the use of non-GAAP financial measures as an analytical tool. In addition, these measures may be different from non-GAAP financial measures used by other companies, limiting their usefulness for comparison purposes. We compensate for these limitations by providing specific information regarding the GAAP amounts excluded from these non-GAAP financial measures.

We believe these non-GAAP financial measures provide investors with useful supplemental information about the financial performance of our business, enable comparison of financial results between periods where certain items may vary independent of business performance, and allow for greater transparency with respect to key metrics used by management in operating our business.

We exclude the following items from our non-GAAP financial measures:

*Foreign exchange effect on revenue*. We translated revenue for the three months ended March 31, 2018 using the prior year's monthly exchange rates for our settlement currencies other than the U.S. dollar, which we believe is a useful metric that facilitates comparison to our historical performance.

*Purchases of property and equipment*. We subtract purchases of property and equipment in our calculation of free cash flow because we believe that this methodology can provide useful supplemental information to help investors better understand underlying trends in our business. Free cash flow is not intended to represent our residual cash flow available for discretionary expenditures.

For more information on our non-GAAP financial measures and a reconciliation of GAAP to non-GAAP measures, please see the "Reconciliation of GAAP to Non-GAAP Results" table in this press release.

## FACEBOOK, INC.
### CONDENSED CONSOLIDATED STATEMENTS OF INCOME
*(In millions, except for per share amounts)*
*(Unaudited)*

| | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Revenue | $ 11,966 | $ 8,032 |
| Costs and expenses: | | |
| Cost of revenue | 1,927 | 1,159 |
| Research and development | 2,238 | 1,834 |
| Marketing and sales | 1,595 | 1,057 |
| General and administrative | 757 | 655 |
| Total costs and expenses | 6,517 | 4,705 |
| Income from operations | 5,449 | 3,327 |
| Interest and other income, net | 161 | 81 |
| Income before provision for income taxes | 5,610 | 3,408 |
| Provision for income taxes | 622 | 344 |
| Net income | $ 4,988 | $ 3,064 |
| Less: Net income attributable to participating securities | 1 | 5 |
| Net income attributable to Class A and Class B common stockholders | $ 4,987 | $ 3,059 |
| | | |
| Earnings per share attributable to Class A and Class B common stockholders: | | |
| Basic | $ 1.72 | $ 1.06 |
| Diluted | $ 1.69 | $ 1.04 |
| Weighted average shares used to compute earnings per share attributable to Class A and Class B common stockholders: | | |
| Basic | 2,906 | 2,891 |
| Diluted | 2,945 | 2,944 |
| Share-based compensation expense included in costs and expenses: | | |
| Cost of revenue | $ 56 | $ 34 |
| Research and development | 718 | 670 |
| Marketing and sales | 109 | 96 |
| General and administrative | 72 | 67 |
| Total share-based compensation expense | $ 955 | $ 867 |

**FACEBOOK, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
*(In millions)*
*(Unaudited)*

| | March 31, 2018 | December 31, 2017 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 12,082 | $ 8,079 |
| Marketable securities | 31,874 | 33,632 |
| Accounts receivable, net of allowances of $204 and $189 as of March 31, 2018 and December 31, 2017, respectively | 5,115 | 5,832 |
| Prepaid expenses and other current assets | 1,341 | 1,020 |
| Total current assets | 50,412 | 48,563 |
| Property and equipment, net | 16,211 | 13,721 |
| Intangible assets, net | 1,735 | 1,884 |
| Goodwill | 18,268 | 18,221 |
| Other assets | 2,319 | 2,135 |
| **Total assets** | $ 88,945 | $ 84,524 |
| | | |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 593 | $ 380 |
| Partners payable | 396 | 390 |
| Accrued expenses and other current liabilities | 4,003 | 2,892 |
| Deferred revenue and deposits | 94 | 98 |
| Total current liabilities | 5,086 | 3,760 |
| Other liabilities | 6,239 | 6,417 |
| Total liabilities | 11,325 | 10,177 |
| Stockholders' equity: | | |
| Common stock and additional paid-in capital | 41,134 | 40,584 |
| Accumulated other comprehensive loss | (294) | (227) |
| Retained earnings | 36,780 | 33,990 |
| Total stockholders' equity | 77,620 | 74,347 |
| **Total liabilities and stockholders' equity** | $ 88,945 | $ 84,524 |

## FACEBOOK, INC.
## CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
*(In millions)*
*(Unaudited)*

| | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017* |
| **Cash flows from operating activities** | | |
| Net income | $ 4,988 | $ 3,064 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 949 | 671 |
| Share-based compensation | 955 | 867 |
| Deferred income taxes | (47) | (84) |
| Other | 8 | 5 |
| Changes in assets and liabilities: | | |
| Accounts receivable | 788 | 609 |
| Prepaid expenses and other current assets | (365) | (365) |
| Other assets | 22 | 31 |
| Accounts payable | 1 | (10) |
| Partners payable | 2 | (3) |
| Accrued expenses and other current liabilities | 707 | 61 |
| Deferred revenue and deposits | (5) | (10) |
| Other liabilities | (143) | 222 |
| **Net cash provided by operating activities** | 7,860 | 5,058 |
| **Cash flows from investing activities** | | |
| Purchases of property and equipment | (2,812) | (1,271) |
| Purchases of marketable securities | (4,022) | (6,992) |
| Sales of marketable securities | 4,330 | 1,762 |
| Maturities of marketable securities | 1,267 | 599 |
| Acquisitions of businesses, net of cash acquired, and purchases of intangible assets | (49) | — |
| Other investing activities, net | (1) | (18) |
| **Net cash used in investing activities** | (1,287) | (5,920) |
| **Cash flows from financing activities** | | |
| Taxes paid related to net share settlement of equity awards | (832) | (771) |
| Repurchases of Class A common stock | (1,774) | (228) |
| Other financing activities, net | 3 | 7 |
| **Net cash used in financing activities** | (2,603) | (992) |
| **Effect of exchange rate changes on cash, cash equivalents, and restricted cash** | 36 | 28 |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | 4,006 | (1,826) |
| Cash, cash equivalents, and restricted cash at beginning of year | 8,204 | 9,109 |
| **Cash, cash equivalents, and restricted cash at end of the period** | $ 12,210 | $ 7,283 |
| | | |
| **Reconciliation of cash, cash equivalents, and restricted cash to the condensed consolidated balance sheets** | | |
| Cash and cash equivalents | $ 12,082 | $ 7,104 |
| Restricted cash, included in prepaid expenses and other current assets | 14 | 85 |
| Restricted cash, included in other assets | 114 | 94 |
| **Total cash, cash equivalents, and restricted cash** | $ 12,210 | $ 7,283 |

*Prior-period information has been retrospectively adjusted due to our adoption of ASU No. 2016-18, *Statement of Cash Flows, Restricted Cash* (Topic 230) on January 1, 2018.

**FACEBOOK, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(In millions)*
*(Unaudited)*

| | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017* |
| **Supplemental cash flow data** | | |
| Cash paid during the period for: | | |
| Income taxes, net | $ 736 | $ 664 |
| Non-cash investing and financing activities: | | |
| Net change in accounts payable, accrued expenses and other current liabilities, and other liabilities related to property and equipment additions | $ 450 | $ (26) |
| Change in unsettled repurchases of Class A common stock | $ 141 | $ — |

*Prior-period information has been retrospectively adjusted due to our adoption of ASU No. 2016-18, *Statement of Cash Flows, Restricted Cash* (Topic 230) on January 1, 2018.

**Reconciliation of GAAP to Non-GAAP Results**

*(In millions, except percentages)*

*(Unaudited)*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| GAAP revenue | $ 11,966 | $ 8,032 |
| Foreign exchange effect on 2018 revenue using 2017 rates | (536) | |
| Revenue excluding foreign exchange effect | $ 11,430 | |
| GAAP revenue year-over-year change % | 49% | |
| Revenue excluding foreign exchange effect year-over-year change % | 42% | |
| GAAP advertising revenue | $ 11,795 | $ 7,857 |
| Foreign exchange effect on 2018 advertising revenue using 2017 rates | (535) | |
| Advertising revenue excluding foreign exchange effect | $ 11,260 | |
| GAAP advertising revenue year-over-year change % | 50% | |
| Advertising revenue excluding foreign exchange effect year-over-year change % | 43% | |
| | | |
| Net cash provided by operating activities | $ 7,860 | $ 5,058 |
| Purchases of property and equipment | (2,812) | (1,271) |
| Free cash flow | $ 5,048 | $ 3,787 |

8

# EXHIBIT 3

# Facebook Q1 2018 Results

**facebook**

investor.fb.com



# Daily Active Users (DAUs)
In Millions

Legend:
- Rest of World
- Asia-Pacific
- Europe
- US & Canada

| | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 1,090 | 1,128 | 1,179 | 1,227 | 1,284 | 1,325 | 1,368 | 1,401 | 1,449 |
| Rest of World | 340 | 355 | 377 | 388 | 408 | 419 | 433 | 441 | 453 |
| Asia-Pacific | 329 | 346 | 368 | 396 | 427 | 453 | 476 | 499 | 529 |
| Europe | 249 | 252 | 256 | 262 | 267 | 271 | 274 | 277 | 282 |
| US & Canada | 173 | 175 | 178 | 180 | 182 | 183 | 185 | 184 | 185 |

DAUs / MAUs

| Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|
| 66% | 66% | 66% | 66% | 66% | 66% | 66% | 66% | 66% |

Please see Facebook's most recent quarterly or annual report filed with the SEC for definitions of user activity used to determine the number of our DAUs and MAUs. The numbers for DAUs and MAUs do not include Instagram, WhatsApp, or Oculus users unless they would otherwise qualify as such users, respectively, based on their other activities on Facebook.



2



# Monthly Active Users (MAUs)
In Millions

Legend:
- Rest of World
- Asia-Pacific
- Europe
- US & Canada

| | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 1,654 | 1,712 | 1,788 | 1,860 | 1,936 | 2,006 | 2,072 | 2,129 | 2,196 |
| Rest of World | 533 | 556 | 587 | 606 | 632 | 654 | 675 | 692 | 705 |
| Asia-Pacific | 566 | 592 | 629 | 673 | 716 | 756 | 794 | 828 | 873 |
| Europe | 333 | 338 | 342 | 349 | 354 | 360 | 364 | 370 | 377 |
| US & Canada | 222 | 226 | 229 | 231 | 234 | 236 | 239 | 239 | 241 |

Please see Facebook's most recent quarterly or annual report filed with the SEC for definitions of user activity used to determine the number of our DAUs and MAUs. The numbers for DAUs and MAUs do not include Instagram, WhatsApp, or Oculus users unless they would otherwise qualify as such users, respectively, based on their other activities on Facebook.



3



# Revenue
In Millions

● Payments and Other Fees
● Advertising

| | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Total | $5,382 | $6,436 | $7,011 | $8,809 | $8,032 | $9,321 | $10,328 | $12,972 | $11,966 |
| Payments and Other Fees | $181 | $197 | $195 | $180 | $175 | $157 | $186 | $193 | $171 |
| Advertising | $5,201 | $6,239 | $6,816 | $8,629 | $7,857 | $9,164 | $10,142 | $12,779 | $11,795 |

facebook

4



# Revenue by User Geography
In Millions

Legend:
- Rest of World
- Asia-Pacific
- Europe
- US & Canada

| | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Total | $5,382 | $6,436 | $7,011 | $8,809 | $8,032 | $9,321 | $10,328 | $12,972 | $11,966 |
| Rest of World | $473 | $614 | $692 | $839 | $784 | $954 | $1,054 | $1,271 | $1,172 |
| Asia-Pacific | $862 | $1,025 | $1,154 | $1,349 | $1,375 | $1,569 | $1,760 | $2,059 | $2,091 |
| Europe | $1,307 | $1,585 | $1,605 | $2,065 | $1,905 | $2,242 | $2,481 | $3,250 | $3,036 |
| US & Canada | $2,740 | $3,212 | $3,560 | $4,556 | $3,968 | $4,556 | $5,033 | $6,392 | $5,667 |

Revenue by user geography is geographically apportioned based on our estimation of the geographic location of our users when they perform a revenue-generating activity. This allocation differs from our revenue disaggregated by geography disclosure in our condensed consolidated financial statements where revenue is disaggregated by geography based on the billing address of our customer.





# Advertising Revenue by User Geography
In Millions

Legend:
- Rest of World
- Asia-Pacific
- Europe
- US & Canada

| Quarter | US & Canada | Europe | Asia-Pacific | Rest of World | Total |
|---|---|---|---|---|---|
| Q1'16 | $2,615 | $1,270 | $849 | $467 | $5,201 |
| Q2'16 | $3,077 | $1,545 | $1,009 | $608 | $6,239 |
| Q3'16 | $3,431 | $1,563 | $1,137 | $685 | $6,816 |
| Q4'16 | $4,435 | $2,025 | $1,337 | $832 | $8,629 |
| Q1'17 | $3,851 | $1,869 | $1,361 | $776 | $7,857 |
| Q2'17 | $4,450 | $2,209 | $1,558 | $947 | $9,164 |
| Q3'17 | $4,912 | $2,434 | $1,749 | $1,047 | $10,142 |
| Q4'17 | $6,271 | $3,196 | $2,048 | $1,264 | $12,779 |
| Q1'18 | $5,559 | $2,992 | $2,080 | $1,164 | $11,795 |

Revenue by user geography is geographically apportioned based on our estimation of the geographic location of our users when they perform a revenue-generating activity. This allocation differs from our revenue disaggregated by geography disclosure in our condensed consolidated financial statements where revenue is disaggregated by geography based on the billing address of our customer.





## Payments & Other Fees Revenue by User Geography
In Millions

- Rest of World
- Asia-Pacific
- Europe
- US & Canada

| | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Total | $181 | $197 | $195 | $180 | $175 | $157 | $186 | $193 | $171 |
| Rest of World | $6 | $6 | $7 | $7 | $8 | $7 | $7 | $7 | $8 |
| Asia-Pacific | $13 | $16 | $17 | $12 | $14 | $11 | $11 | $11 | $11 |
| Europe | $37 | $40 | $42 | $40 | $36 | $33 | $47 | $54 | $44 |
| US & Canada | $125 | $135 | $129 | $121 | $117 | $106 | $121 | $121 | $108 |

Revenue by user geography is geographically apportioned based on our estimation of the geographic location of our users when they perform a revenue-generating activity. This allocation differs from our revenue disaggregated by geography disclosure in our condensed consolidated financial statements where revenue is disaggregated by geography based on the billing address of our customer.



7

# Average Revenue per User (ARPU)

● Payments and Other Fees
● Advertising



**Worldwide**

| | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|
| Total | $4.23 | $4.73 | $5.07 | $6.18 | $5.53 |
| Payments and Other Fees | $0.09 | $0.08 | $0.09 | $0.09 | $0.08 |
| Advertising | $4.14 | $4.65 | $4.97 | $6.08 | $5.45 |

**US & Canada**

| | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|
| Total | $17.07 | $19.38 | $21.20 | $26.76 | $23.59 |
| Payments and Other Fees | $0.50 | $0.45 | $0.51 | $0.51 | $0.45 |
| Advertising | $16.56 | $18.93 | $20.69 | $26.26 | $23.14 |



**Europe**

| | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|
| Total | $5.42 | $6.28 | $6.85 | $8.86 | $8.12 |
| Payments and Other Fees | $0.10 | $0.09 | $0.13 | $0.15 | $0.12 |
| Advertising | $5.32 | $6.19 | $6.72 | $8.71 | $8.01 |



**Asia-Pacific**

| | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|
| Total | $1.98 | $2.13 | $2.27 | $2.54 | $2.46 |
| Payments and Other Fees | $0.02 | $0.01 | $0.01 | $0.01 | $0.01 |
| Advertising | $1.96 | $2.12 | $2.26 | $2.52 | $2.45 |



**Rest of World**

| | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|
| Total | $1.27 | $1.48 | $1.59 | $1.86 | $1.68 |
| Payments and Other Fees | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| Advertising | $1.25 | $1.47 | $1.58 | $1.85 | $1.67 |

Revenue by user geography is geographically apportioned based on our estimation of the geographic location of our users when they perform a revenue-generating activity. This allocation differs from our revenue disaggregated by geography disclosure in our condensed consolidated financial statements where revenue is disaggregated by geography based on the billing address of our customer. Please see Facebook's most recent quarterly or annual report filed with the SEC for the definition of ARPU.



8

# Expenses as a % of Revenue

**Cost of Revenue**



| Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|-------|-------|-------|-------|-------|
| 14%   | 13%   | 14%   | 12%   | 16%   |

**Research & Development**




| Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|-------|-------|-------|-------|-------|
| 23%   | 21%   | 20%   | 15%   | 19%   |

**Marketing & Sales**




| Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|-------|-------|-------|-------|-------|
| 13%   | 12%   | 11%   | 11%   | 13%   |

**General & Administrative**



| Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|-------|-------|-------|-------|-------|
| 8%    | 7%    | 5%    | 5%    | 6%    |

facebook



# Operating Margin



# Effective Tax Rate

| ($ in millions) | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Income before provision for income taxes | $ 2,066 | $ 2,754 | $ 3,164 | $ 4,533 | $ 3,408 | $ 4,488 | $ 5,236 | $ 7,462 | $ 5,610 |
| Provision for income taxes | 328 | 471 | 537 | 965 | 344 | 594 | 529 | 3,194 | **622** |
| **Effective Tax Rate** | **16%** | **17%** | **17%** | **21%** | **10%** | **13%** | **10%** | **43%** | **11%** |

In December 2017, the 2017 Tax Cuts and Jobs Act (the Tax Act) was enacted and significantly impacted the U.S. tax law. As a result of this legislation, our fourth quarter and full year 2017 provision for income taxes increased by $2.27 billion, which impacted our effective tax rate, net income and diluted earnings per share (EPS) for such periods. Our diluted EPS decreased by $0.77 for both the fourth quarter and full year 2017. As a result of the Act, starting in 2018, the U.S. statutory tax rate decreased from 35% to 21%.



12

# Net Income
In Millions



| Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| $1,738 | $2,283 | $2,627 | $3,568 | $3,064 | $3,894 | $4,707 | $4,268 | $4,988 |

In December 2017, the 2017 Tax Cuts and Jobs Act (the Tax Act) was enacted and significantly impacted the U.S. tax law. As a result of this legislation, our fourth quarter and full year 2017 provision for income taxes increased by $2.27 billion, which impacted our effective tax rate, net income and diluted earnings per share (EPS) for such periods. Our diluted EPS decreased by $0.77 for both the fourth quarter and full year 2017. As a result of the Act, starting in 2018, the U.S. statutory tax rate decreased from 35% to 21%.



13

# Diluted Earnings Per Share



| Quarter | EPS |
|---------|-----|
| Q1'16 | $0.60 |
| Q2'16 | $0.78 |
| Q3'16 | $0.90 |
| Q4'16 | $1.21 |
| Q1'17 | $1.04 |
| Q2'17 | $1.32 |
| Q3'17 | $1.59 |
| Q4'17 | $1.44 |
| Q1'18 | $1.69 |

In December 2017, the 2017 Tax Cuts and Jobs Act (the Tax Act) was enacted and significantly impacted the U.S. tax law. As a result of this legislation, our fourth quarter and full year 2017 provision for income taxes increased by $2.27 billion, which impacted our effective tax rate, net income and diluted earnings per share (EPS) for such periods. Our diluted EPS decreased by $0.77 for both the fourth quarter and full year 2017. As a result of the Act, starting in 2018, the U.S. statutory tax rate decreased from 35% to 21%.



14

# Capital Investments
In Millions



$1,271 — Q1'17
$2,812 — Q1'18

**Quarterly**



$4,491 — 2016
$6,733 — 2017

**Annual**

Capital investments for periods presented were related to purchases of property and equipment.

facebook

15



Appendix

# Free Cash Flow Reconciliation

| ($ in millions) | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Net cash provided by operating activities | $ 3,477 | $ 3,665 | $ 4,036 | $ 4,930 | $ 5,058 | $ 5,360 | $ 6,128 | $ 7,670 | $ 7,860 |
| Less: Purchases of property and equipment | 1,132 | 995 | 1,095 | 1,269 | 1,271 | 1,444 | 1,755 | 2,262 | 2,812 |
| Free Cash Flow | $ 2,345 | $ 2,670 | $ 2,941 | $ 3,661 | $ 3,787 | $ 3,916 | $ 4,373 | $ 5,408 | $ 5,048 |

Free Cash Flow (FCF) is a non-GAAP financial measure that has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of other GAAP financial measures, such as net cash provided by operating activities. Some of the limitations of FCF are: (i) FCF does not reflect our future contractual commitments, and (ii) other companies in our industry present similarly titled measures differently than we do, limiting their usefulness as comparative measures. FCF is not intended to represent our residual cash flow available for discretionary expenditures.



# Limitations of Key Metrics and Other Data

The numbers for our key metrics, which include our daily active users (DAUs), monthly active users (MAUs), and average revenue per user (ARPU), are calculated using internal company data based on the activity of user accounts. While these numbers are based on what we believe to be reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring usage of our products across large online and mobile populations around the world. In addition, we are continually seeking to improve our estimates of our user base, and such estimates may change due to improvements or changes in our methodology.

We regularly evaluate these metrics to estimate the number of "duplicate" and "false" accounts among our MAUs. A duplicate account is one that a user maintains in addition to his or her principal account. We divide "false" accounts into two categories: (1) user-misclassified accounts, where users have created personal profiles for a business, organization, or non-human entity such as a pet (such entities are permitted on Facebook using a Page rather than a personal profile under our terms of service); and (2) undesirable accounts, which represent user profiles that we determine to be used for purposes that violate our terms of service, such as spamming. The estimates of duplicate and false accounts are based on an internal review of a limited sample of accounts, and we apply significant judgment in making this determination. For example, to identify duplicate accounts we use data signals such as similar IP addresses or user names, and to identify false accounts we look for names that appear to be fake or other behavior that appears inauthentic to the reviewers. Our estimates may change as our methodologies evolve, including through the application of new data signals or technologies, which may allow us to identify previously undetected duplicate or false accounts and may improve our ability to evaluate a broader population of our users. Duplicate and false accounts are very difficult to measure at our scale, and it is possible that the actual number of duplicate and false accounts may vary significantly from our estimates.

In the fourth quarter of 2017, we estimate that duplicate accounts may have represented approximately 10% of our worldwide MAUs. We believe the percentage of duplicate accounts is meaningfully higher in developing markets such as India, Indonesia, and the Philippines, as compared to more developed markets. In the fourth quarter of 2017, we estimate that false accounts may have represented approximately 3-4% of our worldwide MAUs. Our estimation of false accounts can vary as a result of episodic spikes in the creation of such accounts, which we have seen originate more frequently in specific countries such as Indonesia, Turkey, and Vietnam. From time to time, we may make product changes or take other actions to reduce the number of duplicate or false accounts among our users, which may also reduce our DAU and MAU estimates in a particular period.

Our data limitations may affect our understanding of certain details of our business. For example, while user-provided data indicates a decline in usage among younger users, this age data is unreliable because a disproportionate number of our younger users register with an inaccurate age. Accordingly, our understanding of usage by age group may not be complete.

In addition, our data regarding the geographic location of our users is estimated based on a number of factors, such as the user's IP address and self-disclosed location. These factors may not always accurately reflect the user's actual location. For example, a user may appear to be accessing Facebook from the location of the proxy server that the user connects to rather than from the user's actual location. The methodologies used to measure user metrics may also be susceptible to algorithm or other technical errors. Our estimates for revenue by user location and revenue by user device are also affected by these factors.

We regularly review our processes for calculating these metrics, and from time to time we may discover inaccuracies in our metrics or make adjustments to improve their accuracy, including adjustments that may result in the recalculation of our historical metrics. We believe that any such inaccuracies or adjustments are immaterial unless otherwise stated. We intend to disclose our estimates of the number of duplicate and false accounts among our MAUs on an annual basis. In addition, our DAU and MAU estimates will differ from estimates published by third parties due to differences in methodology.

The numbers of DAUs and MAUs discussed in this presentation, as well as ARPU, do not include Instagram, WhatsApp, or Oculus users unless they would otherwise qualify as such users, respectively, based on their other activities on Facebook.

**facebook**

# Facebook Q1 2018 Results

**facebook**

investor.fb.com

# EXHIBIT 4



# EXHIBIT 5



### Friending

You should send friend requests to friends, family and other people on Facebook you know and trust. You can add a friend by searching for them and sending them a friend request. If they accept, you automatically follow that person, and they automatically follow you — which means that you may see each other's posts in News Feed.

If you'd like to see updates from people you find interesting but don't know personally, like a journalist or celebrity, try following them instead.

Was this information helpful?
○ Yes   ○ No

→ Share Article

### Popular Articles About This Topic

I can't find my friend on Facebook.

Why can't I add someone as a friend on Facebook?

I think my friend's account was hacked.

How do I use Nearby Friends?

How do I accept a friend request?

### Related Topics

**ABOUT**
**Your Profile and Settings**
Learn how to add a profile picture, edit your info and manage posts on your Timeline.

**ABOUT**
**Your Privacy**
Learn how privacy settings help you connect and share with people you know and trust.

**ABOUT**
**Pages**
Get help managing a Page and understand how to interact with Pages you're interested in.

# EXHIBIT 6



# EXHIBIT 7



## What is Town Hall?

Computer Help    Mobile Help ▾

Town Hall is a place on Facebook where people can:

· Find, follow and contact their government officials.

· Find, follow and contact government agencies.

· See a feed of what their government is posting on Facebook.

This tool is part of Facebook's efforts to help build civically engaged communities and make it easier for people to have a voice in government. To access Town Hall, go to www.facebook.com/townhall.

Keep in mind that you may need to enter your address to see local government officials who represent your area. Even after entering your address, you may not see all your government representatives. Some representatives may not appear in Town Hall because they're not on Facebook, or they haven't entered the political office they hold, or there was no public database for this office. You can report missing or incorrect information in Town Hall by clicking on the ··· button in the top right corner.

### Contacting Your Government Representative

If you're using a mobile device, you'll also be able to contact your government representatives by email, Facebook message or call when you interact with one of their posts in News Feed.

Was this information helpful?
  Yes    No

### Related Articles

What is a constituent badge?

Why does Facebook show what's popular in a political district?

What information does Facebook use to show information about elections and government?

What does it mean to be a Top Responding Representative?

Why do some politicians have more than one Facebook Page?

Facebook © 2019    About    Ad Choices    Terms & Policies
English (US)    Privacy    Create Ad    Cookies
    Careers    Create Page

# EXHIBIT 8



## Create and Manage a Page

### Create a Page

**How do I create a Facebook Page?**

Pages are for businesses, brands, organizations and public figures to share their stories and connect with people. Like profiles, Pages can be customized with stories, events and more. People who like or follow a Page can get updates in News Feed.

To create a Page:

1  Go to facebook.com/pages/create.

2  Click to choose a Page type.

3  Fill out the required information.

4  Click **Continue** and follow the on-screen instructions.

Note: Anyone can create a Page, but only official representatives can create a Page for an organization, business, brand or public figure.

Was this information helpful?     View Full Article
○ Yes  ○ No     · Share Article

**Should I create a Page or allow people to follow my public updates from my personal account?**

If your goal is to represent your business, brand or product on Facebook, create a Page. A Page lets you engage with people on Facebook and offers tools to help you manage and track engagement.

If your goal is to share updates from your personal timeline with a broader audience, you can allow people to follow you. When you allow people to follow you, anyone on Facebook can follow you to get your public updates in their News Feed, even if you're not friends on Facebook.

You can have an unlimited amount of people following you, and you can follow up to 5,000 people. You can have up to 5,000 friends on your personal account.

Was this information helpful?     View Full Article
○ Yes  ○ No     · Share Article

### Claim a Page or Convert Your Personal Account

**How do I claim an unmanaged Page?**

A Page may exist for your business even if someone from your business didn't create it. For example, when someone checks into a place that doesn't have a Page, an unmanaged Page is created to represent the location. A Page may also be generated from a Wikipedia article.

If the Page is unmanaged, you'll see **Unofficial Page** below its cover photo. You can request to claim the Page and become its admin, and you can merge the Page into a Page you already manage for your business.

Keep in mind that Pages generated from Wikipedia and Pages that represent geographic locations (example: New York City, Ontario, Switzerland) can't be claimed. You'll know if a Page is generated from Wikipedia if you see a Wikipedia logo at the bottom of the left column.

To claim or merge an unmanaged Page:

1  Click **Is this your business?** below the Page's cover photo.

2  Follow the on-screen instructions.

Keep in mind that you may be asked for information to verify your relationship with the business, such as business phone number, business email or documents.

If you know who the admin is of the Page you want to claim (example: a former employee), you can also contact them and ask them to add you as an admin.

Was this information helpful?     View Full Article
○ Yes  ○ No     · Share Article

**How do I convert my profile to a Facebook Page?**

By creating a Page, you can use more tools and share with a wider audience. Converting your profile to a Page creates a new Facebook Page that's based on your profile. You can only convert your profile to a Page once.

When you convert your profile to a Page:

· You'll have both a profile and a Page after conversion.

· We'll transfer your profile picture and cover photo to the Page, and the name on your profile will become the Page's name.

· You can select from your friends, followers and pending friend requests and add them as your new Page's followers. See more information in the section below.

· You can choose which photos and videos to copy over from your profile, but keep in mind that views and other metrics remain with your profile and can't transfer to the Page.

· If you're converting a verified profile, please note that your verified badge will be removed from your profile, and you'll need to re-submit your new Page for verification.

· You can preview all changes before publishing your new Page.

- When you've finished setting up your new Page, we'll ask you to check your privacy settings on your profile to make sure you're sharing what you want to share.

To convert your profile to a Facebook Page:

1  Go to Create a Facebook Page Based on Your Profile.

2  Click Get Started and follow the on-screen instructions.

3  Your new Page will automatically publish once the conversion process is finished. To change this setting, click to select Off next to Publish Page when done at the top.

### What Happens to My Friends, Followers and Pending Friend Requests When I Convert to a Page?

Once your new Page is published:

- Your profile's followers, friends and friend requests will get notified that you've created a new Page.

- The profile followers you choose will automatically follow the new Page and will be removed from following your profile.

- Friends and pending friend requests you select will automatically like and follow the new Page, and won't be removed from your profile.

Was this information helpful?          View Full Article
◯ Yes  ◯ No                           · Share Article



Why should I convert my profile to a Facebook Page?

It's against the Facebook Terms to use your profile to represent something other than yourself (example: your business), and you could permanently lose access to your account if you don't convert it to a Page.

If you're using your profile to represent a business, there are many benefits to converting your profile to a Page:

- Pages are designed for businesses and organizations, with features that help you connect with customers and reach your goals.

- You'll have access to Page insights, where you can see metrics like which posts people engage with and visitor demographics like age and location.

- Page roles can let you give other people access to edit your Page.

- You can create ads and boost posts.

Convert your profile to a Page or learn more about it in the Help Center.

If you're a public figure, learn about allowing followers.

Was this information helpful?          View Full Article
◯ Yes  ◯ No                           · Share Article



## Merge Pages

Can I merge 2 Facebook Pages?

If you have 2 Facebook Pages for the same thing, you may be able to merge them if:

- You're an admin of both Pages.

- Your Pages have similar names and represent the same thing.

- Your Pages have the same address, if they have physical locations.

Before you request a Page merge, please make sure that any campaigns you're running aren't pointing to the Page that will be deleted.

To merge your Pages:

1  Go to facebook.com/pages/merge.

2  Select 2 Pages you want to merge and click Continue.

3  Click Request Merge.

If you're unable to merge your Pages, it means that your Pages aren't eligible to be merged. If you see the option to request to merge your Pages, we'll review your request.

If your Pages can be merged, the people who like your Pages and any check-ins will be combined, but posts, photos, reviews, ratings and the username will be deleted from the Page you merge. The Page you want to keep will remain unchanged, except for the addition of people who like the Page and check-ins that were merged from the other Page. The Page you don't want to keep will be removed from Facebook, and you won't be able to unmerge it.

Note: If your Pages are on Business Manager, you can go to business.facebook.com/pages/merge to merge them.

Was this information helpful?          View Full Article
◯ Yes  ◯ No                           · Share Article

## Invite Friends

How do I invite people to like my Page on Facebook?

Invite Friends

To invite friends to like your Page:

1  Go to your Page and click Community in the left column. You might have to click See more.

2  In the right column, click Invite your friends to like [your Page's name].

2  In the right column, click **Invite your friends to like [your Page's name]**.

3  Enter a friend's name in the search box and then click **Invite** next to their name.

You can see invitations to like a Page by going to your **Invites** tab.

### Invite People Who React to Your Page's Posts

If your Page has less than 100,000 likes, you can also invite people who react to your Page's posts to like your Page.

To invite people who react to your Page's posts:

1  Go to one of your Page's posts.

2  Click the reactions section of your Page's post. This will show who has reacted to your Page's post.

3  Next to a person's name, click **Invite** to invite the person to like your Page.

Keep in mind that if your Page has more than 100,000 likes, you'll see the option to add people as a friend rather than invite them to like your Page.

Was this information helpful?
◯ Yes  ◯ No

View Full Article
· Share Article

### Delete or Unpublish Your Page

How do I delete my Page?

To delete your Page, you'll need to be an admin of that Page. If you're an admin:

1  Click **Settings** at the top of your Page.

2  From **General**, click **Remove Page**.

3  Click **Delete [Page name]**.

4  Click **Delete Page** and then click **OK**.

Keep in mind your Page won't be permanently deleted until 14 days have passed, but you can unpublish your Page at any time.

To cancel your Page deletion:

1  Go to your Page within 14 days of scheduling to delete your Page.

2  Click **Cancel Deletion** at the top of your Page.

3  Click **Confirm** and then click **OK**.

You can also delete your personal account.

Note: If you don't see the option to delete your Page, make sure you're an admin of the Page. Learn how to see what your role is on a Page.

Was this information helpful?
◯ Yes  ◯ No

View Full Article
· Share Article

How do I unpublish or publish my Page?

Published Pages are visible to the public. Unpublished Pages are only visible to the people who manage the Page. Unpublishing your Page will hide it from the public, including the people who like your Page, and your Page won't be visible to the public until it's published again. If you're an admin, you can unpublish your Page at any time.

To unpublish your Page:

1  Click **Settings** at the top of your Page.

2  From **General**, click **Page Visibility**.

3  Click to select **Page unpublished**.

4  Click **Save Changes**.

To publish your Page, follow the instructions above and click to select **Page published**.

Keep in mind that newly created Pages may be unpublished because of inactivity.

Was this information helpful?
◯ Yes  ◯ No

View Full Article
· Share Article

Facebook © 2019
English (US) ▾

About
Privacy
Careers

Ad Choices
Create Ad
Create Page

Terms & Policies
Cookies

3

# EXHIBIT 9



## Like and Interact with Pages

### Like and Interact

#### How do I like or follow a Page?

If you want to show support for a Page and be able to see updates from it in News Feed, you should like it.

If you just want to see updates from a Page, you should follow it.

To like a Page:

1. Go to the Page
2. Click 👍 **Like** below the Page's cover photo

When you like a Page, you automatically follow it, which means that you may see updates from that Page in News Feed.

Pages you like are listed in the **About** section of your profile below **Likes**. A post that you liked on a Page may appear in News Feed. You may be displayed on the Page you liked or in ads about that Page.

To follow a Page:

1. Go to the Page
2. Click **Follow**

When you follow a Page, you may see updates from that Page in News Feed.

To see the people or Pages that you follow:

1. Go to your profile and click **About**
2. Scroll down to the **Friends** section and then click **More > Following**

Was this information helpful?
   ○ Yes   ○ No

View Full Article
· Share Article

#### How do I unlike a Page?

To unlike a Page:

1. Go to the Page by clicking its name in your News Feed or searching for it.
2. Below the Page's cover photo, hover over 👍 **Liked**.
3. Select **Unlike this Page** from the dropdown menu.

Was this information helpful?
   ○ Yes   ○ No

View Full Article
· Share Article

#### How do I tag people or Pages in photos?

You can tag people or Pages in your own or someone else's photos if the person or Page has allowed others to tag it.

To tag people or Pages in a photo:

1. Click the photo to expand it.
2. Hover over the photo and click **Tag Photo** at the bottom.
3. Click the person in the photo and start typing their name.
4. Choose the full name of the person or Page you want to tag when it appears.
5. Click **Done Tagging**.

You can tag up to 50 people or Pages in a photo.

Keep in mind that when you tag someone in a photo, that person's friends may also see, like or comment on the photo. Also, if you tag a photo that was not uploaded by a friend, the person who uploaded the photo will need to approve the tag.

Was this information helpful?
   ○ Yes   ○ No

View Full Article
· Share Article

#### How do I share a Page with friends?

To share a Page with friends:

1. Click ↗ **Share** below the Page's cover photo.
2. Click the dropdown menu at the top to select where you want to share the Page (example: your timeline, a Page you manage).
3. Write an optional update or message.
4. Click **Post** or **Send**.

Was this information helpful?
   ○ Yes   ○ No

View Full Article
· Share Article

#### How do I post on a Page on Facebook and who can see it?

Facebook Pages are public spaces. Anyone who can see the Page can see your post or comment. When you post or comment on a Page, a story can be published in News Feed and other places on Facebook.

You can only post on Pages that have allowed visitor posts.

To post on a Page that you visit:

1   Click **Write a post...** at the top of the Page and write your post.

2   Click your profile picture in the top right and select to post as yourself or as a Page you manage.

3   Click **Post**.

Was this information helpful?
○ Yes  ○ No



View Full Article
· Share Article

### How do I send a private message to a Page?

You can only send a private message to Pages that have turned on messaging. To send a private message to a Page:

1   Click **Send Message** below the Page's cover photo

2   Type your message and press enter to send

If you don't see the option to message a Page, it means the Page has turned off this feature. To contact a Page with messages turned off, you may be able to post on the Page.

Was this information helpful?
○ Yes  ○ No



View Full Article
· Share Article

### How do I see my country's version of a Page?

Some Pages for global brands have specialized versions of the Page for different regions. To switch the version of the Page you're seeing:

1   Click  ⋯  below the Page's cover photo

2   Select **Switch Region**

3   Select the country you want as your default for the Page

4   Click **Save Preference**

The version of the Page you select will be the version you see in News Feed and when you visit the Page.

Keep in mind that if you like a Page while you're traveling, you may see updates for the country you're visiting even when you return home. If you're seeing posts from the Page that aren't in your language or aren't relevant to where you are, follow the steps above to switch the version of the Page you see.

Was this information helpful?
○ Yes  ○ No



View Full Article
· Share Article

### How do I find and apply to a Page's job post?

You may see job posts in your News Feed, but you can also find job posts by:

·   Clicking **Jobs** in the left column of News Feed. In the left column, you can search jobs, change your location or select an industry or job type. Click **Subscribe** in the right column to get notified about new job openings.

·   Going to a company's Page to see if they have any jobs open by clicking **Jobs** in the left column of the Page. If there isn't a **Jobs** tab, the company hasn't posted any jobs on their Page.

To apply to a job post:

1   Click **Apply Now**.

2   Fill in the application (example: your experience and education).

3   Click **Send**.

Your application will be sent as a message to the employer and won't appear on your profile. Keep in mind that employers can see the public version of your profile, but you can choose who sees your posts and see what your profile looks like to other people.

Learn more about guidelines you can follow when searching for jobs on Facebook.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

## Donate to a Nonprofit Page

### How do I donate to a fundraiser or charitable organization on Facebook?

There are several ways to donate on Facebook.

From a charitable organization's Page:

1   Click **Donate** on the Page's cover photo.

2   Click the amount you'd like to give or enter an amount.

3   Select a payment method.

4   Click **Donate [Amount]**.

From a post published by a charitable organization's Page or shared by someone who donated:

1  Click **Donate** on the post.

2  Click the amount you'd like to give or enter an amount.

3  Select a payment method.

4  Click **Donate [Amount]**.

From a fundraiser:

1  Click **Donate** at the top of the fundraiser.

2  Click the amount you'd like to give or enter an amount.

3  Select a payment method.

4  Click **Donate [Amount]**.

Note: This feature isn't available in every location.

Keep in mind that we securely store your payment card information after you enter it for the first time. This allows you to make future donations without having to re-enter your information. You can remove or manage this information by going to your payment settings.



Are donations made on Facebook tax-deductible?

Donations made on Facebook may be tax deductible. Review the information below to learn more whether a donation is tax-deductible.

›  Donations to Nonprofits

›  Donations to Fundraisers for Personal Causes

Note: Donations and fundraiser features on Facebook aren't available in every area.



How do I contact Facebook about my donation?

If you need help with a recent donation you made, have questions about a fundraiser, or want more information on the status of contributions to your nonprofit, fill out this form to let us know.

Visit Charitable Fundraisers and Donations to learn more about raising money for nonprofits on Facebook.



## Privacy and Reporting

How do I choose who can see stuff I add to sections of my About page?

Your About page helps you share what you care about with others, such as movies or books you've added, stories from apps and games you use and things you've liked. If someone is in the audience of stories you've added or the audience of stories shared by apps and games, they can see that stuff. You can edit the privacy of the individual stories in each section or you can choose to hide a section entirely.

To edit the privacy of:

·  **Things you add:** When you add something like a book or a movie, use the audience selector to choose who it's shared with. The selector remembers your choice, so new things you add (regardless of which section you're adding things to) will have the same audience unless you change it. You can change the audience of something you've already added from your activity log.

·  **Things you've liked:** You can select an audience for each section of things you've liked (example: Pages, music, books). For example, to choose who can see the movies you've liked, scroll down to the movies section, click ✎ in the top-right corner and then select **Edit Privacy.** To choose who can see what Pages you like, scroll down to your **Likes** section, then click ✎ in the top-right and select **Edit the Privacy of Your Likes.**

·  **Stories from apps and games:** If you're sharing stories from an app or game, you can adjust the audience of future stories, or change the audience of a story you've already shared from your activity log.

Keep in mind that when you share something on your timeline, the audience you choose can also see it in other places on Facebook, such as in News Feed and search.



How do I block or unblock a Page?

Once you block a Page, that Page can no longer interact with your posts or like or reply to your comments. You won't be able to post on the Page or message the Page. If you like the Page, you'll unlike and unfollow it.

To block a Page:

1  Go to the Page you want to block.

2  Click  ⋯  below the Page's cover photo.

3  Select **Block Page**.

4  Click **Confirm**.

To unblock a Page:

1   Click ▣ in the top right of Facebook and select **Settings**.

2   Click **Blocking** in the left column.

3   In the **Block Pages** section, click **Unblock** next to the Page's name.

Learn how to block or unblock a person on Facebook.

Was this information helpful?
  ○ Yes   ○ No

View Full Article
· Share Article

## How do I report a Page?

To report a Page:

1. Go to the Page you want to report.

2. Click  ···  below the Page's cover photo.

3. Select **Give feedback or report this Page**.

4. To give feedback, click the option that best describes how this Page goes against our Community Standards.

5. Depending on your feedback, you may then be able to submit a report to Facebook. For some types of content, we don't ask you to submit a report, but we use your feedback to help our systems learn.

If you can't access the Page you want to report, consider asking a friend to report it.

We'll review the Page and remove anything that doesn't follow the Facebook Community Standards. We may also warn or disable the person responsible.

Learn how to report a profile.

Was this information helpful?
  ○ Yes   ○ No

View Full Article
· Share Article

Facebook © 2019
English (US) ·

About
Privacy
Careers

Ad Choices
Create Ad
Create Page

Terms & Policies
Cookies

# EXHIBIT 10



## Banning and Moderation

### Settings for Visitor Posts and Comments

How can I proactively moderate content published by visitors on my Page?

If you're an admin of a Page, you can block certain words from appearing on your Page and turn on the profanity filter.

#### Blocking Words

When people include a word you've blocked in a post or comment on your Page, it won't appear on your Page. To block words:

1. Click **Settings** at the top of your Page.
2. From **General**, click **Page Moderation**.
3. Type the words you want to block, separated by commas. You'll need to add both the singular and plural forms of the word you want to block.
4. Click **Save Changes**.

You can unhide comments that contain blocked words by going to the comment and clicking **Unhide**.

#### Profanity Filter

You can block different degrees of profanity from appearing on your Page. We determine what to block by using the most commonly reported words and phrases marked offensive by the community. To turn on the profanity filter:

1. Click **Settings** at the top of your Page.
2. From **General**, click **Profanity Filter**.
3. Select **Medium** or **Strong**.
4. Click **Save Changes**.

Was this information helpful?   ○ Yes   ○ No

View Full Article
· Share Article

---

What does Most Relevant mean on a Page post?

When you see **Most Relevant** above the comments in a Page post, it means that you're more likely to see comments that are relevant to you. This means that you're more likely to see the following at the top:

· Comments or reactions from your friends

· Comments from verified profiles and Pages

· Comments with the most likes and replies

This personalized order is only available for comments on Page posts. If a Page admin has turned off comment ranking for their Page, the Page will display comments chronologically by default.

#### Change the Order Of Comments on a Post

You can change the order that you see comments on a Page post as a Page admin or visitor. This only affects how you see comments, not other people. Keep in mind that Pages may have different comment ordering options, and changing the order of comments isn't permanent.

To change the order of comments, click the current comment ordering option in the bottom left of the Page post (example: **New, Oldest, All Comments, Most Relevant**), and then select a new option:

· **New** to show all comments, with the newest comments first.

· **Oldest** to show all comments, with the oldest comments first.

· **All Comments** to show all comments, including potential spam. The most relevant comments will appear first.

· **Most Relevant** to show friends' comments and the most engaging comments first.



Most Relevant ▾

✓ **Most Relevant**
Show friend's comments and the most engaging comments first.

**New**
Show all comments, with the newest comments first.

**All Comments**
Show all comments, including potential spam. The most relevant comments will appear first.

Was this information helpful?   ○ Yes   ○ No

View Full Article
· Share Article

---

How do I stop people from publishing photos and videos on my Page's timeline?

Pages are a way for businesses, brands and public figures to connect with their fans on Facebook. Learn more about the difference between a profile and a Page.

Only Page admins can edit this feature.

To stop other people from publishing photos and videos on your Page's timeline:

1   Click **Settings** at the top of your Page.



2   From **General**, click **Visitor Posts**.



3   Select **Allow visitors to the Page to publish posts**, and then click to uncheck the box next to **Allow photo and video posts.**

4   Click **Save Changes**.

Was this information helpful?          View Full Article
◯ Yes  ◯ No                          · Share Article



How do I control what visitors can post on my Page?

The article below is for people who manage a Page. If you have a personal profile, learn more about how you can stop people from posting on your timeline.

You'll need to be an admin to control what visitors can post on your Page. If you allow visitors to publish on your Page, their posts can appear in the **Visitor Posts** section after you click **Posts** on the left side of your Page. If you allow photo and video posts, posts by others can also appear in the **Photos** and **Videos** sections of your Page.

To control what visitors can post on your Page:

1   Click **Settings** at the top of your Page.

2   From **General**, click **Visitor Posts**.

3   Select **Allow visitors to the Page to publish posts** or **Disable posts by other people on the Page.** If you allow visitors to publish posts, you can choose to:

   · Allow photo and video posts

   · Review posts by *other people* before they're published to the Page

4   Click **Save Changes**.

If you choose to review posts, posts by others will be hidden from your Page by default. To approve a post, go to the **Posts by Others** section of your Page's activity log, click ⊙ next to the post and select **Allowed on Page**.

Here are some other things you can do to control what visitors post on your Page:

   · While you can't disable comments on your Page's posts, you can hide or delete individual comments.

   · You can proactively moderate comments and posts by visitors by blocking words and turning on the profanity filter for your Page.

   · You can ban people from your Page.

   · You can turn off reviews for your Page.

Was this information helpful?          View Full Article
◯ Yes  ◯ No                          · Share Article

How do I allow other people to tag my Page's photos and videos?

Pages are a way for businesses, brands and public figures to connect with their fans on Facebook. Learn more about the difference between a profile and a Page.

To allow other people to tag photos and videos published by your Page, you'll need to be an

2

admin. If you're an admin:

1  Click **Settings** at the top of your Page.



2  From **General**, click **Tagging Ability**.



3  Click to check the box next to **Allow others to tag photos and video published by [Page name]**.

4  Click **Save Changes**.

Photos your Page is tagged in are visible to:

· The audience they're shared with

· Other people tagged in the photo

· Friends that the people tagged choose to add to the audience

If you've allowed visitors to publish photo and video posts to your Page, tagged photos and videos of your Page can appear in the **Photos** and **Videos** sections below your Page's cover photo.

Was this information helpful?        View Full Article
○ Yes   ○ No                          · Share Article

How do I stop allowing others to tag or mention my Page?

To stop allowing other people or Pages to tag your Page in their photos and videos or mention your Page in their posts and comments, you'll need to be an admin. If you're an admin:

1  Click **Settings** at the top of your Page.

2  From **General**, click **Others Tagging this Page**.

3  Click to uncheck the box next to **Allow people and other Pages to tag [Page name]**.

4  Click **Save Changes**.

In addition to Pages, you can also report or remove tags for your personal profile.

Was this information helpful?        View Full Article
○ Yes   ○ No                          · Share Article

## Manage Comments

How do I hide or delete a comment from a post on my Page?

When you hide a comment from a post on your Page, the comment will only be visible to the person who wrote it and their friends. When you delete a comment from a post on your Page, the comment will be permanently removed from the post.

To hide a comment from a post on your Page:

1  Hover over the comment.

2  Click  ···  and select **Hide Comment**.

To delete a comment from a post on your Page:

1  Hover over the comment.

2  Click  ···  and select **Hide Comment**.

3  Click **Delete**.

After you hide a comment, you also can ban the person or Page or report the comment if it doesn't follow the Facebook Community Standards.

Was this information helpful?        View Full Article

3

○ Yes   ○ No                                                              › Share Article

How do I reply to comments on my Page's posts?

If you're an admin, editor or moderator, you can reply to comments on your Page's posts publicly or in a private message. When you reply with a private message, anyone can see that your Page has responded privately below the comment.

To reply to a comment publicly:

1  Click **Reply** below the comment

2  Add your reply and press the Enter key

To reply to a comment in a private message:

1  Click **Message** below the comment

2  Enter your message and click **Send**

Was this information helpful?                                            View Full Article
○ Yes   ○ No                                                            › Share Article

## Ban or Remove Someone

How do I ban or unban someone from my Page?

We recommend banning people who continually publish spam on your Page. You can choose to unban them at any time. When you ban someone from your Page, they'll still be able to share content from your Page to other places on Facebook, but they'll no longer be able to publish to your Page, like or comment on your Page's posts, message your Page or like your Page.

You may also remove someone who likes your Page. When you remove someone from your Page, they'll no longer like it. This is a good option for people you don't want following your Page's posts in their News Feeds or the News Feeds of their friends. However, Pages are public spaces and people you've removed can choose to like your Page again.

## Ban Someone

There are several ways to ban a person or another Page from your Page.

From your Page's settings:

1  Click **Settings** at the top of your Page.

2  Click **People and Other Pages** in the left column.

3  Search for the person or click to check the box next to the name of the person you want to ban.

4  Click  ○  and select **Ban From Page**.

5  Click **Confirm**.

From a comment on a Page post:

1  Hover over a comment by the person or Page you want to ban and click  ···.

2  Click **Hide Comment**.

3  Click **Ban [Name]**.

From a post on your Page or a post your Page has been mentioned in:

1  Click **Posts** in the left column of your Page.

2  Click **Visitor Posts** on the right side of your Page.

3  Click  ···  in the top right of the post by the person or Page you want to ban.

4  Select **Ban From Page** and click **Confirm**.

From your Page's inbox:

1  Click **Inbox** at the top of your Page.

2  Click the message on the left from the person you want to ban.

3  Click  ···  in the top right and select **Ban From Page**.

4  Click **Confirm**.

## Unban Someone

There are several ways to unban a person or another Page from your Page.

From your Page's settings:

1  Click **Settings** at the top of your Page.

2  Click **People and Other Pages** in the left column.

3  Click **People Who Like This Page ▾** and select **Banned People and Pages**.

4  Click to check the box next to the name of the person you want to unban.

5  Click  ○  and select **Unban From Page**.

6  Click **Confirm**.

From your Page's inbox:

1  Click **Inbox** at the top of your Page.

2  Click the message on the left from the person you want to unban.

3  Click  ···  in the top right and select **Remove ban from Page**.

4  Click **Confirm**.

Was this information helpful?                                           View Full Article



○ Yes  ○ No

· Share Article

**How do I view the people banned from my Page?**

To view the people banned from your Page:

1  Click **Settings** at the top of your Page

2  Click **People and Other Pages** in the left column

3  Click **People Who Like This Page** at the top and select **Banned People and Pages**

Was this information helpful?    View Full Article
○ Yes  ○ No    · Share Article

**How do I remove someone who likes my Page?**

When you remove someone who likes your Page, they'll no longer like it. Keep in mind that Pages are public spaces, and people you've removed can choose to like your Page again.

You may also ban someone from your Page. When you ban someone from your Page, they'll no longer like it. People you ban will still be able to share content from your Page to other places on Facebook, but they'll no longer be able to publish to your Page, like or comment on your Page's posts, message your Page or like your Page. We recommend banning people who continually publish spam on your Page.

To remove someone who likes your Page:

1  Click **Settings** at the top of your Page

2  Click **People and Other Pages** in the left column

3  Click to check the box next to the person you want to remove

4  Click  ○  and select **Remove From Page Likes**

5  Click **Confirm**

Was this information helpful?    View Full Article
○ Yes  ○ No    · Share Article

**How do I tag other Pages or people in my Page's photos and videos?**

You can tag other Pages in your Page's photos and videos if the Page has allowed others to tag it. You can tag people in your Page's photos and videos if they've liked your Page and are at least 18 years old.

To tag other people or Pages in a photo:

1  Go to your Page and click the photo you want to tag.

2  Click **Tag Photo** on the right.

3  Click the person or Page in the photo.

4  Begin typing the person's or Page's name, then select them from the list that appears.

5  Click **Done Tagging** on the right.

To tag other people or Pages in a video:

1  Click **Publishing Tools** at the top of your Page.

2  Click **Video Library** on the left.

3  Hover over the video you want to tag, then click ✏ .

4  Below **Describe your video...,** click ⚲ .

5  Begin typing the person's or Page's name, then select them from the list that appears.

6  Click **Save.**

Was this information helpful?    View Full Article
○ Yes  ○ No    · Share Article

Facebook © 2019    About    Ad Choices    Terms & Policies

English (US) ▾    Privacy    Create Ad    Cookies

Careers    Create Page

# EXHIBIT 11



## Publishing

### Share from Your Page

How do I share photos from my Page?

### Share Photos or Videos

To share photos from your Page:

1  Click **Share a photo or video** at the top of your Page's timeline.

2  Choose an option:

   - **Upload Photos/Video**: Add photos or a video from your computer. The photos you publish will be added to your Page's timeline Photos album.

   - **Create Photo Album**: Add photos from your computer to a new album.

   - **Create a Photo Carousel**: Photos are taken from a website you choose. Enter a website URL to build a scrolling carousel of photos.

3  Select the photos or videos you want to add.

4  Write an optional update and click **Publish**.

### Share Slideshows

A slideshow is a video based on a series of 3-10 photos. To add a slideshow to your Page:

1  Click **Share a photo or video** at the top of your Page's timeline.

2  Click **Create Slideshow**.

3  Click **+**, select or upload a photo, then click **Add Photo**. You can include up to 10 photos.

4  Customize your slideshow with the options on the left (example: music).

5  Click **Create Slideshow**, then add an optional update to the post.

6  Click **Publish**.

Was this information helpful?    View Full Article
☐ Yes  ☐ No                     · Share Article

How do I create or edit an event for my Page?

### Create an Event

To create an event for your Page:

1  Click **Event** at the top of your Page's timeline.

2  Add an event photo, then enter your event's name, location and frequency (example: occurs once, weekly or you can customize the date range for your event). You can include optional details like:

   - **Ticket URL**: If you've set up the event with an online ticketing provider, enter the link.

   - **On Sale Now or Custom Date**: Choose the date that tickets go on sale. If tickets are available now, fans will be able to purchase tickets from your Page. Those who are interested in an event will receive a notification when tickets go on sale and will be able to purchase from your Page at that time.

   - **Co-hosts**: You can add other Pages (example: promoters, venues, artists) and friends as co-hosts, but only Pages will be displayed as co-hosts on the event page. Co-hosts can edit the event, and it will automatically be added to a co-hosting Page's calendar. You can add or remove co-hosts, but once an event has been created by a Page, the Page is the primary host and can't be removed. Learn more about adding co-hosts below.

3  Click **Publish** or **Save Draft**. You can also click ☑ and select **Schedule** to select a date and time in the future for when you want your event to publish.

Keep in mind that all events hosted by Pages are public. You can also add other people's or Page's public events to your Page. Learn more best practices for creating an event.

· Add Co-Hosts to Your Event

### Edit an Event

To edit an event for your Page:

1  Click **Events** on the left side of your Page.

2  Click the name of the event you want to edit.

3  Click **Edit** in the top right.



4  Edit the event, then click **Save**

1

· Edit the event, then click Save.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

**How do I pin a post to the top of my Page's timeline?**

You'll need to be an admin or editor to pin Page posts. To pin a post to the top of your Page's timeline:

1  Go to the post on your Page's timeline

2  Click ··· in the top right of the post

3  Select **Pin to Top of Page**

**About Pinned Posts**

When you pin a post:

· The post will move to the top of your Page's timeline

· 📌 will appear on the post

Note: You can't pin a post on your personal timeline.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

**How do I edit my Page's start date?**

To edit your Page's start date:

1  Click **About** on the left side of your Page

2  If you haven't added a start date yet, click **Edit Start Date**, or hover over your Page's existing start date and click **Edit**

3  Select a start type (example: opened, founded) and date from the dropdown menus

4  Click **Save**

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

**How do I share a link from my Page?**

When you share a link from your Page, you can include a preview in your post. The preview can include up to 10 images with descriptions and unique destination URLs.

To share a link from your Page:

1  Click **Write something...** at the top of your Page's timeline and enter the link you want to share.

2  Images from the webpage may automatically be added to your post's preview. There are several ways to customize the preview:

· **Add or Remove Images:** You can remove an image from the preview by clicking the thumbnail below **Available Images**. Click **+** to add an image from your computer.

· **Edit Descriptions:** If you've added multiple images, click the description below each image in the preview to edit it.

· **Edit Destination URLs:** To edit the destination URL for an image in the preview, hover over the image and click ⚙ .

3  Click **Publish**.

To remove the preview from your post:

1  Unselect all images by clicking the thumbnails at the bottom.

2  Hover over the preview image.

3  Click **x** in the top-right corner.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

**How do I add or edit a video on my Page?**

Pages are a way for businesses, brands and public figures to connect with their fans on Facebook. If you don't have a Page, you can post a video from your personal profile.

To add a video to your Page:

1  Click **Share a photo or video** or **Photo/Video** at the top of your Page's timeline.

2  Click **Upload Photos/Video** and select a video from your computer.

3  Add a title for your video at the top, an optional description and tags.

4  Click the sections in the right column to add more information to your video (example: thumbnail, distribution and subtitles).

5  Click **Publish**.

To edit a video on your Page:

1  Click **Publishing Tools** at the top of your Page.



2   Click **Video Library** on the left.

3   Click to check the **box** next to the video you want to edit.

4   Click **Actions ▾** at the top and select **Edit Video....**

5   Edit your video and click **Save.**

Was this information helpful?
  Yes   No

View Full Article
· Share Article

---

#### How do I add captions to my Page's video?

You can add captions to your Page's video to make it accessible to a broader audience. You can automatically generate captions and edit them, write them yourself or you can upload a SubRip (.srt) file.

To add captions to your Page's video:

1   Click **Photo/Video** at the top of your Page's timeline.

2   Click **Upload Photos/Video** and select a video from your computer.

3   Once your video has uploaded, click **Subtitles & Captions(CC)** in the column on the right.

4   Next to **Video Language**, select the main language spoken in the video.

5   Once your video has finished uploading, select whether you'd like to auto-generate captions, write them yourself or upload a SubRip (.srt) file.

6   Click **Publish.**

If you choose to upload a .srt file, make sure that your caption files are correctly named and formatted before you upload them.

To add captions to an existing video on your Page, find the post on your Page's timeline, click ··· in the top-right corner, select **Edit Post** and follow the steps above.

Note: People who watch your Page's video with sound turned off will automatically see captions. People who watch your video with sound turned on will need to turn on captions to see them. The language people see captions in is determined by their preferred language.

Was this information helpful?
  Yes   No

View Full Article
· Share Article

---

#### How do I create an offer from my Page?

You can share discounts and deals with customers by creating an offer from your Page. People can redeem it online or in-store, depending on where you make your offer available.

To create an offer from your Page:

1   Click **Create an offer** at the top of your Page's timeline.

2   Describe your offer. You can edit the expiration date for your offer if you'd like it to run longer or shorter than a week.

3   Add a photo and select whether people can use the offer **Online** or **In-Store.** You can also add a promo code or terms and conditions (optional).

4   Click **Publish.**

Was this information helpful?
  Yes   No

View Full Article
· Share Article

---

#### How do I view a Page's notes?

If a Page has published notes, you can visit the Page to see them.

To view a Page's notes:

1   Go to the Page.

2   Click **Notes** on the left side of the Page.

Learn how to add a notes tab to a Page you help manage.

Was this information helpful?
  Yes   No

View Full Article
· Share Article

---

#### How do I create a post for my Page in more than one language?

You'll need to be an admin to write a post for your Page in more than one language. People who view your post will see the language that's most relevant to them based on their language settings and locale.

You'll need to first make sure you've allowed posts in multiple languages:

1   Click **Settings** at the top of your Page.

2  From **General**, click **Post In Multiple Languages.**

3  Click to check the box next to **Allow people who manage this Page to write posts in multiple languages.**

4  Click **Save Changes.**

To create a post for your Page in more than one language:

1  Write your post at the top of your Page's timeline. This will be the default language for the post.

2  Click **Write post in another language**, then click **Select ▾** and select a language.

3  Click **Write post in another language** to add another language or click **Publish.**

Note: People whose primary language isn't included as an additional language will see the post in its default language. For example, if the default language for your post is English and you also wrote your post in Spanish and French, people whose primary language is German will see the post in English.

Was this information helpful?
　Yes 　No

View Full Article
· Share Article

How do I crosspost another Page's video?

### Crosspost Another Page's Non-Live Video

For non-live video, you can only crosspost another Page's video if:

· You've established a crossposting relationship with the Page. (Keep in mind that if you already have an admin or editor role on the Page, you don't need to create a crossposting relationship.)

· The Page has allowed you to crosspost the video.

To crosspost another Page's non-live video:

1  Click **Publishing Tools** at the top of your Page.

2  Click **Videos You Can Crosspost** in the left column.

3  Click the video you want to crosspost.

4  Click **Create Post With This Video.**

5  Add details to your post, then click **Publish.** Keep in mind that you need to add a title to the video before you can publish.

The Page that owns the video can see posts you've used the video in and their insights. If the Page removes your crossposting permissions, posts with the video may be unpublished or removed from your Page.

Keep in mind that captions that are added when a video is first uploaded will be carried over to any crossposts. Captions added through "Edit Video" will not appear in any crossposts. You can also change captions on a crossposted video by uploading a new SubRip (.SRT) file.

### Crosspost Another Page's Live Video

Depending on your Page's crossposting settings when you established a crossposting relationship with the other Page, another Page's live video will either automatically appear on your Page or in your Page's **Publishing Tools > Videos You Can Crosspost.**

To edit these crossposting settings:

1  Click **Settings** at the top of your Page.

2  In the left column, click **Crossposting.**

3  Next to the name of the Page that you've established a crossposting relationship with, below **Their Live Videos**, select whether you'd like to automatically crosspost the other Page's live videos to your Page, or manually post the other Page's live videos by going to your Page's **Publishing Tools > Videos You Can Crosspost.**

Only live videos created via the Live API are eligible for live crossposting, and live video from a mobile device can't be crossposted.

Keep in mind that even if you choose to manually post another Page's live videos but you're a shared admin or editor of both Pages, then the crossposted live video will automatically be posted to your Page.

Note: Each live crosspost is treated as a separate broadcast on each Page. Comments and reactions from the other Page's live video won't appear in your Page's crossposted video, and viewers can't see where the original live video is coming from.

### Metadata and Targeting

If you want a description, title or targeting setting for a crossposted live video on your Page that is different from the original live video before it is shown to the public, make sure you've chosen to manually post the other Page's live videos and that both Pages don't share an admin or editor.

If a crossposted live video has targeting different from the original live video, select manual crossposting to ensure that admins or editors don't have to change targeting settings in real-time and followers of Pages don't receive a live video notification for a broadcast that they likely can't see.

Was this information helpful?
　Yes 　No

View Full Article
· Share Article

How do I allow another Page to crosspost my Page's videos?

Crossposting is a way to use videos across multiple Pages. First, you'll need to establish a crossposting relationship with another Page unless you already have an admin or editor role on that Page. If you already have an admin or editor role on the Page, you don't need to establish a crossposting relationship and can skip to the next section below.

### Establish a Crossposting Relationship

To establish a crossposting relationship with another Page:

1   Click **Settings** at the top of your Page.

2   Click **Crossposting** in the left column.

3   Begin typing the Page's name or Facebook URL and select it from the list that appears.

4   For **Non-Live Videos**, both Pages can crosspost each other's eligible videos by going to the Page's **Publishing Tools** > **Videos You Can Crosspost**. For **Live Videos**, select whether you'd like to:

   • Allow the other Page to crosspost their live video to your Page without further approval.

   • Require the other Page's crossposted live videos to be approved by one of your admins or editors before being crossposted to your Page.

5   Click **Next**.

The other Page must confirm the crossposting relationship by adding your Page to its crossposting settings. To help the Page confirm the relationship, click 🔗 and send the confirmation link to an admin of the Page.

### Allow Another Page to Crosspost Your Page's Non-Live Videos

Once a crossposting relationship is established, you can allow the Page to crosspost non-live videos you add to your Page:

1   At the top of your Page's timeline, below **Write a post...**, click **Photo/Video**.

2   Click **Upload Photos/Video** and select a video from your computer.

3   Enter a title for your video and other details and click **Next**.

4   Scroll down to the section **Make Available to Other Pages** and select which Pages you want to allow to use your Page's video in their posts. The list of Pages includes Pages that you've already established a crossposting relationship with and any Pages in which you have an admin or editor role.

5   Click **Publish**.

You'll be able to see insights for all posts the video has been used in. Pages that crosspost your video can only see insights for the video post on their Page.

### Allow Another Page to Crosspost Your Page's Live Videos

You can allow another Page to crosspost your Page's live video without the other Page needing to upload or share it directly. Only live videos created via the Live API are eligible for live crossposting, and live video from a mobile device can't be crossposted.

Other than establishing a crossposting relationship with the other Page, your Page doesn't need to do anything to allow the other Page to crosspost your Page's live video.

Instead, when the other Page establishes or confirms the crossposting relationship, it will need to decide whether to allow your Page to crosspost automatically or with approval from one of its admins or editors.

Keep in mind that each live crosspost is treated as a separate broadcast on each Page. Comments and reactions from your Page's live video won't appear in the other Page's crossposted broadcast, and viewers can't see where the original live video is coming from.

Was this information helpful?       View Full Article
○ Yes  ○ No                       · Share Article

---

How do I manage job posts for my Page?

Pages are a way for businesses, brands and public figures to connect with their fans on Facebook. Learn more about the difference between a profile and a Page.

· Create a Job Post

· Edit a Job Post

· Close or Renew a Job Post

· Delete a Job Post

Was this information helpful?       View Full Article
○ Yes  ○ No                       · Share Article

---

## Tags, Mentions and Audiences

How do I control who can see my Page's posts?

There are **2 ways** to control who can see your Page's posts:

   • Use Restricted Audience to limit who can see your post.

   • Use News Feed Targeting to make it more likely that your selected audience will see your post in News Feed.

If less than 5,000 people like your Page, you'll need to first make sure you've allowed audience optimization for your Page's posts:

1   Click **Settings** at the top of your Page.

2   From **General**, click **Audience Optimization for Posts**.

3   Click to check the box next to **Allow News Feed targeting and the ability to restrict the audience for your posts**.

4   Click **Save Changes**.

### Limit Your Post's Audience

When you limit your post's audience, you can control the visibility of your post based on audience age and location. Only people in the audience you choose can see the post anywhere on Facebook, including your Page.

To limit your post's audience:

1 Click ⊙ before publishing your post.

2 Click **Restricted Audience** at the top, then select the age and locations of the audience you want to see your post.

3 Click **Save**.

Keep in mind that if someone shares the post, only people in the audience you choose for the post will be able to see it.

## Use News Feed Targeting

You can target a specific audience for your Page's post so that certain people are more likely to see it in News Feed based on the criteria you select. Unlike limiting your post's audience, using News Feed Targeting doesn't affect who can see the post on your Page or anywhere else on Facebook.

To use News Feed Targeting:

1 Click ⊙ before publishing your post.

2 In the **News Feed Targeting** section, enter the criteria of the people you'd like to reach in News Feed.

3 Click **Save**.

Was this information helpful?
Yes    No

View Full Article
· Share Article

How do I tag other Pages or people in my Page's photos and videos?

You can tag other Pages in your Page's photos and videos if the Page has allowed others to tag it. You can tag people in your Page's photos and videos if they've liked your Page and are at least 18 years old.

To tag other people or Pages in a photo:

1 Go to your Page and click the photo you want to tag.

2 Click **Tag Photo** on the right.

3 Click the person or Page in the photo.

4 Begin typing the person's or Page's name, then select them from the list that appears.

5 Click **Done Tagging** on the right.

To tag other people or Pages in a video:

1 Click **Publishing Tools** at the top of your Page.

2 Click **Video Library** on the left.

3 Hover over the video you want to tag, then click ✏️ .

4 Below **Describe your video...**, click ✚ .

5 Begin typing the person's or Page's name, then select them from the list that appears.

6 Click **Save**.

Was this information helpful?
Yes    No

View Full Article
· Share Article

## Draft, Schedule and Backdate

How do I schedule a post and manage scheduled posts for my Page?

You can create a post and schedule it to publish on your Page in the future. Scheduled posts can be created and edited by other admins and editors who help manage your Page.

Keep in mind that all times for scheduling correspond to your current time zone.

## Schedule a Post

To schedule a post:

1 Start creating your post at the top of your Page's timeline

2 Click  next to **Publish** and select **Schedule**

3 Below **Publication**, select the date and time when you want the post to publish

4 Click **Schedule**

## Manage Scheduled Posts

To reschedule, edit or delete a scheduled post:

1 Click **Publishing Tools** at the top of your Page

2 Click **Scheduled Posts** in the left column

3 Click the post you want to edit

4 Click **Edit** to edit the post, or click ▾ to choose to publish, reschedule or delete it

To see a history of all edits to a scheduled post, click **View Edit History**.

Was this information helpful?
Yes    No

View Full Article
· Share Article

How do I create, edit or publish a draft of a post for my Page?

Only **Pages**, **not personal profiles**, can create drafts. You'll need to be an **admin or editor** of your Page to create, edit or publish drafts of posts.

## Create a Draft

To create a draft of a post for your Page:

1 Start creating your post at the top of your Page's timeline.

2 Click ▢ next to **Publish**. If you don't see this, click ⚙ **Share Now ▾** .

3 Select **Save Draft**.

### Edit or Publish Drafts

To edit or publish drafts for your Page:

1 Click **Publishing Tools** at the top of your Page. Only **Pages**, **not personal profiles**, can access **Publishing Tools**.



2 Click **Drafts** in the left column.

3 Click the draft you want to edit or publish.

4 Click **Edit** to edit the draft. To publish the draft, click ▢ and select **Publish**.

Was this information helpful?
　Yes 　 No                                                          View Full Article
· Share Article



How do I choose a date for my Page post to stop showing in News Feed?

To choose a date and time for your Page post to stop showing in News Feed:

1 Start creating your post at the top of your Page's timeline.

2 Click **Share Now ▾** and then select **Schedule**.

3 If you want to publish your post immediately, click to turn off **Publication**.

4 Click to turn on **Stop News Feed Distribution** and select a date and time when you want your post to stop showing in News Feed.

5 Click **Publish** or **Schedule**.

Keep in mind that after the post stops showing in News Feed, it will still be visible on your Page's timeline.

Was this information helpful?
　Yes 　 No                                                          View Full Article
· Share Article

## Edit and Delete Posts

How do I hide or delete posts I've shared from my Page?

Hiding a post that you've shared from your Page will remove it from your Page, but not from your Page's **activity log** (which only you and other managers of your Page can see). When you delete a post, you'll permanently remove it from your Page, including your Page's activity log.

To hide or delete a post from your Page:

1 Go to the post on your Page's timeline.

2 Click ▾ in the top-right corner.

3 Select **Hide from timeline** or **Delete from Page**.

To unhide a post you've hidden:

1 Click **Settings** at the top of your Page.

2 Click **Activity Log** in the left column.

3 Click ⊘ next to the post you want to unhide and select **Allowed on Page**.

Keep in mind that if a post you've hidden was shared, it may still be visible to the audience it was shared with in other places on Facebook, such as News Feed and search. Any photos you've hidden from your Page's timeline will still be visible when people visit your Page's **Photos** section.

Was this information helpful?
　Yes 　 No                                                          View Full Article
· Share Article

How do I edit a post that I've shared from my Page?

To edit a post that you've shared from your Page:

1 Go to the post

2 Click ••• in the top-right corner and select **Edit Post**

3 Edit your post and click **Save**

Note: Posts that have been boosted or are part of an ad campaign can't be edited.

See Who Edited a Post Shared By Your Page

See Who Edited a Post Shared By Your Page

Keep in mind that posts can be edited by other admins and editors who work on your Page.

To see who edited a post:

1   Go to the post and click •••

2   Select **View edit history**

3   From here, you'll see a history of all edits, including edits made before the post was published

4   Click **Close** after you've finished viewing the edit history

Anyone who can see the post can see a history of any edits made after the post was published. Only the people who work on your Page can see edits made before the post was published and who edited it.

Was this information helpful?       View Full Article
○ Yes   ○ No                        · Share Article

## Like and Comment as Your Page

How do I publish, like or comment as my Page on another Page's post or timeline?

You'll need to be an admin, editor or moderator to like or comment as your Page on another Page's post. If you're an admin or editor, you may be able to publish as your Page on another Page's timeline, depending on that Page's settings.

To like or comment on another Page's post as your Page:

1   Go to the Page post you want to like or comment on.

2   Click your profile picture in the bottom-right corner of the post.



3   Select the Page you want to like or comment as.



4   Like or comment on the post.

To publish on another Page's timeline as your Page:

1   Go to the Page you want to publish on.

2   Click your profile picture in the top right corner of the posting box.



3   Select the Page you want to publish as.

4   Create your post, then click **Post**.

Note: Keep in mind that a person's profile isn't the same thing as a Page, which can represent brands, businesses or causes. While you can publish, like or comment as your Page on another Page, you can't do the same thing on a person's profile.

Was this information helpful?       View Full Article
○ Yes   ○ No                        · Share Article

How do I like another Page as my Page, and how do I see Pages Feed?

To like a Page as your Page:

1   Go to the Page you want to like.

8

2   Click   —   below the Page's cover photo.

3   Select **Like As Your Page**.

4   Select a Page and click **Submit**.

To see a list of all the Pages that your Page has liked, go to your Page and scroll down to **Pages liked by this Page** in the right column.

To see posts from Pages you've liked as your Page, go to your Page and click **See Pages Feed** in the right column of your Page.



View Full Article
· Share Article

## Activity Log

How do I view my Page's activity log?

Your Page's activity log helps you manage your Page's timeline. It also shows you a list of posts and comments by your Page, including posts you've hidden, but not those you've deleted. Only people who help manage your Page can see the activity log.

To view your Page's activity log:

1   Click **Settings** at the top of your Page.

2   Click **Activity Log** in the left column.

From here, you can:

· Hide or allow posts.

· Delete your Page's posts or comments.



View Full Article
· Share Article

If multiple people help manage my Page, how can I see who published something?

There are several ways to see who published something on your Page. Keep in mind that only people who help manage your Page can see this information.

· On a Page post, the name of the person who published will be listed next to **Published by**. On a Page comment, the name of the person who commented will be listed below the comment next to **Commented on by**.

· Click **Publishing Tools** at the top of your Page. From the column on the left, click **Published Posts, Scheduled Posts or Drafts** to see who published, scheduled or drafted Page posts.

· You can also see who published or scheduled posts in your Page's activity log.

Note: This information will only be visible on posts or comments created on or after February 20, 2014.



View Full Article
· Share Article

Facebook © 2019
English (US)

About
Privacy
Careers

Ad Choices
Create Ad
Create Page

Terms & Policies
Cookies

9

# EXHIBIT 12



## Insights

**Where can I see Page Insights?**

To see Page Insights:

1 Click **Insights** at the top of your Page.

2 Click sections on the left for more information.

## About Insights

Insights provide information about your Page's performance, like demographic data about your audience and how people are responding to your posts.

Keep in mind that you can only access data in Page Insights for the last 2 years, and demographic data, such as age, gender and location, are available in Page Insights once there is data for 100 or more people. Pages categorized as a Community Page don't have Insights.

You can use Insights to:

- Understand how people are engaging with your Page.

- View metrics about your Page's performance.

- Learn which posts have the most engagement and see when your audience is on Facebook.

Was this information helpful?       View Full Article
○ Yes   ○ No                        · Share Article

**What's the difference between Page views, reach and impressions?**

Page views are the number of times a Page's profile has been viewed by people, including people who are logged into Facebook and those who aren't.

Reach is the number of people who had any content from your Page or about your Page enter their screen.

Impressions are the number of times any content from your Page or about your Page entered a person's screen.

Was this information helpful?       View Full Article
○ Yes   ○ No                        · Share Article

**Where can I see how many people have viewed my Page?**

To see the number of people who viewed your Page, click **Insights** at the top of your Page, then click **Page Views** on the left.

From here, you can see views by:

- Section (example: Posts, Videos, Photos)

- Age and Gender

- Country

- City

- Device (example: computers, mobile devices)

Was this information helpful?       View Full Article
○ Yes   ○ No                        · Share Article

**What metrics are available on Page posts?**

Metrics for your Page's posts are available as soon as the post is published. In the **Posts** section of Insights, you can see the following information about your Page posts:

- The number of people reached

- Post clicks

- Reactions, comments and shares

- Total video views and viewing behavior details

## See Post Reactions, Comments and Shares

You can see how many people are reacting to, commenting on and sharing your Page posts in Page Insights. Keep in mind that post reactions, comments and shares that have been changed or deleted are counted toward the total number in Page Insights.

To see this info by post:

1  Click **Insights** at the top of your Page.

2  Click **Posts** on the left.

3  Scroll down to **All Posts Published** and view the **Engagement** column.

To see this info for all Page posts within a date range:

1  Click **Insights** at the top of your Page.

2  Click **Reach** on the left.

3  Select **Start** and **End** dates in the top right.

4  Scroll down to **Reactions, Comments and Shares** or **Reactions**.



How do I see demographic data about the people who like my Page?

## See Demographic Data About the People Who Like Your Page

To see demographic data about the people who like your Page:

1  Click **Insights** at the top of your Page.

2  Click **People** on the left.

3  Click the **Your Fans** section to see the percentage of people who like your Page by age, gender, country, city and language.

## See When the People Who Like Your Page Are on Facebook

You can see data about when the people who like your Page are on Facebook:

1  Click **Insights** at the top of your Page.

2  Click **Posts** on the left.

In the **When Your Fans Are Online** section, you can see data from a recent one-week period about the days of the week and times when the people who like your Page are on Facebook.



What's the difference between organic, paid and post reach?

Post reach is the number of people who had any posts from your Page enter their screen.

Paid reach is the number of people who had a paid post from your Page enter their screen. Organic reach is the number of people who had an unpaid post from your Page enter their screen. Organic reach can be broken down into viral and nonviral:

- **Viral:** The number of people who had any content from your Page or about your Page enter their screen because their friend likes or follows your Page, engages with a post, shares a photo of your Page or checks into your Page.

- **Nonviral:** The number of people who had any content from your Page enter their screen. This doesn't include when someone's friend likes or follows your Page, engages with a post, shares a photo of your Page and checks into your Page.

If your post reaches someone through both paid and organic distribution, they're counted toward each. Keep in mind that the sum of organic and paid reach won't always equal post reach. For example, if one person sees your post through both paid and organic distribution, they'll be counted as 1 in organic reach, 1 in paid reach, and 1 in post reach.

## Why has my Page's organic reach dropped?

There are many factors that affect reach, including how people are engaging with your Page's content, how people have engaged with similar types of content in the past, the quality of the content and other factors such as time of day and whether people are on Facebook on their mobile phone or computer. It's normal for reach to change based on these factors.

## Where can I find organic reach for my Page using the previous measurement?

To find organic reach for your Page using the previous measurement:

1  Click **Insights** at the top of your Page.

2  Click **Export Data** in the top right.

3  Below **Data Type**, select **Page data** and below **Layout**, select **Edit All Page Data**.

4  Type "served" into the search bar at the top and select whether you'd like daily, weekly or 28 days of served organic reach of Page posts.

5  Once you've made your selection, scroll to the bottom of the column on the right, click the box that says **Served Organic Reach of Page Posts** and drag it to the top of the column, below **Key Metrics**. Do this for each type of **Served Organic Reach of Page Posts** that you've selected. This will prevent any errors from occurring.

6  Click **Apply** and then click **Export Data**.

7  Open the document that downloads to your computer and search for **Served Organic Reach of Page Posts** (this is the term for the previous measurement of organic reach).



How can I see insights about my Page likes and unlikes?

## See Where Your Page Likes Happened

You can see the number of Page likes that occurred on your Page, ads, through Page

suggestions and other sources.

To see where your Page likes happened:

1   Click **Insights** at the top of your Page.



2   Click **Likes** in the left column.

3   Scroll down to **Where Your Page Likes Happened**.

4   Click the chart to see the source of the likes by day.

### See How Many People Have Liked and Unliked Your Page

To see how many people liked and unliked your Page during a specific date range:

1   Click **Insights** at the top of your Page.

2   Click **Likes** in the left column.

3   In the top right, select **Start** and **End** dates for the date range you want to see.

4   Scroll down to **Net Likes**.

5   Click the chart to see the source of the likes and unlikes by day.

To protect the privacy of the people who like your Page, you're not able to see who has unliked your Page.



Was this information helpful?
○ Yes   ○ No

View Full Article
· Share Article

How do I see insights for my Page's videos?

To see insights for all of your Page's videos for a given time period:

1   Click **Insights** at the top of your Page.

2   Click **Videos** on the left.

Keep in mind that not all video insights data will be available before September 2016. For more information, go to Facebook Newsroom.

To see insights for an individual video:

1   Click **Publishing Tools** at the top of your Page.

2   Click **Video Library** on the left.

3   Click a video.

From here, you can click sections on the right to see more details about the video's performance. For example:

·   **Minutes Viewed**: Minutes the video was watched from your Page's post, in posts the video was shared in and in crossposts.

·   **10-Second Views**: The number of times your video was watched for at least 10 seconds, or for nearly its total length, whichever happened first.

·   **Audience and Engagement**: The number of reactions, comments and shares, and for videos with at least 100 views, audience demographics.

Was this information helpful?
○ Yes   ○ No

View Full Article
· Share Article

How can I see how many people are viewing and responding to my Page's events?

To see metrics about your Page's events, click **Insights** at the top of your Page, then click **Events** in the left column.

From here, you can see metrics for all your Page's events:

·   **People Reached**: The number of people who had info about any of your Page's events enter their screen.

·   **Event Page Views**: The number of people who viewed any event hosted by your Page.

·   **Clicks on Buy Tickets**: Click **Tickets** at the top to see the number of clicks on ticketing URLs for all events with a link for tickets.

At the bottom, you can see metrics about individual events that are upcoming or happened in the past:

·   **Responses**: The number of people who responded **Interested** or **Going** to the event.

·   **Reach**: The number of people who had info about your event enter their screen.

Note: Metrics about your Page's events include data from January 20, 2016 or later.

You can see additional metrics, such as your audience's current city on their profiles, as well as recommended actions on your Page's event.

To see additional metrics and recommended actions:

1   Go to your Page and click **Events** in the left column.

2   Click the event you'd like to see metrics on.

3   In the top right, you'll see metrics such as reach, responses and audience.

4   To see more metrics, including metrics on your audience's current city on their profiles, and recommended actions for your event, click **See More** in the top right.

Was this information helpful?
○ Yes   ○ No

View Full Article
· Share Article

### How can I see how many people clicked my Page's call-to-action button, mobile phone number, website or address?

To see how many people clicked your Page's call-to-action button, mobile phone number, website or address:

1   Click **Insights** at the top of your Page.

2   Click **Actions on Page** on the left.

From here, you can see the number of clicks by age and gender, country, city and device.

Was this information helpful?
○ Yes   ○ No

View Full Article
· Share Article

### How do I see insights about my Facebook Page's followers?

When someone follows your Page, it means they may receive updates about your Page in their News Feed.

Keep in mind that whenever someone likes your Page, they automatically follow it, which is included in your total number of Page follows in Page Insights.

To see insights about your Page's followers:

1   Click **Insights** at the top of your Page.

2   Click **Followers** in the left column.

From here, you can see insights about the number of your Page's followers and unfollows over time and where your Page follows happened.

To learn more about the people who follow your Page:

1   Click **Insights** at the top of your Page.

2   Click **People** in the left column.

3   Click **Your Followers** at the top.

From here, you can see information about the gender, age, country, city and language of your Page's followers.

Was this information helpful?
○ Yes   ○ No

View Full Article
· Share Article

### How do I see insights about my Page's recommendations?

Insights about your Page's recommendations are the number of times that people have recommended your Page in posts or comments.

To see insights about your Page recommendations:

1   Click **Insights** at the top of your Page.

2   Click **Reach** in the left column, then scroll down to **Recommendations**.

From here, you can see the number of times people have recommended your Page over time. Keep in mind that there will only be data available for recommendations if your Page has actually been shared as a recommendation.

Was this information helpful?
○ Yes   ○ No

View Full Article
· Share Article

### How do I see insights about my Page's previews?

Insights about Page previews are the number of times someone hovers over your Page name or profile picture in News Feed and in other places for more information without actually clicking your Page.

To see insights about your Page's previews:

1   Click **Insights** at the top of your Page.

2   Click **Page Previews** in the left column.

From here, you can see how many times your Page preview has been seen, and how many people saw your Page preview. Keep in mind that the same person can view your Page preview multiple times.

Was this information helpful?
○ Yes   ○ No

View Full Article
· Share Article

### How do I export my Page's insights data?

To export your Page's insights data:

1   Click **Insights** at the top of your Page.

2   Click **Export Data** in the top right.

3   Select a data type, file format and date range. You may also need to choose a layout.

4

4   Click **Export Data** again.

Keep in mind that you can only export data from up to 2 years ago, and the time range for data must be shorter than 180 days. You may see some additional metrics in your exported data that aren't found in Page Insights.

You can also create a custom layout for your data.

To create a custom layout:

1   Click **Insights** at the top of your Page.

2   Click **Export Data** in the top right.

3   Below **Layout**, select **Make New Custom Layout**.

4   In the bottom right, enter a sheet name for your data and then click **Add**.

5   From the column on the left, select the information you'd like to add to your sheet.

6   When you've finished selecting your custom data, click **Apply**.

7   Click **Export Data**.

Was this information helpful?
Yes   No

View Full Article
Share Article

Facebook © 2019          About              Ad Choices          Terms & Policies
English (US)            Privacy            Create Ad           Cookies
                       Careers            Create Page

5

# EXHIBIT 13



### Public Notification

**Public Notification for Social Media**

Texas A&M University System (A&M System) and its members and agencies provide the following information to notify the public of the policy areas that impact the public's use of the Social Media Tools by the A&M System and its members and agencies.

**Accessibility**

The A&M System is committed to providing an online presence that enables full public access to Texas government information and services. Please reference the A&M System accessibility statement and/or the accessibility policy of each of our members and agencies for more information

To accommodate users with disabilities, here are suggested alternative access sites for these social media channels:

**Facebook**
The Facebook mobile site http://m.facebook.com is a suggested accessible alternative to the original Facebook page. Please also reference Facebook's help page for Accessibility for People with Disabilities for more information.

**Flickr**
The mobile version of Flickr http://m.flickr.com/ is the suggested alternative to access the original Flickr page.

**Google +**
Please reference the accessibility features of Google products for more information.

**Instagram**
As Instagram is owned by Facebook, please reference Facebook's help page for Accessibility for People with Disabilities.

**Twitter**
The accessible version of Twitter www.accessibletwitter.com is the suggested alternative access to the original Twitter profile.

**YouTube**
The A&M System and its members and agencies will make an effort to link to and display videos on its YouTube channel that have closed captioning available for hearing impaired viewers. For more information about the closed captioning feature on YouTube, visit: https://support.google.com/youtube /answer/2734796?hl=en

**Intellectual Property Rights and Ownership**

Intellectual property rights of content provided by the public will be governed by federal copyright law, the terms of service of the social media provider, and the copyright policies of the A&M System and each of its members and agencies. Please reference the Digital Millennium Copyright Act notice and contact information for each of our members and agencies should you need to report a copyright issue.

Any trademarks that appear on A&M System social media sites are the property of their respective owners who may or may not be affiliated with, connected to, or sponsored by the A&M System. Please refer to the trademark requirements of each of our member institutions and agencies for information before using any A&M System trademark.

**Linking/Third-Party Websites**

The A&M System and its members may make available social media applications, and may publish social media content to third party sites. These sites are not official web sites and therefore, the State Website Linking and Privacy Policy apply as well as the Linking Policies of our member institutions and agencies.

**Moderation**

All published social media content may be subject to monitoring. This content may take the form of digital text, photography images, and videos. User-generated posts may be rejected or removed if possible when the content of a post:

- violates the terms of service that governs the social media sites
- contains personal identifying information or sensitive personal information, as defined in Tex. Code Bus & Com. Sec. 521.001 et. seq.

1

- contains offensive terms that target protected classes
- is threatening, harassing or discriminatory
- incites or promotes violence or illegal activities
- contains information that reasonably could compromise public safety
- advertises or promotes a non-affiliated commercial product or service, or any entity or individual
- promotes or endorses political campaigns or candidates
- violates a trademark, copyright or other law

**Privacy**

A&M System members or State employees are permitted to only post public information on social media sites. If communication that takes place on A&M System sites involves or requires private information, communication will be redirected through other appropriate channels. Postings from the public on A&M System or its members' social media sites become public record and may be shared on A&M System websites. This information may be subject to public information requests. For more information, please refer to the A&M System Public Information Act Compliance policy at http://policies.tamus.edu /61-01.pdf and the policies of our members and agencies.

The A&M System and its members and agencies are not responsible for content posted by others to its social media sites. Users that enter personal information on its social media sites do so at their own risk. The A&M System is not responsible for the public display of such private information. The A&M System and its members and agencies may remove postings to its social media sites that contain personally identifiable information, but neither the A&M System, nor its licensors or contractors are responsible for any damages caused by delays in such removal.

**Public Information Act (Public Information Act, Texas Government Code Chapter 552) and Record Retention**

Social media sites may contain communications sent to or received by state employees, and such communications are therefore public records subject to State Records Retention requirements. These retention requirements apply regardless of the form of the record (digital text, photos, audio, or video, for example). The A&M System and its members and agencies will put forth reasonable efforts to archive copies of social media content in order to meet State records retention obligations in accordance with the DIR Records Retention Schedule.

**Terms of Service**

Social media sites are third party sites and have terms of service and policies that are not governed by the A&M System or the State of Texas. These third party sites are not official A&M System web sites and the third party's website terms of service and policies apply. Services provided by us on third-party social networking services, communication services, or media sharing services may be discontinued at any time without prior notice. The terms of service for the social media sites can be found below:

- Facebook
- Flickr
- Foursquare
- Google +
- Instagram
- LinkedIn
- Pinterest
- Twitter
- YouTube



aims to train the next generation of

Embed                                    View on Twitter

Copyright © 2019 Texas A&M University System All rights reserved.
301 Tarrow Street, College Station, TX 77840 | MAP | Phone: (979) 458-7700 | email: tamus-webmaster@tamus.edu.
State of Texas | Texas Homeland Security | Texas Veterans Portal | Statewide Search | Risk, Fraud & Misconduct Hotline | Privacy | Web Accessibility | Google+

# EXHIBIT 14

# Settings

Contact Information
Basic Page Information
Timeline
Administration
Photos
**Settings**
Videos

| | |
|---|---|
| Page Visibility | Page published |
| Page Verification | Page is verified |
| Visitor Posts | Anyone can publish to the Page<br>Anyone can add photos and videos to the Page |
| News Feed Audience and Visibility for Posts | The ability to narrow the potential audience for News Feed and limit visibility on your posts is turned off |
| Messages | People can contact my Page privately. |
| Tagging Ability | Other people can tag photos posted on my Page. |
| Country Restrictions | Page is visible to everyone. |
| Age Restrictions | Page is shown to everyone. |
| Page Moderation | Posts containing these words are blocked: $,a$$,abuse,abusers,aggy,apartment,ass,bastard,bastards,bit card,giftcard,hook,hook em,hookem,hell,illuminati,ipaad,ipad2,ipadss,jersey,jetblue,job,lab,md,ms,pad,padds,penis,peta,sale,shit |
| Profanity Filter | Set to medium |
| Post in Multiple Languages | Ability to write posts in multiple languages is turned off |
| Translate Automatically | Your posts may show translations automatically for people who read other languages |
| Comment Ranking | Most relevant comments are shown for my Page by default. |

# Administration

Contact Information
Basic Page Information
Timeline
**Administration**
Photos
Settings
Videos

| Name | Role |
|------|------|
|      | Admin |
|      | Editor |
|      | Analyst |
|      | Admin |
|      | Editor |

# EXHIBIT 1





CONGRESSIONAL
MANAGEMENT
FOUNDATION

THE PARTNERSHIP FOR

*A More Perfect Union*

at the

CONGRESSIONAL MANAGEMENT FOUNDATION

CongressFoundation.org

Made possible by grants from

**Blue Cross Blue Shield Association**
**DCI Group**
**VoterVoice**



# #SocialCongress 2015

Written by
**Bradford Fitch and Kathy Goldschmidt**

with assistance from
**Nicole Folk Cooper, James Vaughn, Jaime Werner,
Dylan Wulderk and Camille Mendoza**

## Special Thanks

We are grateful to our sponsors, Blue Cross Blue Shield Association, DCI Group, and VoterVoice, who have generously enabled us to produce this report. Their contributions further the important work of CMF's *Partnership for a More Perfect Union* and help promote a more effective and meaningful democratic dialogue.







© 2015, Congressional Management Foundation. All rights reserved.

This content is the intellectual property of the Congressional Management Foundation (CMF), and is protected by Title 17 of the United States Code covering copyright law. By copying and using this material, you are breaking federal law, and are subject to legal action as defined in Title 17, Chapter 5 of the United States Code. You have one way to prevent this level of action: **refrain from reproducing the mentioned works in any manner without the prior express written permission of CMF.** Federal law provides severe civil and criminal penalties for the unauthorized reproduction or distribution of copyrighted content. Criminal copyright infringement, including infringement without monetary gain, is investigated by the FBI and may constitute a felony punishable by up to five years in federal prison and/or a $250,000 fine.

The Partnership for a More Perfect Union at the Congressional Management Foundation

710 E Street SE
Washington, DC 20003
202-546-0100
CongressFoundation.org
@CongressFdn

# Table of Contents

**Methodology** ................................................................ **6**

**Introduction** ............................................................... **7**

**Key Findings** ............................................................. **9**

    Figure 1 ................................................................ 9

    Figure 2 .............................................................. 11

    Figure 3 .............................................................. 12

    Figure 4 .............................................................. 13

    Figure 5 .............................................................. 15

**About the Congressional Management Foundation** ...... **18**

**About the Partnership for a More Perfect Union** ......... **19**

# Methodology

This report is based on two online surveys conducted between July and August 2014, one of House and Senate Communications Directors and the other of House and Senate Legislative Directors and Legislative Assistants. CMF received a total of 116 responses. Of these respondents: 53% were communications staffers while 47% were legislative and policy staffers; 55% were employed by Democratic Members and 45% by Republican Members; 83% were employed in the House while 17% were employed in the Senate.

| ANALYSIS OF RESPONDENTS | |
| --- | --- |
| Total Responses | 116 |
| Party | 55% Democrat; 45% Republican |
| Chamber | 83% House; 17% Senate |
| Position/Title | 53% communications staffers; 47% legislative and policy staffers |
| Member Tenure | 56% were in office 11 years or more; 44% were in office 10 years or less |

Note: Surveys were in the field between July-August 2014.
Source: #SocialCongress 2015, Congressional Management Foundation.

# Introduction

"Social media is the ultimate equalizer. It gives a voice and a platform to anyone willing to engage." That statement by Internet entrepreneur Amy Jo Martin has profound implications in a democracy. Prior to the introduction of the Internet, the process of engaging elected officials was viewed as cumbersome and intimidating, perhaps only available to wealthy campaign donors. And prior to social media, email interactions with lawmakers were viewed by many as formal and robotic – mostly consisting of mass campaigns drafted by special interest lobbyists, forwarded to a congressional office by citizens who barely read the message, resulting in a bland form letter sent back by the legislator. (Sadly, this remains the most ubiquitous form of communication in our democracy.)

Yet social media is different, and is affecting the democratic dialogue in unexpected ways. The authenticity of a tweet or Facebook post, whether by a citizen or lawmaker, has the inescapable power to change minds. This report by the Congressional Management Foundation shows a glimpse at how that process happens. Through surveys of congressional staff, this research opens a window into the perceptions and motivations of how social media influences public policy decisions on Capitol Hill. For Members of Congress and congressional staff, the research offers a benchmark to compare their practices and attitudes with those of their colleagues. For citizens and advocacy groups, it offers exciting new ways to communicate with Congress.

Perhaps the most surprising and significant finding is how a relatively few number of citizens can affect Congress using social media. Eighty percent of congressional staff responding to these surveys noted that less than 30 posts to their office's social media platform would cause them to "pay attention." While the metric captured – getting an office to "pay attention" – may sound unimportant, it is not. It represents a conduit to the lawmaker and staff: access to policy decision-makers. And access is power. But on some levels the numbers shouldn't be surprising. Members of Congress, staff, and professional advocates (i.e., lobbyists) know full well that a small number of people, strategically positioned to engage a legislator, can make a difference. Any lawmaker would readily agree that two dozen like-minded citizens showing up at a town hall meeting would definitely get their attention. Social media allow for similar interactions. What's changed, though, is that now one can engage instantly from almost anywhere in the world with nothing more than a smartphone.

The other surprise to readers outside the Washington Beltway might be how much Congress seems to care about constituents' opinions. Regrettably, negative (and inaccurate) portrayals of Congress permeate all forms of media. A 2015 national public survey asked Americans whether

*Perhaps the most surprising and significant finding is how a relatively few number of citizens can influence Congress using social media.*

*"For those not regularly tuned in to what's going on in Washington, social media gives us the ability to share and engage with those people."*

—House Communications Director

they agreed with this statement: "My representative in Congress cares what I think."[1] Only 31 percent of respondents agreed. Yet in the CMF surveys of congressional staff, only three percent said "We don't review comments" on their social media platforms – suggesting a whopping 97 percent *do* review comments. Congress *is* listening and *does* care what constituents think. Countless CMF surveys and research projects with Members of Congress and staff over more than three decades confirm this surprising truth. (For an education on how Congress actually works, CMF recommends readers skip the third season of *House of Cards* and re-watch a few segments of *Schoolhouse Rock*.)

While the primary purpose of this research is to provide some practical insight into how congressional offices and citizens can use social media to build stronger relationships, a welcome secondary outcome might be to chip a few bricks from the wall of cynicism that separates people from politicians. To quote Margaret Mead, "Never doubt that a small group of thoughtful, committed citizens can change the world; indeed, it's the only thing that ever has." As this report shows, "a small group of thoughtful, committed citizens" can influence public policy. While we're still at the dawn of the marriage between social media and Congress, it's rather exciting to wonder about the potential this partnership could have for American democracy.

---

[1] The survey of 1,000 likely voters was conducted on September 8-9, 2015 by Rasmussen Reports. http://www.rasmussenreports.com/public_content/politics/mood_of_america/congressional_performance

# Key Findings

## 1. Senators and Representatives are more inclined to use social media than they were in the past.

Both communications and legislative staffers indicated that their bosses have become more open to social media in recent years. As Figure 1 shows, most of the respondents (84%) said Members of Congress have become more inclined to use social media while only 1% said their bosses had become less inclined to use it. This may seem an obvious statement, given the ubiquitous nature of social media in American society. However, Congress historically has been slow to adopt technology and integrate it into its operations. As noted in the 2011 CMF report, *#SocialCongress: Perceptions and Use of Social Media on Capitol Hill,* "[T]he legislative branch has adopted social media much more quickly than it adopted other technologies, such as fax machines, email and websites."[2]

> *"It gives us a way to let people back home see behind the scenes."*
>
> —Senate Legislative Staffer

**FIGURE 1.**



**During the past few years, how has your Member/Senator's attitude towards social media changed?**

84% — Become more inclined to use it
16% — Remained the same
1% — Become less inclined to use it

(n = 116)
Source: *#SocialCongress 2015*, Congressional Management Foundation.

## Implications:

This finding suggests the trend to integrate social media into congressional office operations will continue. As natural turnover occurs, with new Members of Congress and staff coming to Congress from other business and government sectors, they will bring their workplace habits and expectations with them. Congressional institutional offices will continue to

---

[2] Congressional Management Foundation, 2011. *#SocialCongress: Perceptions and Use of Social Media on Capitol Hill.* http://www.congressfoundation.org/cwc-social-congress

> *"[Social media] is real-time feedback, amplification of message, interaction with multiple viewpoints, and the ability to share different content via different platforms."*
>
> —House Communications Director

feel pressure from Members and staff to provide support for technologies and platforms in common use outside Capitol Hill. Congressional offices will need to look for ways to integrate social media comments into their processes and decision-making. And citizen groups increasingly will include social media strategies as part of any effort to influence public policy.

## 2. Staff generally feel social media have improved relationships between constituents and Congress.

As Figure 2 shows, more than three-quarters (76%) of the respondents "agree" or "strongly agree" with the statement "social media enabled us to have more meaningful interactions with constituents," and nearly as many (70%) agreed that "social media have made Members/Senators more accountable to constituents." Additionally, 63% of staff feel that social media will surpass email and other forms of communications (in volume) in the next five years.

There appears to be a sense among staff that most of the comments they observe on social media are authentic. However, in their answers to open-ended questions, staff express some frustration with anonymous or angry rants that interfere with a thoughtful policy discussion. Nevertheless, staff value the immediacy and realism of these virtual public forums. This contrasts with staff views of mass email campaigns, which are viewed somewhat skeptically on Capitol Hill, in that they are usually facilitated by third party organizations, such as an association, nonprofit, or company. It is important to note, while congressional staff may view identical email form campaigns with skepticism, congressional staff also report that the results of these campaigns are tabulated and communicated to lawmakers, and therefore have some degree of influence over public policy discussions.[3]

### Implications:

At this time, social media appear to be avenues for citizens and Congress to have honest and (sometimes) thoughtful conversations about public policy. For those lawmakers who embrace these forums, they offer another way to gauge public opinion on issues, albeit an unscientific one. For citizens represented by public officials who are regularly engaged in social media, these platforms offer inexpensive, convenient, and genuine methods for having their voices heard in Washington.

---

[3] Congressional Management Foundation, 2011. *Communicating with Congress: Perceptions of Citizen Advocacy on Capitol Hill.* http://www.congressfoundation.org/cwc-perceptions

**FIGURE 2.**



Please indicate the extent to which you agree or disagree with the following statements.

- Social media enabled us to have more meaningful interactions with constituents — 23% Strongly Agree, 53% Agree
- Social media have made Members/Senators more accountable to constituents — 20% Strongly Agree, 50% Agree
- In the next 5-10 years more constituent communications will come in via social media than email, phone, and other means — 32% Strongly Agree, 31% Agree
- Most of the social media postings to our platforms provide us enough information and context to determine if the post is from a constituent — 3% Strongly Agree, 33% Agree

■ Strongly Agree  ■ Agree

(n = 115)
Source: *#SocialCongress 2015*, Congressional Management Foundation.

# Outstanding Use of Social Media in Congress

## 113TH CONGRESS GOLD MOUSE AWARDS FOR CITIZEN ENGAGEMENT ON SOCIAL MEDIA

In 2014, CMF extended its research into best practices in online communications to congressional use of social media. CMF recognized 17 Members of Congress for their efforts in using these tools in specific ways to further transparency, accountability, and constituent service. For congressional staff, CMF summarized the common characteristics of winners and documented examples of legislators and staff using social media to connect with constituents and make Congress more understandable to the public.

Find out more at: http://www.congressfoundation.org/projects/gold-mouse-project/

*"With budget cuts, social [media] gives us a space outside of our Congressional website to share the Congressman's thoughts and stance on important issues, as well as gauge constituents' opinions."*

—House Communications Director

### 3. Thirty or fewer similar comments on a social media post are enough to get an office's attention, but they need to be posted quickly or they may not be seen.

Legislative staffers and communications staffers were aligned on how many comments it takes for their offices to pay attention. As Figure 3 shows, about one-third (35%) of the respondents said it takes fewer than 10 similar comments for their offices to pay attention, and nearly half (45%) said their offices will pay attention to between 10 and 30 similar comments. Interviews with congressional staff and observations of congressional social media use suggest that respondents are primarily referring to reactions to *their own* posts. In essence, Congress appears to be using Facebook and Twitter as instantaneous means to receive feedback on legislators' statements.

However, as Figure 4 shows, the more time that passes after an office posts on social media, the less likely it will be that staff will review the response. One-quarter (25%) of the respondents indicated their offices will review comments no matter how long it has been since they posted, but most said their offices will be less likely to see comments to older posts as time goes on.

**FIGURE 3.**



How many similar comments on a social media post is enough for your office to pay attention to?

- Less than 10 — 35%
- 10-30 — 45%
- More than 30 — 21%

(n = 110)
Source: *#SocialCongress 2015*, Congressional Management Foundation.

**FIGURE 4.**



How long after posting an office/Member comment will you review reactions?

| | |
|---|---|
| Up to 6 hours | 54% |
| Up to 24 hours | 40% |
| Up to 72 hours | 32% |
| Up to 1 week | 23% |
| Up to 2 weeks | 6% |
| Up to 1 month | 4% |
| It doesn't matter how old the reactions are, we'll still review them | 25% |

(n = 114)
Note: Answers do not equal 100% because respondents were asked to "check all that apply."
Source: *#SocialCongress 2015*, Congressional Management Foundation.

## Implications:

Prior to social media, in order to gain the attention of lawmakers and staff, individuals and groups either had to: organize small cadres to attend in-person events where lawmakers and staff were present; generate significant numbers of constituent comments through postal, email and phone campaigns; or develop long-term relationships with the staff and Member through repeated interactions and/or involvement in the legislator's election campaigns. These other methods are still available to citizens, and research by CMF and other organizations show they remain successful strategies for getting heard by lawmakers. Social media now offer an alternative, with significant efficiency and effectiveness benefits.

However, facilitating grassroots advocacy via social media also presents a challenge. The average citizen doesn't have two dozen advocates ready to act on a moment's notice. And grassroots experts at associations, nonprofits, and companies often remark that mobilizing their supporters on social media is extremely hard. Therefore, this suggests that organized groups with access to constituent lists employ strategies to *anticipate* a lawmaker's social media postings. Consider when a lawmaker will make a statement at a committee hearing or introduce a new bill. They must also train and prepare their network *before* they need them. (Said another way by communications experts, once you hear the thunder it's too late to build the ark.) By encouraging supporters to build social media relationships

*"Because of the high number of Internet users who maintain some level of anonymity on social media, the level of dialogue can devolve and inter-actions can seem counterproductive at times."*

—House Communications Director

with Congress as an ongoing practice, citizens and groups will be in position to offer comments and reactions to legislators' posts when it is most relevant.

## 4. Social media posts by constituents can influence undecided Senators and Representatives, but staff generally do not feel social media posts provide enough information to identify constituents.

Though few of the respondents said constituent input via social media would have "a lot" of influence on their boss if he/she had not arrived at a firm decision on an issue, many felt it would have "some" influence (see Figure 5).[4] Legislators' constituents using social media clearly can get the attention of a congressional office, particularly if they self-identify, which increases their influence.

However, as previously shown in Figure 2, congressional staff indicated that they have a hard time identifying when social media posts are from constituents. Just over one-third (36%) of the respondents indicated they "agree" or "strongly agree" with the statement, "Most of the social media posts to our platforms provide us enough information and context to determine if the post is from a constituent."

### Implications:

Despite overwhelming cynicism as to whether Congress "listens" to citizens, this finding supports previous CMF research indicating that constituents can have an impact on lawmakers' decisions.[5] For Congress, this finding could help to reaffirm citizens' trust in their democratic institutions, knowing that their elected officials actually care about what they think.

Additionally, unlike other forms of communications (email, letters, phone calls), social media appear to be the only communications platforms in which *non-constituents* can influence lawmakers. Since the age of the modern Congress – established in the 1970s, when offices were accorded staff and resources enough to manage and respond to growing amounts of correspondence – lawmakers have used both human and technological filters to ensure only constituent messages get through. Yet no such filters exist for Facebook and Twitter. Therefore, while lawmakers value the authenticity of comments in social media, they cannot be certain the messages are from constituents *unless* the constituent identifies

---

[4] This question is based on and is similar to a question posed in previous CMF surveys: "If your Member of Congress has not arrived at a firm decision on an issue, how much influence might the following advocacy strategies directed to the Washington office have on his or her decision?"

[5] Congressional Management Foundation, 2011. *Communicating with Congress: Perceptions of Citizen Advocacy on Capitol Hill.* http://www.congressfoundation.org/cwc-perceptions

themselves as such. According to this data, those individuals who do confirm their constituent status are more likely to influence decision-making than those who do not.

Finally, it seems important to note that 59% of the survey respondents indicated that "a constituent" could have some or a lot of influence. One constituent. Through CMF's work with Congress during the last 38 years we have regularly heard stories from lawmakers about the "one constituent" who told them a story or made a personal plea regarding public policy that moved them to action. They may have encountered that person during an organized fly-in to Washington, at a town hall meeting, in the grocery store, or at their child's baseball game. The power of that single person's story or argument could influence a tie-breaking vote in committee, lead to the introduction of legislation, or become the human face that symbolizes the impact of policy on an entire community of Americans. This finding suggests that one voice now has another way to influence public policy: social media.

> *"It's an opportunity to have an unfiltered view of the member's stance on a particular issue or reaction to a news story."*
>
> — House Communications Director

**FIGURE 5.**



**If your Member of Congress has not arrived at a firm decision on an issue, how much influence might social media posts directed to your office (including posts on your office/Member platforms) from the following have on his/her decision?**

| | |
|---|---|
| Multiple constituents affiliated with a specific group or cause | 78% |
| A leader or representative of a constituent group | 75% |
| Multiple constituents not affiliated with a specific group or cause | 71% |
| The official account of a group that represents constituents | 69% |
| A constituent affiliated with a specific group or cause | 69% |
| A constituent not affiliated with a specific group or cause | 59% |
| Social media comments in general | 56% |
| More than one person with unclear constituent status | 25% |
| A person with unclear constituent status | 21% |

■ Some or A Lot of Influence

(n = 114)
Source: *#SocialCongress 2015*, Congressional Management Foundation.

# When Social Media Tipped the Scales in Congress: The SOPA-PIPA Debate 2011-2012

While analysts, reporters, and researchers have sought to identify clear examples where social media changed the outcome of a legislative debate, nothing comes remotely close to the case study involving the Stop Online Piracy Act (SOPA) and the Protect Intellectual Property Act (PIPA) that raged from late 2011 to early 2012. As the debate unfolded, CMF initiated a research study on the topic. In real time, we collected data on the activity of proponents and opponents, interviewed congressional staff on the impact of advocacy efforts, and assessed how this campaign compared to other campaigns.

In part through the effective use of social media, the anti-SOPA-PIPA coalition won the day after then-Senate Majority Leader Harry Reid pulled the bill from the floor and cancelled a vote due to lack of support for the legislation. Prior to that decision, 18 Members of Congress who had cosponsored the bills took the unusual action of "un-cosponsoring" the bills. Politicians reversing themselves on positions and legislation are rare – and the number who actually removed their names as cosponsors of the bills is likely the largest number to do so in the history of the Congress.

## BACKGROUND

The Stop Online Piracy Act (SOPA) and the Protect Intellectual Property Act (PIPA) were introduced respectively by the chairs of the House and Senate Judiciary Committees, Representative Lamar Smith (R-TX) and Senator Patrick Leahy (D-VT). According to bill sponsors, the legislation was intended to restrict access to pirated material online and "expand the ability of U.S. law enforcement to fight online trafficking in copyrighted intellectual property and counterfeit goods."

Initially, the bills had bipartisan support and the backing of a wide swath of businesses with a stake in protecting their interests and content including: Comcast, Wal-Mart, the AFL-CIO, Disney, the Motion Picture Association of America, and the U.S. Chamber of Commerce. However, in the summer of 2011 opposition started to coalesce under a "free speech" and "anti-censorship" banner. Eventually, opponents included: Google, Yahoo, Facebook, Wikimedia, Mozilla, ACLU, and Human Rights Watch. (Despite the "internet grassroots" versus "big media businesses" appearance of the battle, according to lobbyist disclosure forms, opponents actually hired more paid lobbyists than proponents.)

## THE BATTLE

While the bills moved through committee in 2011, the American Censorship coalition (opponents) didn't officially form until November of 2011. The rapid rise of this coalition, primarily using social media, was one of the unique hallmarks of this debate. In December 2011 through January 2012, legislators, outside groups, and especially Internet-related organizations and companies quickly began to voice opposition. On January 13, 2012, a group of Republican Senators sent a letter to Senator Reid asking him to delay the vote. On January 14, the White House announced

its opposition. And the climax occurred on January 18 when major internet companies including Google, WordPress, Wikipedia, Tumblr, Craigslist, and Twitter "blacked-out" their websites in protest of SOPA-PIPA. (Note: only Wikipedia actually denied access – others used graphics to denote their protest.)

When the campaign was tallied the numbers told an incredible story. More than 4 million emails were sent to Congress in protest through three major websites. More than 10 million petition signatures were collected by five organizations. Twitter logged 2.4 million PIPA-related tweets on blackout day. And on January 18 blackout day was the lead story on nearly every major media outlet in the U.S.

## CONGRESSIONAL RESPONSE

In early November 2011, 37 Senators had announced support for the bill, while one was opposed. By January 18, 2012, 30 Senators supported the bill and 33 opposed. But the numbers don't provide a complete picture of Congress' reaction to this campaign. In CMF interviews with congressional staff, some staffers felt that the anti-SOPA-PIPA campaign used misleading tactics, exaggerating or misrepresenting the impact the bill would have on "Internet freedom." On blackout day, Wikipedia was inaccessible, except for a message asking visitors to "Imagine a world without free knowledge" and declaring that the legislation "could fatally damage the free and open Internet."

Neither bill has been considered in the 114th Congress.

## ANALYSIS

After the campaign, some technology experts heralded it as the "political coming of age of the tech industry." Another said it would "reinvent how we carry out democratic politics." While these predictions still may come to pass, they have not yet. Congress has not seen a social media campaign approaching the scope and impact of the SOPA-PIPA debate.

Congressional staff reported that this episode did contain aspects different from traditional campaigns. They noted the demographic of constituents contacting Congress was younger. Additionally, many legislators were caught by surprise that a relatively arcane issue (intellectual property) could catch fire, with events changing so rapidly. Both of these observations suggest that social media was a key contributor to these aspects of the campaign.

However, the SOPA-PIPA debate also had the fundamental components of any successful organic grassroots campaign, irrespective of the social media component. Proponents used a powerful word, "censorship," which has an emotional appeal connecting to citizens' values and beliefs. They had a specific "ask": "don't cosponsor" or "vote no," which provided clear means for holding legislators accountable. And there was a deadline: a vote was to be held in January 2012. These same elements have been seen before, including the immigration debate of 2006, which resulted in the demise of bipartisan legislation backed by President George W. Bush and powerful economic interests in Washington. The emotional word used then was "amnesty," but it had the same effect: tens of thousands of Americans petitioned their Congress to do their bidding ... and the Congress obeyed.

# About the
# Congressional Management Foundation

*Established 1977*

## Who We Are

Citizen trust in an effective and responsive Congress is essential to democracy. Since 1977, the Congressional Management Foundation (CMF) has advanced this goal by working directly with Members of Congress and staff to enhance their operations and interactions with constituents. CMF also works directly with citizen groups to educate them on how Congress works, giving constituents a stronger voice in policy outcomes. The aspirations are: a Congress more accountable, transparent, and effective; and an informed citizenry with greater trust in their democratic institutions.

## What We Accomplish

CMF enhances the effectiveness of congressional offices, enabling them to provide better services for their constituents and create better policy outcomes for all Americans.

CMF promotes transparency and accountability in Congress, affording citizens data and tools to become more informed about decisions that affect them, their families, and communities.

CMF educates and motivates individuals to become active and informed citizen-advocates, providing them with an understanding of Congress, the skills to influence public policy, and the value of citizen engagement.

CMF enhances the public's understanding of how the Congress really works, providing a window into our democratic institutions through its unique relationship with lawmakers and staff.

### Quick Facts

- More than 350 congressional offices participated in the 80 training programs CMF conducted in 2014.

- In 2014, CMF conducted 67 educational sessions with groups involving thousands of citizens on effective interactions with Congress.

- Since CMF has been assessing congressional websites and urging more transparent practices, the percentage of Members of Congress who post their voting record online has doubled.

- Since 2000, CMF has conducted more than 500 strategic planning or other consulting projects with Members of Congress and their staffs.

## How We Do It

CMF conducts professional development training and consultations for all levels of congressional staff to strengthen their office operations and management. CMF provides research, training, and publications to citizens and groups so they can better to enhance their interactions with Congress. CMF critiques and explains Congress—demystifying its operations. CMF conducts primary research on Congress and provides best practices guidance on office operations.

For more information, contact CMF at 202-546-0100 or visit **www.CongressFoundation.org**.

# THE PARTNERSHIP FOR *A More Perfect Union* at the CONGRESSIONAL MANAGEMENT FOUNDATION

"We in America do *not* have government by the majority. We have government by the majority who participate."
—Thomas Jefferson

## *Become a Partner in Enriching the Relationship Between Citizens and Congress*

The *Partnership* is a subscription program within CMF that seeks to further our nation's progress toward "a more perfect union" by fostering the genuine and effective exchange of ideas between Members of Congress and citizens.

We conduct communications best practices research and help forge relationships between congressional staff, advocates, and citizens through presentations, webinars and videos based on CMF research.

### Topics of Presentations

- "Screaming Monkeys, Roaring Lions: Making Noise vs. Making a Difference on Capitol Hill"
- "Use Social Media to Build Relationships with Lawmakers"
- "Build an Event in the State Members of Congress Will Attend"
- "Turn a 10-Minute Meeting with a Legislator into a Life-Long Relationship"
- "Tell a Story to Win the Hearts, Minds, and Votes of Lawmakers"
- "Build Relationships with Freshmen Lawmakers"

*"Our members were buzzing about the CMF presentation! The facts, charts, and anecdotes not only engaged them but captured them. They left the session knowing that their work in member advocacy is more important than ever."*
—Laura Vogel, Manager of Federal Member Advocacy, National Association of REALTORS®

CMF's *Partnership for a More Perfect Union* is dedicated to enhancing the relationship, understanding, and communications between citizens and Congress.

All *Partnership* content is protected by copyright laws and cannot be reproduced without the expressed authorization of a CMF representative.

For more details on the *Partnership*, visit **CongressFoundation.org** or contact CMF at 202-546-0100.



THE PARTNERSHIP FOR

*A More Perfect Union*

at the

CONGRESSIONAL MANAGEMENT FOUNDATION

CongressFoundation.org

═══════  SPONSORED BY  ═══════







# EXHIBIT 2

### Facebook Reports First Quarter 2018 Results

MENLO PARK, Calif. – April 25, 2018 – Facebook, Inc. (Nasdaq: FB) today reported financial results for the quarter ended March 31, 2018.

"Despite facing important challenges, our community and business are off to a strong start in 2018," said Mark Zuckerberg, Facebook founder and CEO. "We are taking a broader view of our responsibility and investing to make sure our services are used for good. But we also need to keep building new tools to help people connect, strengthen our communities, and bring the world closer together."

### First Quarter 2018 Financial Highlights

| In millions, except percentages and per share amounts | Three Months Ended March 31, | | Year-over-Year % Change |
| --- | --- | --- | --- |
| | 2018 | 2017 | |
| Revenue: | | | |
| Advertising | $ 11,795 | $ 7,857 | 50 % |
| Payments and other fees | 171 | 175 | (2)% |
| Total revenue | 11,966 | 8,032 | 49 % |
| Total costs and expenses | 6,517 | 4,705 | 39 % |
| Income from operations | $ 5,449 | $ 3,327 | 64 % |
| *Operating margin* | *46%* | *41%* | |
| Provision for income taxes | $ 622 | | |
| *Effective tax rate* | *11%* | | |
| Net income | $ 4,988 | $ 3,064 | 63 % |
| Diluted Earnings per Share (EPS) | $ 1.69 | $ 1.04 | 63 % |

### First Quarter 2018 Operational and Other Financial Highlights

- **Daily active users (DAUs)** – DAUs were 1.45 billion on average for March 2018, an increase of 13% year-over-year.
- **Monthly active users (MAUs)** – MAUs were 2.20 billion as of March 31, 2018, an increase of 13% year-over-year.
- **Mobile advertising revenue** – Mobile advertising revenue represented approximately 91% of advertising revenue for the first quarter of 2018, up from approximately 85% of advertising revenue in the first quarter of 2017.
- **Capital expenditures** – Capital expenditures for the first quarter of 2018 were $2.81 billion.
- **Cash and cash equivalents and marketable securities** – Cash and cash equivalents and marketable securities were $43.96 billion at the end of the first quarter of 2018.
- **Headcount** – Headcount was 27,742 as of March 31, 2018, an increase of 48% year-over-year.

In April 2018, we increased the amount authorized under our share repurchase program by an additional $9.0 billion. Our board of directors originally authorized repurchases of up to $6.0 billion of our Class A common stock under the repurchase program, and this increase is incremental to the original authorization.

**Webcast and Conference Call Information**

Facebook will host a conference call to discuss the results at 2 p.m. PT / 5 p.m. ET today. The live webcast of Facebook's earnings conference call can be accessed at investor.fb.com, along with the earnings press release, financial tables, and slide presentation. Facebook uses the investor.fb.com and newsroom.fb.com websites as well as Mark Zuckerberg's Facebook Page (https://www.facebook.com/zuck) as means of disclosing material non-public information and for complying with its disclosure obligations under Regulation FD.

Following the call, a replay will be available at the same website. A telephonic replay will be available for one week following the conference call at +1 (404) 537-3406 or +1 (855) 859-2056, conference ID 6068418.

**About Facebook**

Founded in 2004, Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them.

**Contacts**

Investors:
Deborah Crawford
investor@fb.com / investor.fb.com

Press:
Vanessa Chan
press@fb.com / newsroom.fb.com

**Forward Looking Statements**

This press release contains forward-looking statements regarding our future business expectations, which are subject to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are only predictions and may differ materially from actual results due to a variety of factors including: our ability to retain or increase users and engagement levels; our reliance on advertising revenue; our dependency on mobile operating systems, networks, and standards that we do not control; risks associated with new products and changes to existing products as well as other new business initiatives; our emphasis on user growth and engagement and the user experience over short-term financial results; maintaining and enhancing our brand and reputation; our ongoing safety, security, and content review efforts; competition; litigation and government inquiries; privacy and regulatory concerns; risks associated with acquisitions; security breaches; and our ability to manage growth and geographically-dispersed operations. These and other potential risks and uncertainties that could cause actual results to differ from the results predicted are more fully detailed under the caption "Risk Factors" in our Annual Report on Form 10-K filed with the SEC on February 1, 2018, which is available on our Investor Relations website at investor.fb.com and on the SEC website at www.sec.gov. Additional information will also be set forth in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2018. In addition, please note that the date of this press release is April 25, 2018, and any forward-looking statements contained herein are based on assumptions that we believe to be reasonable as of this date. We undertake no obligation to update these statements as a result of new information or future events.

**Non-GAAP Financial Measures**

To supplement our condensed consolidated financial statements, which are prepared and presented in accordance with generally accepted accounting principles in the United States (GAAP), we use the following non-GAAP financial measures: revenue excluding foreign exchange effect, advertising revenue excluding foreign exchange effect and free cash flow. The presentation of these financial measures is not intended to be considered in isolation or as a substitute for, or superior to, financial information prepared and presented in accordance with GAAP. Investors are cautioned that there are material limitations associated with the use of non-GAAP financial measures as an analytical tool. In addition, these measures may be different from non-GAAP financial measures used by other companies, limiting their usefulness for comparison purposes. We compensate for these limitations by providing specific information regarding the GAAP amounts excluded from these non-GAAP financial measures.

We believe these non-GAAP financial measures provide investors with useful supplemental information about the financial performance of our business, enable comparison of financial results between periods where certain items may vary independent of business performance, and allow for greater transparency with respect to key metrics used by management in operating our business.

We exclude the following items from our non-GAAP financial measures:

*Foreign exchange effect on revenue.* We translated revenue for the three months ended March 31, 2018 using the prior year's monthly exchange rates for our settlement currencies other than the U.S. dollar, which we believe is a useful metric that facilitates comparison to our historical performance.

*Purchases of property and equipment.* We subtract purchases of property and equipment in our calculation of free cash flow because we believe that this methodology can provide useful supplemental information to help investors better understand underlying trends in our business. Free cash flow is not intended to represent our residual cash flow available for discretionary expenditures.

For more information on our non-GAAP financial measures and a reconciliation of GAAP to non-GAAP measures, please see the "Reconciliation of GAAP to Non-GAAP Results" table in this press release.

**FACEBOOK, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**
*(In millions, except for per share amounts)*
*(Unaudited)*

| | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| Revenue | $ 11,966 | $ 8,032 |
| Costs and expenses: | | |
| Cost of revenue | 1,927 | 1,159 |
| Research and development | 2,238 | 1,834 |
| Marketing and sales | 1,595 | 1,057 |
| General and administrative | 757 | 655 |
| Total costs and expenses | 6,517 | 4,705 |
| Income from operations | 5,449 | 3,327 |
| Interest and other income, net | 161 | 81 |
| Income before provision for income taxes | 5,610 | 3,408 |
| Provision for income taxes | 622 | 344 |
| Net income | $ 4,988 | $ 3,064 |
| Less: Net income attributable to participating securities | 1 | 5 |
| Net income attributable to Class A and Class B common stockholders | $ 4,987 | $ 3,059 |
| | | |
| Earnings per share attributable to Class A and Class B common stockholders: | | |
| Basic | $ 1.72 | $ 1.06 |
| Diluted | $ 1.69 | $ 1.04 |
| Weighted average shares used to compute earnings per share attributable to Class A and Class B common stockholders: | | |
| Basic | 2,906 | 2,891 |
| Diluted | 2,945 | 2,944 |
| Share-based compensation expense included in costs and expenses: | | |
| Cost of revenue | $ 56 | $ 34 |
| Research and development | 718 | 670 |
| Marketing and sales | 109 | 96 |
| General and administrative | 72 | 67 |
| Total share-based compensation expense | $ 955 | $ 867 |

4

**FACEBOOK, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
*(In millions)*
*(Unaudited)*

| | March 31, 2018 | December 31, 2017 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 12,082 | $ 8,079 |
| Marketable securities | 31,874 | 33,632 |
| Accounts receivable, net of allowances of $204 and $189 as of March 31, 2018 and December 31, 2017, respectively | 5,115 | 5,832 |
| Prepaid expenses and other current assets | 1,341 | 1,020 |
| Total current assets | 50,412 | 48,563 |
| Property and equipment, net | 16,211 | 13,721 |
| Intangible assets, net | 1,735 | 1,884 |
| Goodwill | 18,268 | 18,221 |
| Other assets | 2,319 | 2,135 |
| **Total assets** | $ 88,945 | $ 84,524 |
| | | |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 593 | $ 380 |
| Partners payable | 396 | 390 |
| Accrued expenses and other current liabilities | 4,003 | 2,892 |
| Deferred revenue and deposits | 94 | 98 |
| Total current liabilities | 5,086 | 3,760 |
| Other liabilities | 6,239 | 6,417 |
| Total liabilities | 11,325 | 10,177 |
| Stockholders' equity: | | |
| Common stock and additional paid-in capital | 41,134 | 40,584 |
| Accumulated other comprehensive loss | (294) | (227) |
| Retained earnings | 36,780 | 33,990 |
| Total stockholders' equity | 77,620 | 74,347 |
| **Total liabilities and stockholders' equity** | $ 88,945 | $ 84,524 |

### FACEBOOK, INC.
### CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

*(In millions)*

*(Unaudited)*

| | Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017* |
| **Cash flows from operating activities** | | |
| Net income | $ 4,988 | $ 3,064 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 949 | 671 |
| Share-based compensation | 955 | 867 |
| Deferred income taxes | (47) | (84) |
| Other | 8 | 5 |
| Changes in assets and liabilities: | | |
| Accounts receivable | 788 | 609 |
| Prepaid expenses and other current assets | (365) | (365) |
| Other assets | 22 | 31 |
| Accounts payable | 1 | (10) |
| Partners payable | 2 | (3) |
| Accrued expenses and other current liabilities | 707 | 61 |
| Deferred revenue and deposits | (5) | (10) |
| Other liabilities | (143) | 222 |
| **Net cash provided by operating activities** | 7,860 | 5,058 |
| **Cash flows from investing activities** | | |
| Purchases of property and equipment | (2,812) | (1,271) |
| Purchases of marketable securities | (4,022) | (6,992) |
| Sales of marketable securities | 4,330 | 1,762 |
| Maturities of marketable securities | 1,267 | 599 |
| Acquisitions of businesses, net of cash acquired, and purchases of intangible assets | (49) | — |
| Other investing activities, net | (1) | (18) |
| **Net cash used in investing activities** | (1,287) | (5,920) |
| **Cash flows from financing activities** | | |
| Taxes paid related to net share settlement of equity awards | (832) | (771) |
| Repurchases of Class A common stock | (1,774) | (228) |
| Other financing activities, net | 3 | 7 |
| **Net cash used in financing activities** | (2,603) | (992) |
| **Effect of exchange rate changes on cash, cash equivalents, and restricted cash** | 36 | 28 |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | 4,006 | (1,826) |
| Cash, cash equivalents, and restricted cash at beginning of year | 8,204 | 9,109 |
| **Cash, cash equivalents, and restricted cash at end of the period** | $ 12,210 | $ 7,283 |
| | | |
| **Reconciliation of cash, cash equivalents, and restricted cash to the condensed consolidated balance sheets** | | |
| Cash and cash equivalents | $ 12,082 | $ 7,104 |
| Restricted cash, included in prepaid expenses and other current assets | 14 | 85 |
| Restricted cash, included in other assets | 114 | 94 |
| **Total cash, cash equivalents, and restricted cash** | $ 12,210 | $ 7,283 |

*Prior-period information has been retrospectively adjusted due to our adoption of ASU No. 2016-18, *Statement of Cash Flows, Restricted Cash* (Topic 230) on January 1, 2018.

6

**FACEBOOK, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(In millions)*
*(Unaudited)*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2018** | **2017*** |
| **Supplemental cash flow data** | | |
| Cash paid during the period for: | | |
| Income taxes, net | $    736 | $    664 |
| Non-cash investing and financing activities: | | |
| Net change in accounts payable, accrued expenses and other current liabilities, and other liabilities related to property and equipment additions | $    450 | $    (26) |
| Change in unsettled repurchases of Class A common stock | $    141 | $    — |

*Prior-period information has been retrospectively adjusted due to our adoption of ASU No. 2016-18, *Statement of Cash Flows, Restricted Cash* (Topic 230) on January 1, 2018.

**Reconciliation of GAAP to Non-GAAP Results**

*(In millions, except percentages)*

*(Unaudited)*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| GAAP revenue | $ 11,966 | $ 8,032 |
| Foreign exchange effect on 2018 revenue using 2017 rates | (536) | |
| Revenue excluding foreign exchange effect | $ 11,430 | |
| GAAP revenue year-over-year change % | 49% | |
| Revenue excluding foreign exchange effect year-over-year change % | 42% | |
| GAAP advertising revenue | $ 11,795 | $ 7,857 |
| Foreign exchange effect on 2018 advertising revenue using 2017 rates | (535) | |
| Advertising revenue excluding foreign exchange effect | $ 11,260 | |
| GAAP advertising revenue year-over-year change % | 50% | |
| Advertising revenue excluding foreign exchange effect year-over-year change % | 43% | |
| | | |
| Net cash provided by operating activities | $ 7,860 | $ 5,058 |
| Purchases of property and equipment | (2,812) | (1,271) |
| Free cash flow | $ 5,048 | $ 3,787 |

# EXHIBIT 3

# Facebook Q1 2018 Results

**facebook**

investor.fb.com

# Daily Active Users (DAUs)
### In Millions



Legend:
- Rest of World
- Asia-Pacific
- Europe
- US & Canada

| | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 1,090 | 1,128 | 1,179 | 1,227 | 1,284 | 1,325 | 1,368 | 1,401 | 1,449 |
| Rest of World | 340 | 355 | 377 | 388 | 408 | 419 | 433 | 441 | 453 |
| Asia-Pacific | 329 | 346 | 368 | 396 | 427 | 453 | 476 | 499 | 529 |
| Europe | 249 | 252 | 256 | 262 | 267 | 271 | 274 | 277 | 282 |
| US & Canada | 173 | 175 | 178 | 180 | 182 | 183 | 185 | 184 | 185 |

| DAUs / MAUs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
| 66% | 66% | 66% | 66% | 66% | 66% | 66% | 66% | 66% |

Please see Facebook's most recent quarterly or annual report filed with the SEC for definitions of user activity used to determine the number of our DAUs and MAUs. The numbers for DAUs and MAUs do not include Instagram, WhatsApp, or Oculus users unless they would otherwise qualify as such users, respectively, based on their other activities on Facebook.



2

# Monthly Active Users (MAUs)
### In Millions



Legend:
- Rest of World
- Asia-Pacific
- Europe
- US & Canada

| | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 1,654 | 1,712 | 1,788 | 1,860 | 1,936 | 2,006 | 2,072 | 2,129 | 2,196 |
| Rest of World | 533 | 556 | 587 | 606 | 632 | 654 | 675 | 692 | 705 |
| Asia-Pacific | 566 | 592 | 629 | 673 | 716 | 756 | 794 | 828 | 873 |
| Europe | 333 | 338 | 342 | 349 | 354 | 360 | 364 | 370 | 377 |
| US & Canada | 222 | 226 | 229 | 231 | 234 | 236 | 239 | 239 | 241 |

Please see Facebook's most recent quarterly or annual report filed with the SEC for definitions of user activity used to determine the number of our DAUs and MAUs. The numbers for DAUs and MAUs do not include Instagram, WhatsApp, or Oculus users unless they would otherwise qualify as such users, respectively, based on their other activities on Facebook.



3





# Revenue by User Geography
In Millions

Legend:
- Rest of World
- Asia-Pacific
- Europe
- US & Canada

| | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Total | $5,382 | $6,436 | $7,011 | $8,809 | $8,032 | $9,321 | $10,328 | $12,972 | $11,966 |
| Rest of World | $473 | $614 | $692 | $839 | $784 | $954 | $1,054 | $1,271 | $1,172 |
| Asia-Pacific | $862 | $1,025 | $1,154 | $1,349 | $1,375 | $1,569 | $1,760 | $2,059 | $2,091 |
| Europe | $1,307 | $1,585 | $1,605 | $2,065 | $1,905 | $2,242 | $2,481 | $3,250 | $3,036 |
| US & Canada | $2,740 | $3,212 | $3,560 | $4,556 | $3,968 | $4,556 | $5,033 | $6,392 | $5,667 |

Revenue by user geography is geographically apportioned based on our estimation of the geographic location of our users when they perform a revenue-generating activity. This allocation differs from our revenue disaggregated by geography disclosure in our condensed consolidated financial statements where revenue is disaggregated by geography based on the billing address of our customer.



5



# Advertising Revenue by User Geography
In Millions

Legend:
- Rest of World
- Asia-Pacific
- Europe
- US & Canada

| | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Total | $5,201 | $6,239 | $6,816 | $8,629 | $7,857 | $9,164 | $10,142 | $12,779 | $11,795 |
| Rest of World | $467 | $608 | $685 | $832 | $776 | $947 | $1,047 | $1,264 | $1,164 |
| Asia-Pacific | $849 | $1,009 | $1,137 | $1,337 | $1,361 | $1,558 | $1,749 | $2,048 | $2,080 |
| Europe | $1,270 | $1,545 | $1,563 | $2,025 | $1,869 | $2,209 | $2,434 | $3,196 | $2,992 |
| US & Canada | $2,615 | $3,077 | $3,431 | $4,435 | $3,851 | $4,450 | $4,912 | $6,271 | $5,559 |

Revenue by user geography is geographically apportioned based on our estimation of the geographic location of our users when they perform a revenue-generating activity. This allocation differs from our revenue disaggregated by geography disclosure in our condensed consolidated financial statements where revenue is disaggregated by geography based on the billing address of our customer.



# Payments & Other Fees Revenue by User Geography
In Millions



- Rest of World
- Asia-Pacific
- Europe
- US & Canada

| | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Total | $181 | $197 | $195 | $180 | $175 | $157 | $186 | $193 | $171 |
| Rest of World | $6 | $6 | $7 | $7 | $8 | $7 | $7 | $7 | $8 |
| Asia-Pacific | $13 | $16 | $17 | $12 | $14 | $11 | $11 | $11 | $11 |
| Europe | $37 | $40 | $42 | $40 | $36 | $33 | $47 | $54 | $44 |
| US & Canada | $125 | $135 | $129 | $121 | $117 | $106 | $121 | $121 | $108 |

Revenue by user geography is geographically apportioned based on our estimation of the geographic location of our users when they perform a revenue-generating activity. This allocation differs from our revenue disaggregated by geography disclosure in our condensed consolidated financial statements where revenue is disaggregated by geography based on the billing address of our customer.



7

# Average Revenue per User (ARPU)

● Payments and Other Fees
● Advertising



### Worldwide

| Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|
| $4.23 | $4.73 | $5.07 | $6.18 | $5.53 |
| $0.09 | $0.08 | $0.09 | $0.09 | $0.08 |
| $4.14 | $4.65 | $4.97 | $6.08 | $5.45 |

### US & Canada

| Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|
| $17.07 | $19.38 | $21.20 | $26.76 | $23.59 |
| $0.50 | $0.45 | $0.51 | $0.51 | $0.45 |
| $16.56 | $18.93 | $20.69 | $26.26 | $23.14 |



### Europe

| Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|
| $5.42 | $6.28 | $6.85 | $8.86 | $8.12 |
| $0.10 | $0.09 | $0.13 | $0.15 | $0.12 |
| $5.32 | $6.19 | $6.72 | $8.71 | $8.01 |



### Asia-Pacific

| Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|
| $1.98 | $2.13 | $2.27 | $2.54 | $2.46 |
| $0.02 | $0.01 | $0.01 | $0.01 | $0.01 |
| $1.96 | $2.12 | $2.26 | $2.52 | $2.45 |



### Rest of World

| Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|
| $1.27 | $1.48 | $1.59 | $1.86 | $1.68 |
| $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| $1.25 | $1.47 | $1.58 | $1.85 | $1.67 |

Revenue by user geography is geographically apportioned based on our estimation of the geographic location of our users when they perform a revenue-generating activity. This allocation differs from our revenue disaggregated by geography disclosure in our condensed consolidated financial statements where revenue is disaggregated by geography based on the billing address of our customer. Please see Facebook's most recent quarterly or annual report filed with the SEC for the definition of ARPU.



8

# Expenses as a % of Revenue



# Income from Operations
In Millions



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $2,010 | $2,734 | $3,117 | $4,566 | $3,327 | $4,401 | $5,122 | $7,352 | $5,449 |
| Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |

facebook

# Operating Margin



# Effective Tax Rate

| ($ in millions) | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Income before provision for income taxes | $ 2,066 | $ 2,754 | $ 3,164 | $ 4,533 | $ 3,408 | $ 4,488 | $ 5,236 | $ 7,462 | $ 5,610 |
| Provision for income taxes | 328 | 471 | 537 | 965 | 344 | 594 | 529 | 3,194 | 622 |
| **Effective Tax Rate** | **16%** | **17%** | **17%** | **21%** | **10%** | **13%** | **10%** | **43%** | **11%** |

In December 2017, the 2017 Tax Cuts and Jobs Act (the Tax Act) was enacted and significantly impacted the U.S. tax law. As a result of this legislation, our fourth quarter and full year 2017 provision for income taxes increased by $2.27 billion, which impacted our effective tax rate, net income and diluted earnings per share (EPS) for such periods. Our diluted EPS decreased by $0.77 for both the fourth quarter and full year 2017. As a result of the Act, starting in 2018, the U.S. statutory tax rate decreased from 35% to 21%.



12

# Net Income
In Millions



| | |
|---|---|
| Q1'16 | $1,738 |
| Q2'16 | $2,283 |
| Q3'16 | $2,627 |
| Q4'16 | $3,568 |
| Q1'17 | $3,064 |
| Q2'17 | $3,894 |
| Q3'17 | $4,707 |
| Q4'17 | $4,268 |
| Q1'18 | $4,988 |

In December 2017, the 2017 Tax Cuts and Jobs Act (the Tax Act) was enacted and significantly impacted the U.S. tax law. As a result of this legislation, our fourth quarter and full year 2017 provision for income taxes increased by $2.27 billion, which impacted our effective tax rate, net income and diluted earnings per share (EPS) for such periods. Our diluted EPS decreased by $0.77 for both the fourth quarter and full year 2017. As a result of the Act, starting in 2018, the U.S. statutory tax rate decreased from 35% to 21%.



13

# Diluted Earnings Per Share



Bar chart of Diluted Earnings Per Share by quarter:

- Q1'16: $0.60
- Q2'16: $0.78
- Q3'16: $0.90
- Q4'16: $1.21
- Q1'17: $1.04
- Q2'17: $1.32
- Q3'17: $1.59
- Q4'17: $1.44
- Q1'18: $1.69

In December 2017, the 2017 Tax Cuts and Jobs Act (the Tax Act) was enacted and significantly impacted the U.S. tax law. As a result of this legislation, our fourth quarter and full year 2017 provision for income taxes increased by $2.27 billion, which impacted our effective tax rate, net income and diluted earnings per share (EPS) for such periods. Our diluted EPS decreased by $0.77 for both the fourth quarter and full year 2017. As a result of the Act, starting in 2018, the U.S. statutory tax rate decreased from 35% to 21%.



# Capital Investments
In Millions





**Quarterly**                    **Annual**

Capital investments for periods presented were related to purchases of property and equipment.

facebook

15



Appendix

# Free Cash Flow Reconciliation

| ($ in millions) | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 |
|---|---|---|---|---|---|---|---|---|---|
| Net cash provided by operating activities | $ 3,477 | $ 3,665 | $ 4,036 | $ 4,930 | $ 5,058 | $ 5,360 | $ 6,128 | $ 7,670 | $ 7,860 |
| Less: Purchases of property and equipment | 1,132 | 995 | 1,095 | 1,269 | 1,271 | 1,444 | 1,755 | 2,262 | 2,812 |
| Free Cash Flow | $ 2,345 | $ 2,670 | $ 2,941 | $ 3,661 | $ 3,787 | $ 3,916 | $ 4,373 | $ 5,408 | $ 5,048 |

Free Cash Flow (FCF) is a non-GAAP financial measure that has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of other GAAP financial measures, such as net cash provided by operating activities. Some of the limitations of FCF are: (i) FCF does not reflect our future contractual commitments, and (ii) other companies in our industry present similarly titled measures differently than we do, limiting their usefulness as comparative measures. FCF is not intended to represent our residual cash flow available for discretionary expenditures.



# Limitations of Key Metrics and Other Data

The numbers for our key metrics, which include our daily active users (DAUs), monthly active users (MAUs), and average revenue per user (ARPU), are calculated using internal company data based on the activity of user accounts. While these numbers are based on what we believe to be reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring usage of our products across large online and mobile populations around the world. In addition, we are continually seeking to improve our estimates of our user base, and such estimates may change due to improvements or changes in our methodology.

We regularly evaluate these metrics to estimate the number of "duplicate" and "false" accounts among our MAUs. A duplicate account is one that a user maintains in addition to his or her principal account. We divide "false" accounts into two categories: (1) user-misclassified accounts, where users have created personal profiles for a business, organization, or non-human entity such as a pet (such entities are permitted on Facebook using a Page rather than a personal profile under our terms of service); and (2) undesirable accounts, which represent user profiles that we determine to be used for purposes that violate our terms of service, such as spamming. The estimates of duplicate and false accounts are based on an internal review of a limited sample of accounts, and we apply significant judgment in making this determination. For example, to identify duplicate accounts we use data signals such as similar IP addresses or user names, and to identify false accounts we look for names that appear to be fake or other behavior that appears inauthentic to the reviewers. Our estimates may change as our methodologies evolve, including through the application of new data signals or technologies, which may allow us to identify previously undetected duplicate or false accounts and may improve our ability to evaluate a broader population of our users. Duplicate and false accounts are very difficult to measure at our scale, and it is possible that the actual number of duplicate and false accounts may vary significantly from our estimates.

In the fourth quarter of 2017, we estimate that duplicate accounts may have represented approximately 10% of our worldwide MAUs. We believe the percentage of duplicate accounts is meaningfully higher in developing markets such as India, Indonesia, and the Philippines, as compared to more developed markets. In the fourth quarter of 2017, we estimate that false accounts may have represented approximately 3-4% of our worldwide MAUs. Our estimation of false accounts can vary as a result of episodic spikes in the creation of such accounts, which we have seen originate more frequently in specific countries such as Indonesia, Turkey, and Vietnam. From time to time, we may make product changes or take other actions to reduce the number of duplicate or false accounts among our users, which may also reduce our DAU and MAU estimates in a particular period.

Our data limitations may affect our understanding of certain details of our business. For example, while user-provided data indicates a decline in usage among younger users, this age data is unreliable because a disproportionate number of our younger users register with an inaccurate age. Accordingly, our understanding of usage by age group may not be complete.

In addition, our data regarding the geographic location of our users is estimated based on a number of factors, such as the user's IP address and self-disclosed location. These factors may not always accurately reflect the user's actual location. For example, a user may appear to be accessing Facebook from the location of the proxy server that the user connects to rather than from the user's actual location. The methodologies used to measure user metrics may also be susceptible to algorithm or other technical errors. Our estimates for revenue by user location and revenue by user device are also affected by these factors.

We regularly review our processes for calculating these metrics, and from time to time we may discover inaccuracies in our metrics or make adjustments to improve their accuracy, including adjustments that may result in the recalculation of our historical metrics. We believe that any such inaccuracies or adjustments are immaterial unless otherwise stated. We intend to disclose our estimates of the number of duplicate and false accounts among our MAUs on an annual basis. In addition, our DAU and MAU estimates will differ from estimates published by third parties due to differences in methodology.

The numbers of DAUs and MAUs discussed in this presentation, as well as ARPU, do not include Instagram, WhatsApp, or Oculus users unless they would otherwise qualify as such users, respectively, based on their other activities on Facebook.

facebook

# Facebook Q1 2018 Results

**facebook**

investor.fb.com

# EXHIBIT 4



# EXHIBIT 5



# EXHIBIT 6



# EXHIBIT 7



## What is Town Hall?

Computer Help    Mobile Help

Town Hall is a place on Facebook where people can:

- Find, follow and contact their government officials.

- Find, follow and contact government agencies.

- See a feed of what their government is posting on Facebook.

This tool is part of Facebook's efforts to help build civically engaged communities and make it easier for people to have a voice in government. To access Town Hall, go to www.facebook.com/townhall.

Keep in mind that you may need to enter your address to see local government officials who represent your area. Even after entering your address, you may not see all your government representatives. Some representatives may not appear in Town Hall because they're not on Facebook, or they haven't entered the political office they hold, or there was no public database for this office. You can report missing or incorrect information in Town Hall by clicking on the ⋯ button in the top right corner.

**Contacting Your Government Representative**

If you're using a mobile device, you'll also be able to contact your government representatives by email, Facebook message or call when you interact with one of their posts in News Feed.

Was this information helpful?
    Yes    No

**Related Articles**

What is a constituent badge?

Why does Facebook show what's popular in a political district?

What information does Facebook use to show information about elections and government?

What does it mean to be a Top Responding Representative?

Why do some politicians have more than one Facebook Page?

# EXHIBIT 8



## Create and Manage a Page

### Create a Page

**How do I create a Facebook Page?**

Pages are for businesses, brands, organizations and public figures to share their stories and connect with people. Like profiles, Pages can be customized with stories, events and more. People who like or follow a Page can get updates in News Feed.

To create a Page:

1. Go to facebook.com/pages/create.

2. Choose to choose a Page type.

3. Fill out the required information.

4. Click **Continue** and follow the on-screen instructions.

Note: Anyone can create a Page, but only official representatives can create a Page for an organization, business, brand or public figure.

Was this information helpful?
Yes    No

View Full Article
· Share Article

**Should I create a Page or allow people to follow my public updates from my personal account?**

If your goal is to represent your business, brand or product on Facebook, create a Page. A Page lets you engage with people on Facebook and offers tools to help you manage and track engagement.

If your goal is to share updates from your personal timeline with a broader audience, you can allow people to follow you. When you allow people to follow you, anyone on Facebook can follow you to get your public updates in their News Feed, even if you're not friends on Facebook.

You can have an unlimited amount of people following you, and you can follow up to 5,000 people. You can have up to 5,000 friends on your personal account.

Was this information helpful?
Yes    No

View Full Article
· Share Article

### Claim a Page or Convert Your Personal Account

**How do I claim an unmanaged Page?**

A Page may exist for your business even if someone from your business didn't create it. For example, when someone checks into a place that doesn't have a Page, an unmanaged Page is created to represent the location. A Page may also be generated from a Wikipedia article.

If the Page is unmanaged, you'll see **Unofficial Page** below its cover photo. You can request to claim the Page and become its admin, and you can merge the Page into a Page you already manage for your business.

Keep in mind that Pages generated from Wikipedia and Pages that represent geographic locations (example: New York City, Ontario, Switzerland) can't be claimed. You'll know if a Page is generated from Wikipedia if you see a Wikipedia logo at the bottom of the left column.

To claim or merge an unmanaged Page:

1. Click **Is this your business?** below the Page's cover photo.

2. Follow the on-screen instructions.

Keep in mind that you may be asked for information to verify your relationship with the business, such as business phone number, business email or documents.

If you know who the admin is of the Page you want to claim (example: a former employee), you can also contact them and ask them to add you as an admin.

Was this information helpful?
Yes    No

View Full Article
· Share Article

**How do I convert my profile to a Facebook Page?**

By creating a Page, you can use more tools and share with a wider audience. Converting your profile to a Page creates a new Facebook Page that's based on your profile. You can only convert your profile to a Page once.

When you convert your profile to a Page:

· You'll have both a profile and a Page after conversion.

· We'll transfer your profile picture and cover photo to the Page, and the name on your profile will become the Page's name.

· You can select from your friends, followers and pending friend requests and add them as your new Page's followers. See more information in the section below.

· You can choose which photos and videos to copy over from your profile, but keep in mind that views and other metrics remain with your profile and can't transfer to the Page.

· If you're converting a verified profile, please note that your verified badge will be removed from your profile, and you'll need to re-submit your new Page for verification.

· You can preview all changes before publishing your new Page.

- When you've finished setting up your new Page, we'll ask you to check your privacy settings on your profile to make sure you're sharing what you want to share.

To convert your profile to a Facebook Page:

1 Go to Create a Facebook Page Based on Your Profile.

2 Click **Get Started** and follow the on-screen instructions.

3 Your new Page will automatically publish once the conversion process is finished. To change this setting, click to select **Off** next to **Publish Page when done** at the top.

### What Happens to My Friends, Followers and Pending Friend Requests When I Convert to a Page?

Once your new Page is published:

- Your profile's followers, friends and friend requests will get notified that you've created a new Page.

- The profile followers you choose will automatically follow the new Page and will be removed from following your profile.

- Friends and pending friend requests you select will automatically like and follow the new Page, and won't be removed from your profile.


Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

---

Why should I convert my profile to a Facebook Page?

It's against the Facebook Terms to use your profile to represent something other than yourself (example: your business), and you could permanently lose access to your account if you don't convert it to a Page.

If you're using your profile to represent a business, there are many benefits to converting your profile to a Page:

- Pages are designed for businesses and organizations, with features that help you connect with customers and reach your goals.

- You'll have access to Page insights, where you can see metrics like which posts people engage with and visitor demographics like age and location.

- Page roles can let you give other people access to edit your Page.

- You can create ads and boost posts.

Convert your profile to a Page or learn more about it in the Help Center.

If you're a public figure, learn about allowing followers.


Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

---

## Merge Pages

Can I merge 2 Facebook Pages?

If you have 2 Facebook Pages for the same thing, you may be able to merge them if:

- You're an admin of both Pages.

- Your Pages have similar names and represent the same thing.

- Your Pages have the same address, if they have physical locations.

Before you request a Page merge, please make sure that any campaigns you're running aren't pointing to the Page that will be deleted.

To merge your Pages:

1 Go to facebook.com/pages/merge.

2 Select 2 Pages you want to merge and click **Continue**.

3 Click **Request Merge**.

If you're unable to merge your Pages, it means that your Pages aren't eligible to be merged. If you see the option to request to merge your Pages, we'll review your request.

If your Pages can be merged, the people who like your Pages and any check-ins will be combined, but posts, photos, reviews, ratings and the username will be deleted from the Page you merge. The Page you want to keep will remain unchanged, except for the addition of people who like the Page and check-ins that were merged from the other Page. The Page you don't want to keep will be removed from Facebook, and you won't be able to unmerge it.

Note: If your Pages are on Business Manager, you can go to business.facebook.com/pages/merge to merge them.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

---

## Invite Friends

How do I invite people to like my Page on Facebook?

### Invite Friends

To invite friends to like your Page:

1 Go to your Page and click **Community** in the left column. You might have to click **See more**.

2 In the right column, click **Invite your friends to like [your Page's name]**



2. In the right column, click **Invite your friends to like [your Page's name]**.

3. Enter a friend's name in the search box and then click **Invite** next to their name.

You can see invitations to like a Page by going to your **Invites** tab.

### Invite People Who React to Your Page's Posts

If your Page has less than 100,000 likes, you can also invite people who react to your Page's posts to like your Page.

To invite people who react to your Page's posts:

1. Go to one of your Page's posts.

2. Click the reactions section of your Page's post. This will show who has reacted to your Page's post.

3. Next to a person's name, click **Invite** to invite the person to like your Page.

Keep in mind that if your Page has more than 100,000 likes, you'll see the option to add people as a friend rather than invite them to like your Page.

Was this information helpful?
  ○ Yes   ○ No

View Full Article
· Share Article

---

### Delete or Unpublish Your Page

How do I delete my Page?

To delete your Page, you'll need to be an admin of that Page. If you're an admin:

1. Click **Settings** at the top of your Page.

2. From **General**, click **Remove Page**.

3. Click **Delete [Page name]**.

4. Click **Delete Page** and then click **OK**.

Keep in mind your Page won't be permanently deleted until 14 days have passed, but you can unpublish your Page at any time.

To cancel your Page deletion:

1. Go to your Page within 14 days of scheduling to delete your Page.

2. Click **Cancel Deletion** at the top of your Page.

3. Click **Confirm** and then click **OK**.

You can also delete your personal account.

Note: If you don't see the option to delete your Page, make sure you're an admin of the Page. Learn how to see what your role is on a Page.

Was this information helpful?
  ○ Yes   ○ No

View Full Article
· Share Article

---

How do I unpublish or publish my Page?

Published Pages are visible to the public. Unpublished Pages are only visible to the people who manage the Page. Unpublishing your Page will hide it from the public, including the people who like your Page, and your Page won't be visible to the public until it's published again. If you're an admin, you can unpublish your Page at any time.

To unpublish your Page:

1. Click **Settings** at the top of your Page.

2. From **General**, click **Page Visibility**.

3. Click to select **Page unpublished**.

4. Click **Save Changes**.

To publish your Page, follow the instructions above and click to select **Page published**.

Keep in mind that newly created Pages may be unpublished because of inactivity.

Was this information helpful?
  ○ Yes   ○ No

View Full Article
· Share Article

Facebook © 2019
English (US) ▾

About
Privacy
Careers

Ad Choices
Create Ad
Create Page

Terms & Policies
Cookies

# EXHIBIT 9



## Like and Interact with Pages

### Like and Interact

#### How do I like or follow a Page?

If you want to show support for a Page and be able to see updates from it in News Feed, you should like it.

If you just want to see updates from a Page, you should follow it.

To like a Page:

1. Go to the Page
2. Click 👍 **Like** below the Page's cover photo

When you like a Page, you automatically follow it, which means that you may see updates from that Page in News Feed.

Pages you like are listed in the **About** section of your profile below **Likes**. A post that you liked on a Page may appear in News Feed. You may be displayed on the Page you liked or in ads about that Page.

To follow a Page:

1. Go to the Page
2. Click **Follow**

When you follow a Page, you may see updates from that Page in News Feed.

To see the people or Pages that you follow:

1. Go to your profile and click **About**
2. Scroll down to the **Friends** section and then click **More > Following**

Was this information helpful?
○ Yes ○ No

View Full Article
· Share Article

#### How do I unlike a Page?

To unlike a Page:

1. Go to the Page by clicking its name in your News Feed or searching for it.
2. Below the Page's cover photo, hover over 👍 **Liked**.
3. Select **Unlike this Page** from the dropdown menu.

Was this information helpful?
○ Yes ○ No

View Full Article
· Share Article

#### How do I tag people or Pages in photos?

You can tag people or Pages in your own or someone else's photos if the person or Page has allowed others to tag it.

To tag people or Pages in a photo:

1. Click the photo to expand it.
2. Hover over the photo and click **Tag Photo** at the bottom.
3. Click the person in the photo and start typing their name.
4. Choose the full name of the person or Page you want to tag when it appears.
5. Click **Done Tagging**.

You can tag up to 50 people or Pages in a photo.

Keep in mind that when you tag someone in a photo, that person's friends may also see, like or comment on the photo. Also, if you tag a photo that was not uploaded by a friend, the person who uploaded the photo will need to approve the tag.

Was this information helpful?
○ Yes ○ No

View Full Article
· Share Article

#### How do I share a Page with friends?

To share a Page with friends:

1. Click ↗ **Share** below the Page's cover photo.
2. Click the dropdown menu at the top to select where you want to share the Page (example: your timeline, a Page you manage).
3. Write an optional update or message.
4. Click **Post** or **Send**.

Was this information helpful?
○ Yes ○ No

View Full Article
· Share Article

#### How do I post on a Page on Facebook and who can see it?

Facebook Pages are public spaces. Anyone who can see the Page can see your post or comment. When you post or comment on a Page, a story can be published in News Feed and other places on Facebook.

You can only post on Pages that have allowed visitor posts.

To post on a Page that you visit:

1  Click **Write a post...** at the top of the Page and write your post.

2  Click your profile picture in the top right and select to post as yourself or as a Page you manage.

3  Click **Post**.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

**How do I send a private message to a Page?**

You can only send a private message to Pages that have turned on messaging. To send a private message to a Page:

1  Click **Send Message** below the Page's cover photo

2  Type your message and press enter to send

If you don't see the option to message a Page, it means the Page has turned off this feature. To contact a Page with messages turned off, you may be able to post on the Page.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

**How do I see my country's version of a Page?**

Some Pages for global brands have specialized versions of the Page for different regions. To switch the version of the Page you're seeing:

1  Click  ···  below the Page's cover photo

2  Select **Switch Region**

3  Select the country you want as your default for the Page

4  Click **Save Preference**

The version of the Page you select will be the version you see in News Feed and when you visit the Page.

Keep in mind that if you like a Page while you're traveling, you may see updates for the country you're visiting even when you return home. If you're seeing posts from the Page that aren't in your language or aren't relevant to where you are, follow the steps above to switch the version of the Page you see.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

**How do I find and apply to a Page's job post?**

You may see job posts in your News Feed, but you can also find job posts by:

· Clicking **Jobs** in the left column of News Feed. In the left column, you can search jobs, change your location or select an industry or job type. Click **Subscribe** in the right column to get notified about new job openings.

· Going to a company's Page to see if they have any jobs open by clicking **Jobs** in the left column of the Page. If there isn't a **Jobs** tab, the company hasn't posted any jobs on their Page.

To apply to a job post:

1  Click **Apply Now**.

2  Fill in the application (example: your experience and education).

3  Click **Send**.

Your application will be sent as a message to the employer and won't appear on your profile. Keep in mind that employers can see the public version of your profile, but you can choose who sees your posts and see what your profile looks like to other people.

Learn more about guidelines you can follow when searching for jobs on Facebook.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

## Donate to a Nonprofit Page

**How do I donate to a fundraiser or charitable organization on Facebook?**

There are several ways to donate on Facebook.

From a charitable organization's Page:

1  Click **Donate** on the Page's cover photo.

2  Click the amount you'd like to give or enter an amount.

3  Select a payment method.

4  Click **Donate [Amount]**.

From a post published by a charitable organization's Page or shared by someone who donated:

1. Click **Donate** on the post.

2. Click the amount you'd like to give or enter an amount.

3. Select a payment method.

4. Click **Donate [Amount]**.

From a fundraiser:

1. Click **Donate** at the top of the fundraiser.

2. Click the amount you'd like to give or enter an amount.

3. Select a payment method.

4. Click **Donate [Amount]**.

Note: This feature isn't available in every location.

Keep in mind that when you securely store your payment card information after you enter it for the first time. This allows you to make future donations without having to re-enter your information. You can remove or manage this information by going to your payment settings.



---

Are donations made on Facebook tax-deductible?

Donations made on Facebook may be tax deductible. Review the information below to learn more whether a donation is tax-deductible.

› Donations to Nonprofits

› Donations to Fundraisers for Personal Causes

Note: Donations and fundraiser features on Facebook aren't available in every area.



---

How do I contact Facebook about my donation?

If you need help with a recent donation you made, have questions about a fundraiser, or want more information on the status of contributions to your nonprofit, fill out this form to let us know.

Visit Charitable Fundraisers and Donations to learn more about raising money for nonprofits on Facebook.



---

## Privacy and Reporting

How do I choose who can see stuff I add to sections of my About page?

Your About page helps you share what you care about with others, such as movies or books you've added, stories from apps and games you use and things you've liked. If someone is in the audience of things you've added or the audience of stories shared by apps and games, they can see that stuff. You can edit the privacy of the individual stories in each section or you can choose to hide a section entirely.

To edit the privacy of:

- **Things you add:** When you add something like a book or a movie, use the audience selector to choose who it's shared with. The selector remembers your choice, so new things you add (regardless of which section you're adding to to) will have the same audience unless you change it. You can change the audience of something you've already added from your activity log.

- **Things you've liked:** You can select an audience for each section of things you've liked (example: Pages, music, books). For example, to choose who can see the movies you've liked, scroll down to the movies section, click ⁄ in the top-right corner and then select **Edit Privacy**. To choose who can see what Pages you like, scroll down to your **Likes** section, then click ⁄ in the top-right and select **Edit the Privacy of Your Likes.**

- **Stories from apps and games:** If you're sharing stories from an app or game, you can adjust the audience of future stories, or change the audience of a story you've already shared from your activity log.

Keep in mind that when you share something on your timeline, the audience you choose can also see it in other places on Facebook, such as in News Feed and search.



---

How do I block or unblock a Page?

Once you block a Page, that Page can no longer interact with your posts or like or reply to your comments. You won't be able to post on the Page or message the Page. If you like the Page, you'll unlike and unfollow it.

To block a Page:

1. Go to the Page you want to block.

2. Click ⋯ below the Page's cover photo.

3. Select **Block Page**.

4. Click **Confirm**.

To unblock a Page:

1  Click [ ] in the top right of Facebook and select **Settings**.

2  Click **Blocking** in the left column.

3  In the **Block Pages** section, click **Unblock** next to the Page's name.

Learn how to block or unblock a person on Facebook.

Was this information helpful?
  Yes   No

View Full Article
· Share Article

How do I report a Page?

To report a Page:

1. Go to the Page you want to report.

2. Click  ···  below the Page's cover photo.

3. Select **Give feedback or report this Page**.

4. To give feedback, click the option that best describes how this Page goes against our Community Standards.

5. Depending on your feedback, you may then be able to submit a report to Facebook. For some types of content, we don't ask you to submit a report, but we use your feedback to help our systems learn.

If you can't access the Page you want to report, consider asking a friend to report it.

We'll review the Page and remove anything that doesn't follow the Facebook Community Standards. We may also warn or disable the person responsible.

Learn how to report a profile.

Was this information helpful?
  Yes   No

View Full Article
· Share Article

Facebook © 2019
English (US) ·

About
Privacy
Careers

Ad Choices
Create Ad
Create Page

Terms & Policies
Cookies

# EXHIBIT 10



## Banning and Moderation

### Settings for Visitor Posts and Comments

How can I proactively moderate content published by visitors on my Page?

If you're an admin of a Page, you can block certain words from appearing on your Page and turn on the profanity filter.

#### Blocking Words

When people include a word you've blocked in a post or comment on your Page, it won't appear on your Page. To block words:

1. Click **Settings** at the top of your Page.
2. From **General**, click **Page Moderation**.
3. Type the words you want to block, separated by commas. You'll need to add both the singular and plural forms of the word you want to block.
4. Click **Save Changes**.

You can unhide comments that contain blocked words by going to the comment and clicking **Unhide**.

#### Profanity Filter

You can block different degrees of profanity from appearing on your Page. We determine what to block by using the most commonly reported words and phrases marked offensive by the community. To turn on the profanity filter:

1. Click **Settings** at the top of your Page.
2. From **General**, click **Profanity Filter**.
3. Select **Medium** or **Strong**.
4. Click **Save Changes**.

Was this information helpful?
○ Yes   ○ No

View Full Article
· Share Article

---

What does Most Relevant mean on a Page post?

When you see **Most Relevant** above the comments in a Page post, it means that you're more likely to see comments that are relevant to you. This means that you're more likely to see the following at the top:

· Comments or reactions from your friends
· Comments from verified profiles and Pages
· Comments with the most likes and replies

This personalized order is only available for comments on Page posts. If a Page admin has turned off comment ranking for their Page, the Page will display comments chronologically by default.

#### Change the Order Of Comments on a Post

You can change the order that you see comments on a Page post as a Page admin or visitor. This only affects how you see comments, not other people. Keep in mind that Pages may have different comment ordering options, and changing the order of comments isn't permanent.

To change the order of comments, click the current comment ordering option in the bottom left of the Page post (example: **New, Oldest, All Comments, Most Relevant**), and then select a new option:

· **New** to show all comments, with the newest comments first.
· **Oldest** to show all comments, with the oldest comments first.
· **All Comments** to show all comments, including potential spam. The most relevant comments will appear first.
· **Most Relevant** to show friends' comments and the most engaging comments first.



Was this information helpful?
○ Yes   ○ No

View Full Article
· Share Article

---

How do I stop people from publishing photos and videos on my Page's timeline?

Pages are a way for businesses, brands and public figures to connect with their fans on Facebook. Learn more about the difference between a profile and a Page.

Only Page admins can edit this feature.

1

To stop other people from publishing photos and videos on your Page's timeline:

1   **Click Settings** at the top of your Page.



2   From **General**, click **Visitor Posts**.



3   Select **Allow visitors to the Page to publish posts**, and then click to uncheck the box next to **Allow photo and video posts**.

4   Click **Save Changes**.

Was this information helpful?                                                    View Full Article
   ◯ Yes   ◯ No                                                                  · Share Article

---

How do I control what visitors can post on my Page?

The article below is for people who manage a Page. If you have a personal profile, learn more about how you can stop people from posting on your timeline.

You'll need to be an **admin** to control what visitors can post on your Page. If you allow visitors to publish on your Page, their posts can appear in the **Visitor Posts** section after you click **Posts** on the left side of your Page. If you allow photo and video posts, posts by others can also appear in the **Photos and Videos** sections of your Page.

To control what visitors can post on your Page:

1   **Click Settings** at the top of your Page.

2   From **General**, click **Visitor Posts**.

3   Select **Allow visitors to the Page to publish posts** or **Disable posts by other people on the Page**. If you allow visitors to publish posts, you can choose to:

   · Allow photo and video posts

   · Review posts by *other people* before they're published to the Page

4   Click **Save Changes**.

If you choose to review posts, posts by others will be hidden from your Page by default. To approve a post, go to the **Posts by Others** section of your Page's activity log, click ⊙ next to the post and select **Allowed on Page**.

Here are some other things you can do to control what visitors post on your Page:

   · While you can't disable comments on your Page's posts, you can hide or delete individual comments.

   · You can proactively moderate comments and posts by visitors by blocking words and turning on the profanity filter for your Page.

   · You can ban people from your Page.

   · You can turn off reviews for your Page.

Was this information helpful?                                                    View Full Article
   ◯ Yes   ◯ No                                                                  · Share Article

---

How do I allow other people to tag my Page's photos and videos?

Pages are a way for businesses, brands and public figures to connect with their fans on Facebook. Learn more about the difference between a profile and a Page.

To allow other people to tag photos and videos published by your Page, you'll need to be an

admin. If you're an admin:

1   Click **Settings** at the top of your Page.



2   From **General**, click **Tagging Ability**.



3   Click to check the box next to **Allow others to tag photos and video published by [Page name]**.

4   Click **Save Changes**.

Photos your Page is tagged in are visible to:

·   The audience they're shared with

·   Other people tagged in the photo

·   Friends that the people tagged choose to add to the audience

If you've allowed visitors to publish photo and video posts to your Page, tagged photos and videos of your Page can appear in the **Photos** and **Videos** sections below your Page's cover photo.



Was this information helpful?                                          View Full Article
Yes    No                                                             · Share Article

---

How do I stop allowing others to tag or mention my Page?

To stop allowing other people or Pages to tag your Page in their photos and videos or mention your Page in their posts and comments, you'll need to be an admin. If you're an admin:

1   Click **Settings** at the top of your Page.

2   From **General**, click **Others Tagging this Page**.

3   Click to uncheck the box next to **Allow people and other Pages to tag [Page name]**.

4   Click **Save Changes**.

In addition to Pages, you can also report or remove tags for your personal profile.



Was this information helpful?                                          View Full Article
Yes    No                                                             · Share Article

---

## Manage Comments

How do I hide or delete a comment from a post on my Page?

When you hide a comment from a post on your Page, the comment will only be visible to the person who wrote it and their friends. When you delete a comment from a post on your Page, the comment will be permanently removed from the post.

To hide a comment from a post on your Page:

1   Hover over the comment.

2   Click  ···  and select **Hide Comment**.

To delete a comment from a post on your Page:

1   Hover over the comment.

2   Click  ···  and select **Hide Comment**.

3   Click **Delete**.

After you hide a comment, you also can ban the person or Page or report the comment if it doesn't follow the Facebook Community Standards.

Was this information helpful?                                          View Full Article

Yes ○ No                                                     · Share Article

**How do I reply to comments on my Page's posts?**

If you're an admin, editor or moderator, you can reply to comments on your Page's posts publicly or in a private message. When you reply with a private message, anyone can see that your Page has responded privately below the comment.

To reply to a comment publicly:

1  Click **Reply** below the comment

2  Add your reply and press the Enter key

To reply to a comment in a private message:

1  Click **Message** below the comment

2  Enter your message and click **Send**

Was this information helpful?                                View Full Article
○ Yes  ○ No                                                 · Share Article

## Ban or Remove Someone

How do I ban or unban someone from my Page?

We recommend banning people who continually publish spam on your Page. You can choose to unban them at any time. When you ban someone from your Page, they'll still be able to share content from your Page to other places on Facebook, but they'll no longer be able to publish to your Page, like or comment on your Page's posts, message your Page or like your Page.

You may also remove someone who likes your Page. When you remove someone from your Page, they'll no longer like it. This is a good option for people you don't want following your Page's posts in their News Feeds or the News Feeds of their friends. However, Pages are public spaces and people you've removed can choose to like your Page again.

### Ban Someone

There are several ways to ban a person or another Page from your Page.

From your Page's settings:

1  Click **Settings** at the top of your Page.

2  Click **People and Other Pages** in the left column.

3  Search for the person or click to check the box next to the name of the person you want to ban.

4  Click  ○  and select **Ban From Page**.

5  Click **Confirm**.

From a comment on a Page post:

1  Hover over a comment by the person or Page you want to ban and click  ···.

2  Click **Hide Comment**.

3  Click **Ban [Name]**.

From a post on your Page or a post your Page has been mentioned in:

1  Click **Posts** in the left column of your Page.

2  Click **Visitor Posts** on the right side of your Page.

3  Click  ···  in the top right of the post by the person or Page you want to ban.

4  Select **Ban From Page** and click **Confirm**.

From your Page's inbox:

1  Click **Inbox** at the top of your Page.

2  Click the message on the left from the person you want to ban.

3  Click  ···  in the top right and select **Ban From Page**.

4  Click **Confirm**.

### Unban Someone

There are several ways to unban a person or another Page from your Page.

From your Page's settings:

1  Click **Settings** at the top of your Page.

2  Click **People and Other Pages** in the left column.

3  Click **People Who Like This Page** ▾ and select **Banned People and Pages**.

4  Click to check the box next to the name of the person you want to unban.

5  Click  ○  and select **Unban From Page**.

6  Click **Confirm**.

From your Page's inbox:

1  Click **Inbox** at the top of your Page.

2  Click the message on the left from the person you want to unban.

3  Click  ···  in the top right and select **Remove ban from Page**.

4  Click **Confirm**.

Was this information helpful?                                View Full Article



○ Yes   ○ No                                                                    · Share Article

**How do I view the people banned from my Page?**

To view the people banned from your Page:

1   Click **Settings** at the top of your Page

2   Click **People and Other Pages** in the left column

3   Click **People Who Like This Page** at the top and select **Banned People and Pages**

Was this information helpful?                                    View Full Article
   ○ Yes   ○ No                                                  · Share Article

**How do I remove someone who likes my Page?**

When you remove someone who likes your Page, they'll no longer like it. Keep in mind that Pages are public spaces, and people you've removed can choose to like your Page again.

You may also ban someone from your Page. When you ban someone from your Page, they'll no longer like it. People you ban will still be able to share content from your Page to other places on Facebook, but they'll no longer be able to publish to your Page, like or comment on your Page's posts, message your Page or like your Page. We recommend banning people who continually publish spam on your Page.

To remove someone who likes your Page:

1   Click **Settings** at the top of your Page

2   Click **People and Other Pages** in the left column

3   Click to check the box next to the person you want to remove

4   Click  ○  and select **Remove From Page Likes**

5   Click **Confirm**

Was this information helpful?                                    View Full Article
   ○ Yes   ○ No                                                  · Share Article

**How do I tag other Pages or people in my Page's photos and videos?**

You can tag other Pages in your Page's photos and videos if the Page has allowed others to tag it. You can tag people in your Page's photos and videos if they've liked your Page and are at least 18 years old.

To tag other people or Pages in a photo:

1   Go to your Page and click the photo you want to tag.

2   Click **Tag Photo** on the right.

3   Click the person or Page in the photo.

4   Begin typing the person's or Page's name, then select them from the list that appears.

5   Click **Done Tagging** on the right.

To tag other people or Pages in a video:

1   Click **Publishing Tools** at the top of your Page.

2   Click **Video Library** on the left.

3   Hover over the video you want to tag, then click ✐ .

4   Below **Describe your video...**, click ⚲ .

5   Begin typing the person's or Page's name, then select them from the list that appears.

6   Click **Save**.

Was this information helpful?                                    View Full Article
   ○ Yes   ○ No                                                  · Share Article

Facebook © 2019        About              Ad Choices         Terms & Policies
English (US) ∨         Privacy            Create Ad           Cookies
                       Careers            Create Page

# EXHIBIT 11



## Publishing

### Share from Your Page

How do I share photos from my Page?

### Share Photos or Videos

To share photos from your Page:

1  Click **Share a photo or video** at the top of your Page's timeline.

2  Choose an option:

   · **Upload Photos/Video:** Add photos or a video from your computer. The photos you publish will be added to your Page's timeline Photos album.

   · **Create Photo Album:** Add photos from your computer to a new album.

   · **Create a Photo Carousel:** Photos are taken from a website you choose. Enter a website URL to build a scrolling carousel of photos.

3  Select the photos or videos you want to add.

4  Write an optional update and click **Publish**.

### Share Slideshows

A slideshow is a video based on a series of 3-10 photos. To add a slideshow to your Page:

1  Click **Share a photo or video** at the top of your Page's timeline.

2  Click **Create Slideshow**.

3  Click **+**, select or upload a photo, then click **Add Photo**. You can include up to 10 photos.

4  Customize your slideshow with the options on the left (example: music).

5  Click **Create Slideshow**, then add an optional update to the post.

6  Click **Publish**.

Was this information helpful?          View Full Article
  Yes     No                          · Share Article

How do I create or edit an event for my Page?

### Create an Event

To create an event for your Page:

1  Click **Event** at the top of your Page's timeline.

2  Add an event photo, then enter your event's name, location and frequency (example: occurs once, weekly or you can customize the date range for your event). You can include optional details like:

   · **Ticket URL:** If you've set up the event with an online ticketing provider, enter the link.

   · **On Sale Now or Custom Date:** Choose the date that tickets go on sale. If tickets are available now, fans will be able to purchase tickets from your Page. Those who are interested in an event will receive a notification when tickets go on sale and will be able to purchase from your Page at that time.

   · **Co-hosts:** You can add other Pages (example: promoters, venues, artists) and friends as co-hosts, but only Pages will be displayed as co-hosts on the event page. Co-hosts can edit the event, and it will automatically be added to a co-hosting Page's calendar. You can add or remove co-hosts, but once an event has been created by a Page, the Page is the primary host and can't be removed. Learn more about adding co-hosts below.

3  Click **Publish** or **Save Draft**. You can also click ▼ and select **Schedule** to select a date and time in the future for when you want your event to publish.

Keep in mind that all events hosted by Pages are public. You can also add other people's or Page's public events to your Page. Learn more best practices for creating an event.

· Add Co-Hosts to Your Event

### Edit an Event

To edit an event for your Page:

1  Click **Events** on the left side of your Page.

2  Click the name of the event you want to edit.

3  Click **Edit** in the top right.



4  Edit the event, then click Save.



Was this information helpful?
○ Yes ○ No

View Full Article
· Share Article

### How do I pin a post to the top of my Page's timeline?

You'll need to be an admin or editor to pin Page posts. To pin a post to the top of your Page's timeline:

1 Go to the post on your Page's timeline

2 Click ••• in the top right of the post

3 Select **Pin to Top of Page**

### About Pinned Posts

When you pin a post:

· The post will move to the top of your Page's timeline

· 🔲 will appear on the post

Note: You can't pin a post on your personal timeline.

Was this information helpful?
○ Yes ○ No

View Full Article
· Share Article

### How do I edit my Page's start date?

To edit your Page's start date:

1 Click **About** on the left side of your Page

2 If you haven't added a start date yet, click **Edit Start Date**, or hover over your Page's existing start date and click **Edit**

3 Select a start type (example: opened, founded) and date from the dropdown menus

4 Click **Save**

Was this information helpful?
○ Yes ○ No

View Full Article
· Share Article

### How do I share a link from my Page?

When you share a link from your Page, you can include a preview in your post. The preview can include up to 10 images with descriptions and unique destination URLs.

To share a link from your Page:

1 Click **Write something...** at the top of your Page's timeline and enter the link you want to share.

2 Images from the webpage may automatically be added to your post's preview. There are several ways to customize the preview:

· **Add or Remove Images:** You can remove an image from the preview by clicking the thumbnail below **Available Images**. Click + to add an image from your computer.

· **Edit Descriptions:** If you've added multiple images, click the description below each image in the preview to edit it.

· **Edit Destination URLs:** To edit the destination URL for an image in the preview, hover over the image and click ⚙ .

3 Click **Publish**.

To remove the preview from your post:

1 Unselect all images by clicking the thumbnails at the bottom.

2 Hover over the preview image.

3 Click **x** in the top-right corner.

Was this information helpful?
○ Yes ○ No

View Full Article
· Share Article

### How do I add or edit a video on my Page?

Pages are a way for businesses, brands and public figures to connect with their fans on Facebook. If you don't have a Page, you can post a video from your personal profile.

To add a video to your Page:

1 Click **Share a photo or video** or **Photo/Video** at the top of your Page's timeline.

2 Click **Upload Photos/Video** and select a video from your computer.

3 Add a title for your video at the top, an optional description and tags.

4 Click the sections in the right column to add more information to your video (example: thumbnail, distribution and subtitles).

5 Click **Publish**.

To edit a video on your Page:

1 Click **Publishing Tools** at the top of your Page.

2



2   Click **Video Library** on the left.

3   Click to check the box next to the video you want to edit.

4   Click **Actions ▾** at the top and select **Edit Video....**

5   Edit your video and click **Save.**

Was this information helpful?
  ○ Yes  ○ No

View Full Article
· Share Article

---

How do I add captions to my Page's video?

You can add captions to your Page's video to make it accessible to a broader audience. You can
automatically generate captions and edit them, write them yourself or you can upload a SubRip
(.srt) file.

To add captions to your Page's video:

1   Click **Photo/Video** at the top of your Page's timeline.

2   Click **Upload Photos/Video** and select a video from your computer.

3   Once your video has uploaded, click **Subtitles & Captions(CC)** in the column on the right.

4   Next to **Video Language**, select the main language spoken in the video.

5   Once your video has finished uploading, select whether you'd like to auto-generate captions,
write them yourself or upload a SubRip (.srt) file.

6   Click **Publish.**

If you choose to upload a .srt file, make sure that your caption files are correctly named and
formatted before you upload them.

To add captions to an existing video on your Page, find the post on your Page's timeline, click ···
in the top-right corner, select **Edit Post** and follow the steps above.

Note: People who watch your Page's video with sound turned off will automatically see captions.
People who watch your video with sound turned on will need to turn on captions to see them. The
language people see captions in is determined by their preferred language.

Was this information helpful?
  ○ Yes  ○ No

View Full Article
· Share Article

---

How do I create an offer from my Page?

You can share discounts and deals with customers by creating an offer from your Page. People
can redeem it online or in-store, depending on where you make your offer available.

To create an offer from your Page:

1   Click **Create an offer** at the top of your Page's timeline.

2   Describe your offer. You can edit the expiration date for your offer if you'd like it to run longer
or shorter than a week.

3   Add a photo and select whether people can use the offer **Online** or **In-Store.** You can also
add a promo code or terms and conditions (optional).

4   Click **Publish.**

Was this information helpful?
  ○ Yes  ○ No

View Full Article
· Share Article

---

How do I view a Page's notes?

If a Page has published notes, you can visit the Page to see them.

To view a Page's notes:

1   Go to the Page.

2   Click **Notes** on the left side of the Page.

Learn how to add a notes tab to a Page you help manage.

Was this information helpful?
  ○ Yes  ○ No

View Full Article
· Share Article

---

How do I create a post for my Page in more than one language?

You'll need to be an admin to write a post for your Page in more than one language. People who
view your post will see the language that's most relevant to them based on their language settings
and locale.

You'll need to first make sure you've allowed posts in multiple languages:

1   Click **Settings** at the top of your Page.

2  From **General**, click **Post In Multiple Languages**.

3  Click to check the box next to **Allow people who manage this Page to write posts in multiple languages**.

4  Click **Save Changes**.

To create a post for your Page in more than one language:

1  Write your post at the top of your Page's timeline. This will be the default language for the post.

2  Click **Write post in another language**, then click **Select ▾** and select a language.

3  Click **Write post in another language** to add another language or click **Publish**.

Note: People whose primary language isn't included as an additional language will see the post in its default language. For example, if the default language for your post is English and you also wrote your post in Spanish and French, people whose primary language is German will see the post in English.

Was this information helpful?
  Yes   No

View Full Article
· Share Article

## How do I crosspost another Page's video?

### Crosspost Another Page's Non-Live Video

For non-live video, you can only crosspost another Page's video if:

· You've established a crossposting relationship with the Page. (Keep in mind that if you already have an admin or editor role on the Page, you don't need to establish a crossposting relationship.)

· The Page has allowed you to crosspost the video.

To crosspost another Page's non-live video:

1  Click **Publishing Tools** at the top of your Page.

2  Click **Videos You Can Crosspost** in the left column.

3  Click the video you want to crosspost.

4  Click **Create Post With This Video**.

5  Add details to your post, then click **Publish**. Keep in mind that you need to add a title to the video before you can publish.

The Page that owns the video can see posts you've used the video in and their insights. If the Page removes your crossposting permissions, posts with the video may be unpublished or removed from your Page.

Keep in mind that captions that are added when a video is first uploaded will be carried over to any crossposts. Captions added through "Edit Video" will not appear in any crossposts. You can also change captions on a crossposted video by uploading a new SubRip (.SRT) file.

### Crosspost Another Page's Live Video

Depending on your Page's crossposting settings when you established a crossposting relationship with the other Page, another Page's live video will either automatically appear on your Page or in your Page's **Publishing Tools > Videos You Can Crosspost**.

To edit these crossposting settings:

1  Click **Settings** at the top of your Page.

2  In the left column, click **Crossposting**.

3  Next to the name of the Page that you've established a crossposting relationship with, below **Their Live Videos**, select whether you'd like to automatically crosspost the other Page's live videos to your Page, or manually post the other Page's live videos by going to your Page's **Publishing Tools > Videos You Can Crosspost**.

Only live videos created via the Live API are eligible for live crossposting, and live video from a mobile device can't be crossposted.

Keep in mind that even if you choose to manually post another Page's live videos but you're a shared admin or editor of both Pages, then the crossposted live video will automatically be posted to your Page.

Note: Each live crosspost is treated as a separate broadcast on each Page. Comments and reactions from the other Page's live video won't appear in your Page's crossposted video, and viewers can't see where the original live video is coming from.

### Metadata and Targeting

If you want a description, title or targeting setting for a crossposted live video on your Page that is different from the original live video before it is shown to the public, make sure you've chosen to manually post the other Page's live videos and that both Pages don't share an admin or editor.

If a crossposted live video has targeting different from the original live video, select manual crossposting to ensure that admins or editors don't have to change targeting settings in real-time and followers of Pages don't receive a live video notification for a broadcast that they likely can't see.

Was this information helpful?
  Yes   No

View Full Article
· Share Article

## How do I allow another Page to crosspost my Page's videos?

Crossposting is a way to use videos across multiple Pages. First, you'll need to establish a crossposting relationship with another Page unless you already have an admin or editor role on that Page. If you already have an admin or editor role on the Page, you don't need to establish a crossposting relationship and can skip to the next section below.

### Establish a Crossposting Relationship

To establish a crossposting relationship with another Page:

1   Click **Settings** at the top of your Page.

2   Click **Crossposting** in the left column.

3   Begin typing the Page's name or Facebook URL and select it from the list that appears.

4   For **Non-Live Videos**, both Pages can crosspost each other's eligible videos by going to the Page's **Publishing Tools > Videos You Can Crosspost**. For **Live Videos**, select whether you'd like to:

   • Allow the other Page to crosspost their live video to your Page without further approval.

   • Require the other Page's crossposted live videos to be approved by one of your admins or editors before being crossposted to your Page.

5   Click **Next**.

The other Page must confirm the crossposting relationship by adding your Page to its crossposting settings. To help the Page confirm the relationship, click ⚙ and send the confirmation link to an admin of the Page.

### Allow Another Page to Crosspost Your Page's Non-Live Videos

Once a crossposting relationship is established, you can allow the Page to crosspost non-live videos you add to your Page:

1   At the top of your Page's timeline, below **Write a post...**, click **Photo/Video**.

2   Click **Upload Photos/Video** and select a video from your computer.

3   Enter a title for your video and other details and click **Next**.

4   Scroll down to the section **Make Available to Other Pages** and select which Pages you want to allow to use your Page's video in their posts. The list of Pages includes Pages that you've already established a crossposting relationship with and any Pages in which you have an admin or editor role.

5   Click **Publish**.

You'll be able to see insights for all posts the video has been used in. Pages that crosspost your video can only see Insights for the video post on their Page.

### Allow Another Page to Crosspost Your Page's Live Videos

You can allow another Page to crosspost your Page's live video without the other Page needing to upload or share it directly. Only live videos created via the Live API are eligible for live crossposting, and live video from a mobile device can't be crossposted.

Other than establishing a crossposting relationship with the other Page, your Page doesn't need to do anything to allow the other Page to crosspost your Page's live video.

Instead, when the other Page establishes or confirms the crossposting relationship, it will need to decide whether to allow your Page to crosspost automatically or with approval from one of its admins or editors.

Keep in mind that each live crosspost is treated as a separate broadcast on each Page. Comments and reactions from your Page's live video won't appear in the other Page's crossposted broadcast, and viewers can't see where the original live video is coming from.

Was this information helpful?          View Full Article
  ○ Yes   ○ No                         · Share Article

---

How do I manage job posts for my Page?

Pages are a way for businesses, brands and public figures to connect with their fans on Facebook. Learn more about the difference between a profile and a Page.

› Create a Job Post

› Edit a Job Post

› Close or Renew a Job Post

› Delete a Job Post

Was this information helpful?          View Full Article
  ○ Yes   ○ No                         · Share Article

## Tags, Mentions and Audiences

How do I control who can see my Page's posts?

There are 2 ways to control who can see your Page's posts:

   • Use Restricted Audience to limit who can see your post.

   • Use News Feed Targeting to make it more likely that your selected audience will see your post in News Feed.

If less than 5,000 people like your Page, you'll need to first make sure you've allowed audience optimization for your Page's posts:

1   Click **Settings** at the top of your Page.

2   From **General**, click **Audience Optimization for Posts**.

3   Click to check the box next to **Allow News Feed targeting and the ability to restrict the audience for your posts**.

4   Click **Save Changes**.

## Limit Your Post's Audience

When you limit your post's audience, you can control the visibility of your post based on audience age and location. Only people in the audience you choose can see the post anywhere on Facebook, including your Page.

To limit your post's audience:

1  Click ⊙ before publishing your post.

2  Click **Restricted Audience** at the top, then select the age and locations of the audience you
   want to see your post.

3  Click **Save**.

Keep in mind that if someone shares the post, only people in the audience you choose for the
post will be able to see it.

## Use News Feed Targeting

You can target a specific audience for your Page's post so that certain people are more likely to
see it in News Feed based on the criteria you select. Unlike limiting your post's audience, using
News Feed Targeting doesn't affect who can see the post on your Page or anywhere else on
Facebook.

To use News Feed Targeting:

1  Click ⊙ before publishing your post.

2  In the **News Feed Targeting** section, enter the criteria of the people you'd like to reach in
   News Feed.

3  Click **Save**.

Was this information helpful?            View Full Article
   ○ Yes    ○ No                         · Share Article

---



How do I tag other Pages or people in my Page's photos and videos?

You can tag other Pages in your Page's photos and videos if the Page has allowed others to tag
it. You can tag people in your Page's photos and videos if they've liked your Page and are at least
18 years old.

To tag other people or Pages in a photo:

1  Go to your Page and click the photo you want to tag.

2  Click **Tag Photo** on the right.

3  Click the person or Page in the photo.

4  Begin typing the person's or Page's name, then select them from the list that appears.

5  Click **Done Tagging** on the right.

To tag other people or Pages in a video:

1  Click **Publishing Tools** at the top of your Page.

2  Click **Video Library** on the left.

3  Hover over the video you want to tag, then click ✏ .

4  Below **Describe your video...**, click  ▵ .

5  Begin typing the person's or Page's name, then select them from the list that appears.

6  Click **Save**.

Was this information helpful?            View Full Article
   ○ Yes    ○ No                         · Share Article

---

## Draft, Schedule and Backdate



How do I schedule a post and manage scheduled posts for my Page?

You can create a post and schedule it to publish on your Page in the future. Scheduled posts can
be created and edited by other admins and editors who help manage your Page.

Keep in mind that all times for scheduling correspond to your current time zone.

### Schedule a Post

To schedule a post:

1  Start creating your post at the top of your Page's timeline

2  Click ▾ next to **Publish** and select **Schedule**

3  Below **Publication**, select the date and time when you want the post to publish

4  Click **Schedule**

### Manage Scheduled Posts

To reschedule, edit or delete a scheduled post:

1  Click **Publishing Tools** at the top of your Page

2  Click **Scheduled Posts** in the left column

3  Click the post you want to edit

4  Click **Edit** to edit the post, or click ▾ to choose to publish, reschedule or delete it

To see a history of all edits to a scheduled post, click **View Edit History**.

Was this information helpful?            View Full Article
   ○ Yes    ○ No                         · Share Article

---

How do I create, edit or publish a draft of a post for my Page?

Only Pages, not personal profiles, can create drafts. You'll need to be an admin or editor of your Page to create, edit or publish drafts of posts.

## Create a Draft

To create a draft of a post for your Page:

1  Start creating your post at the top of your Page's timeline.

2  Click ⊞ next to Publish. If you don't see this, click ⊙ Share Now ▾ .

3  Select Save Draft.

## Edit or Publish Drafts

To edit or publish drafts for your Page:

1  Click Publishing Tools at the top of your Page. Only Pages, not personal profiles, can access Publishing Tools.



2  Click Drafts in the left column.

3  Click the draft you want to edit or publish.

4  Click Edit to edit the draft. To publish the draft, click ⊞ and select Publish.

Was this information helpful?
　Yes 　No

View Full Article
· Share Article

How do I choose a date for my Page post to stop showing in News Feed?

To choose a date and time for your Page post to stop showing in News Feed:

1  Start creating your post at the top of your Page's timeline.

2  Click Share Now ▾  and then select Schedule.

3  If you want to publish your post immediately, click to turn off Publication.

4  Click to turn on Stop News Feed Distribution and select a date and time when you want your post to stop showing in News Feed.

5  Click Publish or Schedule.

Keep in mind that after the post stops showing in News Feed, it will still be visible on your Page's timeline.

Was this information helpful?
　Yes 　No

View Full Article
· Share Article

## Edit and Delete Posts

How do I hide or delete posts I've shared from my Page?

Hiding a post that you've shared from your Page will remove it from your Page, but not from your Page's activity log (which only you and other managers of your Page can see). When you delete a post, you'll permanently remove it from your Page, including your Page's activity log.

To hide or delete a post from your Page:

1  Go to the post on your Page's timeline.

2  Click ⌄ in the top-right corner.

3  Select Hide from timeline or Delete from Page.

To unhide a post you've hidden:

1  Click Settings at the top of your Page.

2  Click Activity Log in the left column.

3  Click ⊘ next to the post you want to unhide and select Allowed on Page.

Keep in mind that if a post you've hidden was shared, it may still be visible to the audience it was shared with in other places on Facebook, such as in News Feed and search. Any photos you've hidden from your Page's timeline will still be visible when people visit your Page's Photos section.

Was this information helpful?
　Yes 　No

View Full Article
· Share Article

How do I edit a post that I've shared from my Page?

To edit a post that you've shared from your Page:

1  Go to the post

2  Click ••• in the top-right corner and select Edit Post

3  Edit your post and click Save

Note: Posts that have been boosted or are part of an ad campaign can't be edited.

See Who Edited a Post Shared By Your Page

See Who Edited a Post Shared By Your Page

Keep in mind that posts can be edited by other admins and editors who work on your Page.

To see who edited a post:

1   Go to the post and click •••

2   Select **View edit history**

3   From here, you'll see a history of all edits, including edits made before the post was published

4   Click **Close** after you've finished viewing the edit history

Anyone who can see the post can see a history of any edits made after the post was published. Only the people who work on your Page can see edits made before the post was published and who edited it.

Was this information helpful?          View Full Article
○ Yes  ○ No                           · Share Article

## Like and Comment as Your Page

How do I publish, like or comment as my Page on another Page's post or timeline?

You'll need to be an admin, editor or moderator to like or comment as your Page on another Page's post. If you're an admin or editor, you may be able to publish as your Page on another Page's timeline, depending on that Page's settings.

To like or comment on another Page's post as your Page:

1   Go to the Page post you want to like or comment on.

2   Click your profile picture in the bottom-right corner of the post.



3   Select the Page you want to like or comment as.



4   Like or comment on the post.

To publish on another Page's timeline as your Page:

1   Go to the Page you want to publish on.

2   Click your profile picture in the top right corner of the posting box.



3   Select the Page you want to publish as.



4   Create your post, then click **Post**.

Note: Keep in mind that a person's profile isn't the same thing as a Page, which can represent brands, businesses or causes. While you can publish, like or comment as your Page on another Page, you can't do the same thing on a person's profile.

Was this information helpful?          View Full Article
○ Yes  ○ No                           · Share Article

How do I like another Page as my Page, and how do I see Pages Feed?

To like a Page as your Page:

1   Go to the Page you want to like.

8

2   Click  –  below the Page's cover photo.

3   Select **Like As Your Page**.

4   Select a Page and click **Submit**.

To see a list of all the Pages that your Page has liked, go to your Page and scroll down to **Pages liked by this Page** in the right column.

To see posts from Pages you've liked as your Page, go to your Page and click **See Pages Feed** in the right column of your Page.



Was this information helpful?
  ○ Yes   ○ No

View Full Article
· Share Article

## Activity Log

How do I view my Page's activity log?

Your Page's activity log helps you manage your Page's timeline. It also shows you a list of posts and comments by your Page, including posts you've hidden, but not those you've deleted. Only people who help manage your Page can see the activity log.

To view your Page's activity log:

1   Click **Settings** at the top of your Page.

2   Click **Activity Log** in the left column.

From here, you can:

· Hide or allow posts.

· Delete your Page's posts or comments.



Was this information helpful?
  ○ Yes   ○ No

View Full Article
· Share Article

If multiple people help manage my Page, how can I see who published something?

There are several ways to see who published something on your Page. Keep in mind that only people who help manage your Page can see this information.

· On a Page post, the name of the person who published will be listed next to **Published by.** On a Page comment, the name of the person who commented will be listed below the comment next to **Commented on by**.

· Click **Publishing Tools** at the top of your Page. From the column on the left, click **Published Posts, Scheduled Posts or Drafts** to see who published, scheduled or drafted Page posts.

· You can also see who published or scheduled posts in your Page's activity log.

Note: This information will only be visible on posts or comments created on or after February 20, 2014.



Was this information helpful?
  ○ Yes   ○ No

View Full Article
· Share Article

Facebook © 2019
English (US)

About
Privacy
Careers

Ad Choices
Create Ad
Create Page

Terms & Policies
Cookies

9

EXHIBIT 12



To see this info by post:

1  Click **Insights** at the top of your Page.

2  Click **Posts** on the left.

3  Scroll down to **All Posts Published** and view the **Engagement** column.

To see this info for all Page posts within a date range:

1  Click **Insights** at the top of your Page.

2  Click **Reach** on the left.

3  Select **Start** and **End** dates in the top right.

4  Scroll down to **Reactions, Comments and Shares** or **Reactions**.



How do I see demographic data about the people who like my Page?

### See Demographic Data About the People Who Like Your Page

To see demographic data about the people who like your Page:

1  Click **Insights** at the top of your Page.

2  Click **People** on the left.

3  Click the **Your Fans** section to see the percentage of people who like your Page by age, gender, country, city and language.

### See When the People Who Like Your Page Are on Facebook

You can see data about when the people who like your Page are on Facebook:

1  Click **Insights** at the top of your Page.

2  Click **Posts** on the left.

In the **When Your Fans Are Online** section, you can see data from a recent one-week period about the days of the week and times when the people who like your Page are on Facebook.



What's the difference between organic, paid and post reach?

Post reach is the number of people who had any posts from your Page enter their screen.

Paid reach is the number of people who had a paid post from your Page enter their screen. Organic reach is the number of people who had an unpaid post from your Page enter their screen. Organic reach can be broken down into viral and nonviral:

- **Viral**: The number of people who had any content from your Page or about your Page enter their screen because their friend likes or follows your Page, engages with a post, shares a photo of your Page or checks into your Page.

- **Nonviral**: The number of people who had any content from your Page enter their screen. This doesn't include when someone's friend likes or follows your Page, engages with a post, shares a photo of your Page and checks into your Page.

If your post reaches someone through both paid and organic distribution, they're counted toward each. Keep in mind that the sum of organic and paid reach won't always equal post reach. For example, if one person sees your post through both organic and paid distribution, they'll be counted as 1 in organic reach, 1 in paid reach, and 1 in post reach.

### Why has my Page's organic reach dropped?

There are many factors that affect reach, including how people are engaging with your Page's content, how people have engaged with similar types of content in the past, the quality of the content and other factors such as time of day and whether people are on Facebook on their mobile phone or computer. It's normal for reach to change based on these factors.

### Where can I find organic reach for my Page using the previous measurement?

To find organic reach for your Page using the previous measurement:

1  Click **Insights** at the top of your Page.

2  Click **Export Data** in the top right.

3  Below **Data Type**, select **Page data** and below **Layout**, select **Edit All Page Data**.

4  Type "served" into the search bar at the top and select whether you'd like daily, weekly or 28 days of served organic reach of Page posts.

5  Once you've made your selection, scroll to the bottom of the column on the right, click the box that says **Served Organic Reach of Page Posts** and drag it to the top of the column, below **Key Metrics**. Do this for each type of **Served Organic Reach of Page Posts** that you've selected. This will prevent any errors from occurring.

6  Click **Apply** and then click **Export Data**.

7  Open the document that downloads to your computer and search for **Served Organic Reach of Page Posts** (this is the term for the previous measurement of organic reach).

Was this information helpful?    Yes    No
View Full Article
· Share Article

How can I see insights about my Page likes and unlikes?

### See Where Your Page Likes Happened

You can see the number of Page likes that occurred on your Page, ads, through Page

suggestions and other sources.

To see where your Page likes happened:

1   Click **Insights** at the top of your Page.



2   Click **Likes** in the left column.

3   Scroll down to **Where Your Page Likes Happened**.

4   Click the chart to see the source of the likes by day.

### See How Many People Have Liked and Unliked Your Page

To see how many people liked and unliked your Page during a specific date range:

1   Click **Insights** at the top of your Page.

2   Click **Likes** in the left column.

3   In the top right, select **Start** and **End** dates for the date range you want to see.

4   Scroll down to **Net Likes**.

5   Click the chart to see the source of the likes and unlikes by day.

To protect the privacy of the people who like your Page, you're not able to see who has unliked your Page.



Was this information helpful?    View Full Article
◯ Yes  ◯ No              · Share Article

---

How do I see insights for my Page's videos?

To see insights for all of your Page's videos for a given time period:

1   Click **Insights** at the top of your Page.

2   Click **Videos** on the left.

Keep in mind that not all video insights data will be available before September 2016. For more information, go to Facebook Newsroom.

To see insights for an individual video:

1   Click **Publishing Tools** at the top of your Page.

2   Click **Video Library** on the left.

3   Click a video.

From here, you can click sections on the right to see more details about the video's performance. For example:

·   **Minutes Viewed**: Minutes the video was watched from your Page's post, in posts the video was shared in and in crossposts.

·   **10-Second Views**: The number of times your video was watched for at least 10 seconds, or for nearly its total length, whichever happened first.

·   **Audience and Engagement**: The number of reactions, comments and shares, and for videos with at least 100 views, audience demographics.

Was this information helpful?    View Full Article
◯ Yes  ◯ No              · Share Article

---

How can I see how many people are viewing and responding to my Page's events?

To see metrics about your Page's events, click **Insights** at the top of your Page, then click **Events** in the left column.

From here, you can see metrics for all your Page's events:

·   **People Reached**: The number of people who had info about any of your Page's events enter their screen.

·   **Event Page Views**: The number of people who viewed any event hosted by your Page.

·   **Clicks on Buy Tickets**: Click **Tickets** at the top to see the number of clicks on ticketing URLs for all events with a link for tickets.

At the bottom, you can see metrics about individual events that are upcoming or happened in the past:

·   **Responses**: The number of people who responded **Interested** or **Going** to the event.

·   **Reach**: The number of people who had info about your event enter their screen.

Note: Metrics about your Page's events include data from January 20, 2016 or later.

You can see additional metrics, such as your audience's current city on their profiles, as well as recommended actions on your Page's event.

To see additional metrics and recommended actions:

1   Go to your Page and click **Events** in the left column.

2   Click the event you'd like to see metrics on.

3  In the top right, you'll see metrics such as reach, responses and audience.

4  To see more metrics, including metrics on your audience's current city on their profiles, and recommended actions for your event, click **See More** in the top right.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

How can I see how many people clicked my Page's call-to-action button, mobile phone number, website or address?

To see how many people clicked your Page's call-to-action button, mobile phone number, website or address:

1  Click **Insights** at the top of your Page.

2  Click **Actions on Page** on the left.

From here, you can see the number of clicks by age and gender, country, city and device.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

How do I see insights about my Facebook Page's followers?

When someone follows your Page, it means they may receive updates about your Page in their News Feed.

Keep in mind that whenever someone likes your Page, they automatically follow it, which is included in your total number of Page follows in Page Insights.

To see insights about your Page's followers:

1  Click **Insights** at the top of your Page.

2  Click **Followers** in the left column.

From here, you can see insights about the number of your Page's followers and unfollows over time and where your Page follows happened.

To learn more about the people who follow your Page:

1  Click **Insights** at the top of your Page.

2  Click **People** in the left column.

3  Click **Your Followers** at the top.

From here, you can see information about the gender, age, country, city and language of your Page's followers.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

How do I see insights about my Page's recommendations?

Insights about your Page's recommendations are the number of times that people have recommended your Page in posts or comments.

To see insights about your Page recommendations:

1  Click **Insights** at the top of your Page.

2  Click **Reach** in the left column, then scroll down to **Recommendations**.

From here, you can see the number of times people have recommended your Page over time. Keep in mind that there will only be data available for recommendations if your Page has actually been shared as a recommendation.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

How do I see insights about my Page's previews?

Insights about Page previews are the number of times someone hovers over your Page name or profile picture in News Feed and in other places for more information without actually clicking your Page.

To see insights about your Page's previews:

1  Click **Insights** at the top of your Page.

2  Click **Page Previews** in the left column.

From here, you can see how many times your Page preview has been seen, and how many people saw your Page preview. Keep in mind that the same person can view your Page preview multiple times.

Was this information helpful?
○ Yes  ○ No

View Full Article
· Share Article

How do I export my Page's insights data?

To export your Page's insights data:

1  Click **Insights** at the top of your Page.

2  Click **Export Data** in the top right.

3  Select a data type, file format and date range. You may also need to choose a layout.

4  Click **Export Data** again.

Keep in mind that you can only export data from up to 2 years ago, and the time range for data must be shorter than 180 days. You may see some additional metrics in your exported data that aren't found in Page Insights.

You can also create a custom layout for your data.

To create a custom layout:

1  Click **Insights** at the top of your Page.

2  Click **Export Data** in the top right.

3  Below **Layout**, select **Make New Custom Layout**.

4  In the bottom right, enter a sheet name for your data and then click **Add**.

5  From the column on the left, select the information you'd like to add to your sheet.

6  When you've finished selecting your custom data, click **Apply**.

7  Click **Export Data.**

Was this information helpful?
Yes    No

View Full Article
Share Article

Facebook © 2019
English (US)

About
Privacy
Careers

Ad Choices
Create Ad
Create Page

Terms & Policies
Cookies

# EXHIBIT 13



THE TEXAS A&M UNIVERSITY SYSTEM

HOME   ABOUT   REGENTS   CHANCELLOR   OFFICES   JOBS   CONTACT

Home » Social Media » Public Notification

## Public Notification

### Public Notification for Social Media

Texas A&M University System (A&M System) and its members and agencies provide the following information to notify the public of the policy areas that impact the public's use of the Social Media Tools by the A&M System and its members and agencies.

**Accessibility**

The A&M System is committed to providing an online presence that enables full public access to Texas government information and services. Please reference the A&M System accessibility statement and/or the accessibility policy of each of our members and agencies for more information

To accommodate users with disabilities, here are suggested alternative access sites for these social media channels:

**Facebook**
The Facebook mobile site http://m.facebook.com is a suggested accessible alternative to the original Facebook page. Please also reference Facebook's help page for Accessibility for People with Disabilities for more information.

**Flickr**
The mobile version of Flickr http://m.flickr.com/ is the suggested alternative to access the original Flickr page.

**Google +**
Please reference the accessibility features of Google products for more information.

**Instagram**
As Instagram is owned by Facebook, please reference Facebook's help page for Accessibility for People with Disabilities.

**Twitter**
The accessible version of Twitter  www.accessibletwitter.com is the suggested alternative access to the original Twitter profile.

**YouTube**
The A&M System and its members and agencies will make an effort to link to and display videos on its YouTube channel that have closed captioning available for hearing impaired viewers. For more information about the closed captioning feature on YouTube, visit: https://support.google.com/youtube/answer/2734796?hl=en

**Intellectual Property Rights and Ownership**

Intellectual property rights of content provided by the public will be governed by federal copyright law, the terms of service of the social media provider, and the copyright policies of the A&M System and each of its members and agencies. Please reference the Digital Millennium Copyright Act notice and contact information for each of our members and agencies should you need to report a copyright issue.

Any trademarks that appear on A&M System social media sites are the property of their respective owners who may or may not be affiliated with, connected to, or sponsored by the A&M System. Please refer to the trademark requirements of each of our member institutions and agencies for information before using any A&M System trademark.

**Linking/Third-Party Websites**

The A&M System and its members may make available social media applications, and may publish social media content to third party sites. These sites are not official web sites and therefore, the State Website Linking and Privacy Policy apply as well as the Linking Policies of our member institutions and agencies.

**Moderation**

All published social media content may be subject to monitoring. This content may take the form of digital text, photography images, and videos. User-generated posts may be rejected or removed if possible when the content of a post:

- violates the terms of service that governs the social media sites
- contains personal identifying information or sensitive personal information, as defined in Tex. Code Bus & Com. Sec. 521.001 et. seq.

### Office Of Marketing And Communications

Communications
+ Brand Guide
Video Guidelines
+ Social Media
   Public Notification
   Employee Guidelines
Communication Offices
Publications
+ Reports
Responsibilities
Templates
+ Written Style Guidelines
A&M System News

- contains offensive terms that target protected classes
- is threatening, harassing or discriminatory
- incites or promotes violence or illegal activities
- contains information that reasonably could compromise public safety
- advertises or promotes a non-affiliated commercial product or service, or any entity or individual
- promotes or endorses political campaigns or candidates
- violates a trademark, copyright or other law

**Privacy**

A&M System members or State employees are permitted to only post public information on social media sites. If communication that takes place on A&M System sites involves or requires private information, communication will be redirected through other appropriate channels. Postings from the public on A&M System or its members' social media sites become public record and may be shared on A&M System websites. This information may be subject to public information requests. For more information, please refer to the A&M System Public Information Act Compliance policy at http://policies.tamus.edu /61-01.pdf and the policies of our members and agencies.

The A&M System and its members and agencies are not responsible for content posted by others to its social media sites. Users that enter personal information on its social media sites do so at their own risk. The A&M System is not responsible for the public display of such private information. The A&M System and its members and agencies may remove postings to its social media sites that contain personally identifiable information, but neither the A&M System, nor its licensors or contractors are responsible for any damages caused by delays in such removal.

**Public Information Act (Public Information Act, Texas Government Code Chapter 552) and Record Retention**

Social media sites may contain communications sent to or received by state employees, and such communications are therefore public records subject to State Records Retention requirements. These retention requirements apply regardless of the form of the record (digital text, photos, audio, or video, for example). The A&M System and its members and agencies will put forth reasonable efforts to archive copies of social media content in order to meet State records retention obligations in accordance with the DIR Records Retention Schedule.

**Terms of Service**

Social media sites are third party sites and have terms of service and policies that are not governed by the A&M System or the State of Texas. These third party sites are not official A&M System web sites and the third party's website terms of service and policies apply. Services provided by us on third-party social networking services, communication services, or media sharing services may be discontinued at any time without prior notice. The terms of service for the social media sites can be found below:

- Facebook
- Flickr
- Foursquare
- Google +
- Instagram
- LinkedIn
- Pinterest
- Twitter
- YouTube



aims to train the next generation of

Embed                    View on Twitter

Copyright © 2019 Texas A&M University System All rights reserved.
301 Tarrow Street, College Station, TX 77840 | MAP | Phone: (979) 458-7700 | email: tamus-webmaster@tamus.edu
State of Texas | Texas Homeland Security | Texas Veterans Portal | Statewide Search | Risk, Fraud & Misconduct Hotline | Privacy | Web Accessibility | Google+

# EXHIBIT 14

# Settings

Contact Information

Basic Page Information

Timeline

Administration

Photos

**Settings**

Videos

| | |
|---|---|
| Page Visibility | Page published |
| Page Verification | Page is verified |
| Visitor Posts | Anyone can publish to the Page<br>Anyone can add photos and videos to the Page |
| News Feed Audience and Visibility for Posts | The ability to narrow the potential audience for News Feed and limit visibility on your posts is turned off |
| Messages | People can contact my Page privately. |
| Tagging Ability | Other people can tag photos posted on my Page. |
| Country Restrictions | Page is visible to everyone. |
| Age Restrictions | Page is shown to everyone. |
| Page Moderation | Posts containing these words are blocked: $,a$$,abuse,abusers,aggy,apartment,ass,bastard,bastards,bit card,giftcard,hook,hook em,hookem,hell,illuminati,ipaad,ipad2,ipadss,jersey,jetblue,job,lab,md,ms,pad,padds,penis,peta,sale,shit |
| Profanity Filter | Set to medium |
| Post in Multiple Languages | Ability to write posts in multiple languages is turned off |
| Translate Automatically | Your posts may show translations automatically for people who read other languages |
| Comment Ranking | Most relevant comments are shown for my Page by default. |

# Administration

Contact Information
Basic Page Information
Timeline
**Administration**
Photos
Settings
Videos

| Name | Role |
|------|------|
|      | Admin |
|      | Editor |
|      | Analyst |
|      | Admin |
|      | Editor |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| )<br>PEOPLE FOR THE ETHICAL TREATMENT )<br>OF ANIMALS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL K. YOUNG, in his official capacity )<br>as President of Texas A&M University, )<br>)<br>Defendant. )<br>) | Civil Action No. 18-cv-1547 |

## PLAINTIFF'S MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

DAVID GREENE*
*Attorney-in-Charge for Plaintiff*
California Bar No. 160107
ADAM SCHWARTZ*
California Bar No. 309491
CAMILLE FISCHER*
Maryland Bar No. 201612130192
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
415.436.9333 telephone
415.436.9993 facsimile
davidg@eff.org

*Admitted *pro hac vice*

GABRIEL WALTERS*
District of Columbia Bar No. 1019272
PETA Foundation
1536 16th Street NW
Washington, DC 20036
202.483.7382 telephone
gabew@petaf.org

CHRISTOPHER ROTHFELDER
Texas Bar No. 2408470
Southern District No. 2449594
Rothfelder & Falick, L.L.P.
1201 Louisiana St., Suite 550
Houston, TX 77002
713.220.2288 telephone
crothfelder@rothfelderfalick.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 2

I.    Social Media Is the 21st Century's Town Square, a Tool for Free Expression Among Many People, and Governments Use it for that Purpose ....................................................2

II.   TAMU's Facebook Page Contains Interactive Spaces for Free Expression......................3

III.  TAMU Censored PETA from the Interactive Spaces of Its Facebook Page. ...................4

ARGUMENT ........................................................................................................ 5

I.    TAMU Discriminates Against PETA's Viewpoint, Which Is Unconstitutional Even in Nonpublic Forums. ................................................................................6

    A.    The First Amendment Forbids Viewpoint Discrimination in All Types of Government Forums. .................................................................................6

    B.    TAMU Censors PETA's Viewpoint from Its Facebook Page.............................7

II.   TAMU's Automatic Content Censorship Is an Unconstitutional Prior Restraint...............7

III.  The Interactive Spaces of the TAMU Facebook Page Are Designated Public Forums, and TAMU Unlawfully Censors Content in these Forums. ..........................................9

    A.    The Relevant Forum Is Not TAMU's Entire Facebook Page, But Particular Interactive Components of It. ..................................................................9

    B.    Designated Public Forums Exist Where a Wide Variety of Speech Is Permitted, Though It Need Not be Limitless. ........................................................11

    C.    The Visitor "Comments" and "Posts" Sections of TAMU's Facebook Page Are Designated Public Forums.................................................................13

        1.    TAMU's Intent to Designate a Forum Is Shown by Its Social Media Policy and Page Settings.......................................................................13

        2.    TAMU's Intent to Designate a Public Forum Is Shown By How, in Practice, It Operates the Interactive Elements of the Facebook Page. ........15

        3.    The Nature and Purpose of the Interactive Elements of TAMU's Facebook Page Show Their Designation as Forums for Speech. ...............16

    D.    TAMU's Automatic and Manual Content Censorship Fails First Amendment Scrutiny................................................................................17

IV.  Even If the Interactive Elements of TAMU's Facebook Page Are Limited Public Or Nonpublic Forums, PETA Still Prevails, Because Its Speech Falls Within Any Limitations, and TAMU's Speech Restraints Are Not Reasonable..................................19

    A.    PETA and Its Speech Fall Within Any Limits TAMU Has Imposed. .................19

    B.    Even If the Interactive Elements of TAMU's Facebook Page Are Nonpublic Forums, TAMU's Censorship Is Not Reasonable...............................................20

V.   TAMU Violated PETA's First Amendment Right To Petition Government for Redress of
Grievances.............................................................................................................. 21

CONCLUSION.................................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Alexander v. United States*,
   509 U.S. 544 (1993)................................................................................................ 8

*Arkansas Educ. Television Comm'n v. Forbes*,
   523 U.S. 666 (1998)................................................................................... 6, 10, 12

*BE&K Constr. Co. v. NLRB*,
   536 U.S. 516 (2002)............................................................................................. 23

*Borough of Duryea v. Guarnieri*,
   564 U.S. 379 (2011)...................................................................................... 22, 23

*Brown v. Entm't Merchants Ass'n*,
   564 U.S. 786 (2011)............................................................................................. 19

*California Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972)............................................................................................. 22

*Catholic Leadership Coalition of Tex. v. Reisman*,
   764 F.3d 409 (5th Cir. 2014) ................................................................................ 8

*Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*,
   470 F.3d 1062 (4th Cir. 2006) ........................................................................... 22

*Chiu v. Plano Indep. Sch. Dist.*,
   260 F.3d 330 (5th Cir. 2001) ............................................................ 6, 10, 12, 13

*Concerned Women for American Education & Legal Defense, Foundation, Inc. v. Lafayette County*,
   883 F.2d 32 (5th Cir. 1989) ................................................................... 13, 16, 17

*Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*,
   447 U.S. 530 (1980)............................................................................................. 18

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
   473 U.S. 788 (1985)........................................................................ 11, 12, 17, 20

*Davison v. Randall*,
   912 F.3d 666 (4th Cir. 2019) ..................................................................... passim

*Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*,
   760 F.3d 427 (5th Cir. 2014) ............................................................................. 19

*Doe v. Santa Fe Indep. Sch. Dist.*,
   168 F.3d 806 (5th Cir. 1999) ..................................................................... passim

*Estiverne v. Louisiana State Bar Assn.*,
　863 F.2d 371 (5th Cir. 1989) ........................................................ 17

*Fairchild v. Liberty Indep. Sch. Dist.*,
　597 F.3d 747 (5th Cir. 2010) ................................................ 12, 13

*Forsyth Cty., Ga. v. Nationalist Movement*,
　505 U.S. 123 (1992)........................................................................ 8

*Freedman v. Maryland*,
　380 U.S. 51 (1965).......................................................................... 9

*FW/PBS, Inc. v. City of Dallas*,
　493 U.S. 215 (1990)........................................................................ 8

*Gay Student Services v. Texas A&M Univ.*,
　737 F.2d 1317 (5th Cir. 1984) ...................................................... 7

*Good News Club v. Milford Central Sch.*,
　533 U.S. 98 (2001).......................................................................... 7

*Gordon v. Houston*,
　79 F. Supp. 3d 676, (S.D. Tex. 2015) .......................................... 6

*Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5*,
　941 F.2d 45, 47 (1st Cir. 1991)................................................... 14

*Hall v. Bd. of Sch. Comm'rs of Mobile Co.*,
　681 F.2d 965 (5th Cir. 1982) ...................................................... 15

*Hays Cty. Guardian v. Supple*,
　969 F.2d 111 (5th Cir. 1992) ...................................... 12, 13, 15, 20

*Heffron v. International Soc. for Krishna Consciousness, Inc.*,
　452 U.S. 640 (1981)...................................................................... 21

*Hopper v. City of Pasco*,
　241 F.3d 1067 (9th Cir. 2001) .................................................... 14

*Justice for All v. Faulkner*,
　410 F. 3d 760 (5th Cir. 2005) ...................................... 10, 13, 15, 17

*Knight First Amendment Inst. at Columbia University v. Trump*,
　302 F. Supp. 3d 541, 572 (S.D.N.Y. 2018) ........................... 3, 4, 6, 11

*Lakewood v. Plain Dealer Publ'g Co.*,
　486 U.S. 750 (1988)........................................................................ 8

iv

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
  508 U.S. 384 (1993) ............................................................................ 12, 13, 20

*Lowrey v. Texas A&M Univ. System*,
  11 F. Supp. 2d 895 (S.D. Tex. 1988). ................................................................ 6

*Mance v. Sessions*,
  896 F.3d 699 (5th Cir. 2018) ............................................................................ 19

*McAllen Grace Brethren Church v. Salazar*,
  764 F.3d 465 (5th Cir. 2014) ............................................................................ 19

*McCutcheon v. FEC*,
  134 S. Ct. 1434 (2014) ........................................................................................ 6

*Minnesota Voters Alliance v. Mansky*,
  138 S. Ct. 1876 (2018) ...................................................................................... 21

*Mirabella v. Villard*,
  853 F.3d 641 (3d Cir. 2017) ......................................................................... 22, 23

*N.W. Enters. v. City of Houston*,
  352 F.3d 162 (5th Cir. 2003) .............................................................................. 9

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ......................................................................................... 8, 9

*New York Times Co. v United States*,
  403 U.S. 713 (1971) ............................................................................................ 9

*Niemotko v. Maryland*,
  340 U.S. 268 (1951) ............................................................................................ 8

*Org. for a Better Austin v. Keefe*,
  402 U.S. 415 (1971) ............................................................................................ 8

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) .................................................................................... 2, 22

*Pro-Life Cougars v. University of Houston*,
  259 F. Supp. 2d 575 (S.D. Tex. 2003) .............................................................. 15

*Putnam Pit, Inc. v. City of Cookeville*,
  221 F.3d 834 (6th Cir. 2000) .............................................................................. 6

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ............................................................................................ 7

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) ................................................................................. 18

*Reno v. American Civil Liberties Union*,
  521 U.S. 844 (1997) ................................................................................. 2, 19

*Republican Party of Minn. v. White*,
  416 F.3d 738 (8th Cir.2005) ......................................................................... 19

*Ridley v. Massachusetts Bay Transp. Auth.*,
  390 F.3d 65 (1st Cir. 2004) ....................................................................... 7, 14

*Roberts v. Haragan*,
  346 F. Supp. 2d 853 (N.D. Tex. 2004) ......................................................... 15

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995) ................................................................................. 6, 20

*Smith v. Tarrant County College Dist.*,
  694 F. Supp. 2d 610 (N.D. Tex. 2010) ......................................................... 15

*State of Texas v. Knights of Ku Klux Klan*,
  58 F.3d 1075 (5th Cir. 1995) ....................................................................... 10

*Time Warner Cable, Inc. v. Hudson*,
  667 F.3d 630 (5th Cir. 2012) ....................................................................... 18

*United States v. Playboy Entm't Grp.*,
  529 U.S. 803 (2000) ..................................................................................... 19

*White Buffalo Ventures, LLC v. University of Texas at Austin*,
  420 F.3d 366 (5th Cir. 2005) ....................................................................... 15

## Other Authorities

*United Nations E-Government Survey 2016: E-Government in Support of Sustainable
  Development*, U.N. Sales No. E.16.II.H.2 ...................................................... 2

# INTRODUCTION

Defendant Texas A&M University (TAMU) is unconstitutionally blocking a critic from participating in a forum for community engagement created and maintained by TAMU. TAMU ensures that mention of the critic and its criticism does not appear in the forum, creating the false impression that TAMU's actions are beyond public reproach. This is classic viewpoint discrimination, rarely, if ever, permissible under the First Amendment.

That this forum exists because TAMU has created a Facebook page and allowed the public to post comments to the page does not change this hornbook result. Like government bodies around the nation, TAMU uses its Facebook page not only to provide information to the public, but also to create a forum for people to express themselves, to TAMU and to each other, on myriad subjects related to the University, including University controversies.

Plaintiff People for the Ethical Treatment of Animals (PETA) is the critic that TAMU has blocked. It seeks to use these interactive public parts of TAMU's Facebook page to express its views on a TAMU issue of significant public concern: whether TAMU's dog lab is cruel and should be closed.

TAMU uses two methods to censor PETA's viewpoint. First, TAMU automatically blocks third-party content from its Facebook page that contains banned words like "PETA" and "lab." Second, if this digital filter misses any unwanted views, TAMU manually deletes them.

In doing so, TAMU violates the First Amendment in five distinct ways. First, TAMU has censored PETA's speech because TAMU disagrees with PETA's viewpoint, which is forbidden in every kind of forum. Second, TAMU has created an unlawful prior restraint. Third, TAMU has designated its Facebook page as a public forum, but TAMU's exclusion of PETA's message is not content neutral and does not survive the scrutiny required in a designated forum. Fourth, even if

1

TAMU's Facebook page is a limited public forum or a nonpublic forum, PETA's speech falls within any limits, and TAMU's exclusion of PETA is not reasonable. Fifth, TAMU's censorship regime violates PETA's right to petition the government for a redress of grievances.

## STATEMENT OF FACTS

### I.   Social Media Is the 21st Century's Town Square, a Tool for Free Expression Among Many People, and Governments Use It for That Purpose.

Social media has changed the way that people all over the world connect and communicate. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997), and social media in particular." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). Facebook was designed for the very purpose of facilitating communication and human interaction online. *See* https://www.facebook.com/pg/facebook/about/.

Governments use social media for this very purpose: to engage in two-way communication with the public, and facilitate communications among members of the public. *See United Nations E-Government Survey 2016: E-Government in Support of Sustainable Development*, U.N. Sales No. E.16.II.H.2, at 65-68.[1] They don't just use social media to disseminate their own information to the public. Rather, they also create "interactive spaces" where members of the public can talk back to the government and communicate with each other. *See Davison v. Randall*, 912 F.3d 666, 686-88 (4th Cir. 2019) (addressing the "interactive component" of a public official's Facebook page, the comments section); *Knight First Amendment Inst. at Columbia University v. Trump*, 302

---

[1] *Available at* http://workspace.unpan.org/sites/Internet/Documents/UNPAN97453.pdf.

F. Supp. 3d 541, 572 (S.D.N.Y. 2018) (addressing the reply section of the president's Twitter feed), *appeal pending*, No. 18-01691 (2nd Cir.).

## II.     TAMU's Facebook Page Contains Interactive Spaces for Free Expression.

TAMU's Facebook page includes at least three distinct elements. Two are interactive, that is, they allow for a back-and-forth discussion among numerous speakers.

First, TAMU regularly posts information about educational opportunities, research programs, and athletics, as well as profiles about students and other members of the TAMU community on its Facebook Page. *See* Answer (ECF Dkt. 35) ¶ 19.[2] This is the only content displayed if the page is viewed in the "Home" setting. *Id*. at ¶ 20.

Second, the University's social media policy and Facebook settings permit anyone, including current students, prospective students, alumni, and non-affiliated persons still interested in the University, to post text and other media in the "Visitor Posts" section of TAMU's page. *See* Answer (ECF Dkt. 35) ¶ 28. Visitors can publish such posts in two distinct ways: (1) by posting directly on TAMU's page, or (2) by posting in their own timeline and tagging TAMU (that is, by including "@TAMU" in the text) in the post.[3] *Id*. at ¶ 17. TAMU could disable all visitor posts, but has not done so. *See id*. at ¶¶ 17, 39. *See also* Walters Decl. Exh. 14 (TAMU's Facebook Page "Settings"). Visitors will see each other's posts if they view the page in the "Posts" setting. *See* Answer (ECF Dkt. 35) ¶ 20.

Third, guests can add content to the Facebook page by commenting on both TAMU's own posts and the guest posts. *See* Answer (ECF Dkt. 35) ¶¶ 17, 24. Comments are an easy way for visitors to offer opinions on TAMU's posts, ask questions about TAMU's policies, and respond to

---

[2] The Answer corresponds to the same paragraphs in the First Amended Complaint (ECF Dkt. 17).
[3] For example, Senator Ted Cruz tagged TAMU in a post about foreign relations and education policy, and it appeared in the Posts feed. *See* Answer (ECF Dkt. 35) at ¶ 30.

information and opinions in visitor posts. *Id.* Comments allow multiple Facebook users to express their views to other users on a single post. *See Davison*, 912 F.3d at 686 (explaining the comments function on a government Facebook page). Newer comments respond to older comments, as well as the original post. The comments appear directly below a post, with a few of the most popular comments usually appearing in a compressed preview and visitors having the ability to click to see more comments or change the order of the comments they see. *See* Walters Decl. Exh. 10 (Facebook Help Center, Banning and Moderation) at p. 1. TAMU can turn off all comments, but has not done so. *See* Answer (ECF Dkt. 35) ¶ 24. *See also* Walters Decl. Exh. 10 (Facebook Help Center, Banning and Moderation) at p. 2. TAMU could place geographic restrictions on comments, but has not. *See* Answer (ECF Dkt. 35) ¶ 39. *See also* Walters Decl. Exh. 14 (TAMU's Facebook Page "Settings").

Comments are a popular element on TAMU's Facebook page. *See* Answer (ECF Dkt. 35) ¶ 24. Some posts have hundreds of comments. *Id.* Visitor comments on TAMU's posts, and Visitor Posts, sometimes include discussion of TAMU policies and decisions. *Id.*

This case concerns the second element (visitor posts) and third element (visitor comments) of TAMU's Facebook page. They are the "interactive components," *Davison*, 912 F.3d at 686, and "interactive spaces," *Knight First Amendment Inst.*, 302 F. Supp. 3d at 572, that other courts have found to be public forums.

## III.   TAMU Censored PETA from the Interactive Spaces of Its Facebook Page.

In 2016, PETA began an advocacy campaign against TAMU's dog lab, in which researchers use live canines to study a canine form of Duchenne Muscular Dystrophy ("DMD"). This campaign has included letters to governmental officials and funding agencies, protests of Board of Regents' meetings, and a video by political commentator Bill Maher. *See* Answer (ECF Dkt. 35) ¶ 33.

4

TAMU censored PETA's own speech and speech about PETA itself and the dog labs in two ways.

First, Visitor Posts and Comments containing words or phrases TAMU selected are automatically blocked from the University's Facebook page. *See id.* at ¶¶ 38-39. *See also* Walters Decl. Exh. 14 (TAMU's Facebook Page "Settings"). Facebook gives Page administrators the ability to create a customized list of "blocked" words, which prevents the publication on that Page of posts and comments containing any of these words. *See* Answer (ECF Dkt. 35) ¶ 18. *See also* Walters Decl. Exh. 10 (Facebook Help Center, Banning and Moderation) at p. 1.

TAMU concedes that these block-triggering words include "PETA" and "lab." *See* Answer (ECF Dkt. 35) ¶ 1. A log of TAMU's Facebook Page settings shows that TAMU also chose to block other words associated with PETA's viewpoint including "abuse," "abusers," and "md" (the common abbreviation for "muscular dystrophy"). *Id.* at ¶ 39. *See also* Walters Decl. Exh. 14 (TAMU's Facebook Page "Settings").[4] No viewpoint other than PETA's was so targeted during this time period. Nearly all of the other words that TAMU automatically blocks are profanity or words commonly associated with automated spam. *Id.*

Second, TAMU has manually deleted PETA-generated posts from its Facebook page. *See* Answer (ECF Dkt. 35) ¶ 43. Content PETA has attempted to post to the TAMU Facebook Page has been removed, as well as content mentioning PETA and PETA's anti-dog lab campaign.

## ARGUMENT

TAMU bears the burden of proving that its censorship regime passes First Amendment muster. *Gordon v. Houston*, 79 F. Supp. 3d 676, 688 (S.D. Tex. 2015) (citing *McCutcheon v. FEC*,

---

[4] PETA obtained this particular settings log from TAMU by means of a request under the Texas Public Information Act. *See* Answer (ECF Dkt. 35), at ¶¶ 38, 40.

134 S. Ct. 1434, 1452 (2014)). Speech on public issues—like PETA's criticism of TAMU's experimentation on dogs—"is central to the First Amendment and enjoys special protection under the Constitution." *Lowrey v. Texas A&M Univ. System*, 11 F. Supp. 2d 895, 918 (S.D. Tex. 1988).

## I.   TAMU Discriminates Against PETA's Viewpoint, Which Is Unconstitutional Even in Nonpublic Forums.

### A.   The First Amendment Forbids Viewpoint Discrimination in All Types of Government Forums.

Because TAMU has censored PETA's speech because of the viewpoints it expresses, this court need not decide precisely what kind of forum TAMU has created within its Facebook page. "It is well settled that viewpoint discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001). Thus, in *Davison*, the Fourth Circuit declined to decide whether the comments section of a government official's Facebook Page was a traditional, designated, or limited public forum, because viewpoint discrimination was prohibited in each of them. 912 F.3d at 687. Indeed, viewpoint discrimination is also forbidden in nonpublic forums. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998).

Viewpoint discrimination is "an egregious form" of content discrimination, in which government targets not just a subject matter, but "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995), *quoted in Chiu*, 260 F.3d at 350. *See, e.g.*, *Knight First Amendment Inst.*, 302 F. Supp. 3d at 575; *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834 (6th Cir. 2000) (reversing summary judgment for a city that allegedly exercised viewpoint discrimination in deciding which groups could post links on the city's website).

Viewpoint discrimination need not be motivated by any nefarious intent, other than the intent to silence. Thus in *Davison*, the official removed a comment alleging corruption on the

school board from her Facebook page because she was concerned it was slanderous and "didn't want [the allegations] on the site." 912 F.3d at 687 (internal quotations omitted). The Fourth Circuit found that this "amply supports" a finding of viewpoint discrimination. *Id.*[5]

Viewpoint discrimination exists and is unconstitutional when a government eliminates any amount of speech on the basis of viewpoint, even if it also occasionally allows that viewpoint to appear. It is enough that the disfavored speaker is burdened more than other speakers who espouse favored viewpoints and face no censorship at all. *See Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 88 (1st Cir. 2004).

### B.   TAMU Censors PETA's Viewpoint from Its Facebook Page.

As set forth above, TAMU censors PETA's views in two ways—automatically and manually. See Answer (ECF Dkt. 35) ¶¶ 1, 43-46. This censorship is in response to and specifically designed to suppress PETA's criticism of the dog lab. It is thus unconstitutional.

## II.   TAMU's Automatic Content Censorship Is an Unconstitutional Prior Restraint.

TAMU's key word blocking of any comment including "PETA" or "lab" (or other blocked words) is a prior restraint, that is, an "administrative . . . order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotation marks omitted). Rather than wait until the comments have been posted and respond to any harm those comments may actually cause, TAMU forbids their publication from the start.

---

[5] *See also, e.g.*, *Good News Club v. Milford Central Sch.*, 533 U.S. 98 (2001) (striking down a policy of excluding religious viewpoints from a government forum); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (striking down a ban on "fighting words" that provoke violence on the basis of race and the like, but not fighting words that provoke violence on any other basis); *Gay Student Services v. Texas A&M Univ.*, 737 F.2d 1317, 1333 (5th Cir. 1984) (rejecting TAMU's refusal to recognize a pro-gay student group, though TAMU had recognized student groups with other views about gay rights).

Any system of prior restraint bears a heavy presumption of unconstitutionality, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990), and "carries a heavy burden of showing justification." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

Prior restraints require "narrowly drawn, reasonable and definite standards" to guide the censor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992) (citing *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951) (internal quotation marks omitted)). A prior restraint will be unconstitutional if it results from the exercise of excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988)).

Prior restraints must be necessary to further a governmental interest of the highest magnitude. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562-63 (1976) (finding that a criminal defendant's right to a fair trial was a sufficiently important governmental interest). The prior restraint will be *necessary* only if:

(1)     the harm to the governmental interest is highly likely to occur, *see id.* at 563, 565, 567 (approving of the trial court's finding of a clear and present danger of impairment of the defendant's fair trial rights, but cautioning against uncertainty); *see also New York Times Co. v United States*, 403 U.S. 713, 730 (1971) (per curiam; Stewart, J. concurring) (requiring absence of prior restraint to "surely result" in feared harm);

(2)     the harm will be irreparable, *New York Times*, 403 U.S. at 730;

(3)     no alternative exists for preventing the harm, *see Nebraska Press*, 427 U.S. at 563-65; and,

8

(4)      the prior restraint will actually prevent the harm. *See id.* at 565-66 ("We must also

assess the probable efficacy of prior restraint on publication . . . .").

Moreover, prior restraints must contain certain procedural protections: (1) any restraint

before judicial review occurs can be imposed for only a specified brief period of time during which

the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3)

the censor must bear the burdens of going to court and providing the basis to suppress the speech.

*N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003) (citing *Freedman v.

Maryland*, 380 U.S. 51, 58–59 (1965)).

TAMU has not complied with any these substantive or procedural protections. Indeed, it

did not even inform PETA that it had blocked words associated with PETA's campaign, explain

its reasoning for doing so, prove that the keyword blocking was pursuant to narrowly drawn,

definite and definite standards, attempt to justify it as being necessary to further a governmental

interest of the highest magnitude, or offer PETA any avenue for prompt judicial review.

## III.   The Interactive Spaces of the TAMU Facebook Page Are Designated Public Forums, and TAMU Unlawfully Censors Content in These Forums.

TAMU has created designated public forums by opening the interactive spaces of its

Facebook page for the general public to discuss events, policies, and issues related to the

University. TAMU has engaged in content-based and viewpoint-based censorship of PETA's

messages in these forums. This censorship is unconstitutional.

### A.      The Relevant Forum Is Not TAMU's Entire Facebook Page, But Particular Interactive Components of It.

Forum analysis operates on a precise level, focusing on specific spaces within a larger

environment, and not on the environment as a whole: it is "not a simple 'all-or-nothing'

proposition." *See Justice for All v. Faulkner*, 410 F. 3d 760, 766 (5th Cir. 2005) (citing *Arkansas

Educ'l Telev'n Comm.*, 523 U.S. at 677-81) (explaining that a given forum may be designated for

one class of speaker or speech, and still "limited" with respect to others)). Thus, in one case, the relevant forum was not an entire school graduation event, but just "the portions of the commencement program allocated to the invocation and benediction." *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 819 (5th Cir. 1999), *aff'd*, 530 U.S. 290 (2000). Likewise, in *Chiu*, the relevant forum was a school's Math Night event and internal mail delivery system, not its entire building. 260 F.3d at 354-55.[6]

Consistent with this, the courts that have applied forum analysis to governmental social media pages have focused on the "interactive spaces" and "interactive components" of the government's social media presence, distinguishing those from the government's own speech on those sites. *See Davison*, 912 F.3d at 686 ("But the interactive component of the Chair's Facebook Page—the portion of the middle column in which the public can post comments, reply to posts, and 'like' comments and posts—is materially different. . . . [C]omments and posts by users cannot be mistaken for Randall's own speech because they identify the posting or replying personal profile or Page); *Knight First Amendment Inst.*, 302 F. Supp. 3d at 572 (identifying the relevant forum as "the interactive space of each tweet, as distinguished from the content of the tweet").

_____

[6] As the Fifth Circuit explained in *State of Texas v. Knights of Ku Klux Klan*, 58 F.3d 1075, 1078 (5th Cir. 1995):

> In pinpointing the relevant forum, we must focus on the "access sought by the speaker." *Id.* We employ a "tailored approach" in determining what constitutes the forum within the confines of government property. *Id.* In *Cornelius,* the government wished to exclude certain groups from participating in a charitable fundraising drive conducted in the federal workplace. The Supreme Court defined the forum as the fundraising campaign rather than the government buildings which housed federal workers. *Id.* In *Perry Educ. Ass'n,* the Court defined the forum as the internal mail system of a public school rather than the school property. 460 U.S. at 44 . . . . Similarly, we define the forum in this case as the [adopt-a-highway] Program rather than the public highways.

PETA does not seek to speak on TAMU's Facebook page the way TAMU does, or in TAMU's own posts in particular. Rather, PETA only seeks to speak the way other members of the public do, in the two interactive spaces: (1) visitor posts, and (2) visitor comments on TAMU posts and visitor posts. These interactive spaces are designed to facilitate speech by many people, and TAMU by policy and practice has intentionally facilitated and permitted such private speech.

### B. Designated Public Forums Exist Where a Wide Variety of Speech Is Permitted, Though It Need Not Be Limitless.

A designated public forum is "a place or channel of communication [not traditionally open to assembly and debate] for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Doe*, 168 F.3d at 819 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985)).

Although designated public forums are sometimes characterized as allowing "general access," *Doe*, 168 F.3d at 819 (quoting *Cornelius*, 473 U.S. at 802), or being "open for indiscriminate public use," *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010) (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993)), a designated public forum will generally have some speaker or subject-matter restrictions. "Government property . . . does not automatically cease to be a designated public forum because the government restricts some speech on the property. Otherwise, the restriction of speech on government property would be self-justifying. The restriction would disprove any intent to create a designated public forum, and the failure to create a public forum would justify the restriction of speech." *Hays Cty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992).

Most basically, a designated public forum is generally open, with a few exceptions for closure, and a limited or nonpublic forum is generally closed, with a few exceptions for openness. *See Ark. Educ. Television Comm'n*, 523 U.S. at 679–80. The Supreme Court's public forum cases

> illustrate the distinction between "general access," . . . which indicates the property is a designated public forum, and "selective access," . . . which indicates the property is a nonpublic forum. On one hand, the government creates a designated public forum when it makes its property generally available to a certain class of speakers . . . . On the other hand, the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, "obtain permission," . . . to use it.

*Id.* at 679. The government may thus "designate a particular forum as appropriate for certain types of speech or for speech on particular topics," *Chiu*, 260 F.3d at 347, or "may designate a forum only for particular speakers or for the discussion of particular topics." *Doe*, 168 F.3d at 821.

A forum, even one with some content or speaker restrictions, remains a designated public forum as long as it is "heavily used by a wide variety of private organizations." *Lamb's Chapel*, 508 U.S. at 391. "Heavily used" does not require great numerosity of private speakers: in *Concerned Women for American Education & Legal Defense, Foundation, Inc. v. Lafayette County*, 883 F.2d 32, 34 (5th Cir. 1989), the Fifth Circuit found that the government "created a public forum by allowing diverse groups to use its auditorium," based on use by just seven organizations and one individual.

Thus, the Fifth Circuit, like other courts, has recognized designated public forums despite the presence of restrictions on both speakers and subjects. In *Justice For All*, 410 F.3d at 769, for example, the Fifth Circuit found the public spaces of the University of Texas's Austin campus to be designated public forums for students, even though the University imposed a "small number of enumerated content-based restrictions." The Fifth Circuit reached a similar result in *Hays Cty. Guardian*, 969 F.2d at 117, even though the public university in that case prohibited speech that was "obscene, vulgar, or libelous" or contained "impermissible solicitation."

### C.     The Visitor "Comments" and "Posts" Sections of TAMU's Facebook Page Are Designated Public Forums.

In determining whether the government has created a designated public forum, the Fifth Circuit looks to "(1) the government's intent with respect to the forum, and (2) the nature of the forum and its compatibility with the speech at issue." *Justice for All*, 410 F.3d at 765. The government's intent can be determined by both stated policy and the actual practice of the forum. *Doe*, 168 F.3d at 819. A stated policy alone is not determinative: "self-serving statements regarding the purpose of the meeting are not enough to prove 'intent.'" *Chiu*, 260 F.3d at 349 n.13. Rather, courts "push aside 'self-serving statements regarding the purpose of the meeting' for objective evidence leavened by common sense." *Fairchild*, 597 F.3d at 759. "[I]t is clear that the government's proffered intent does not govern [the public forum] inquiry, else it would be a limited inquiry indeed. . . . We must, therefore, view skeptically [the agency's] own self-serving assertion of its intent and examine closely the relationship between the objective nature of the venue and its compatibility with expressive activity." *Doe*, 168 F.3d at 820.[7]

The undisputed summary judgment record shows that the interactive spaces of TAMU's Facebook Page are designated public forums. This record includes TAMU's policies for its Facebook Page, TAMU's practice of using the interactive spaces of its Facebook Page as a public forum, and the basic nature of Facebook.

### 1.     TAMU's Intent to Designate a Forum Is Shown by Its Social Media Policy and Page Settings.

---

[7] *Accord Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3c 65, 76 (1st Cir. 2004) ("a statement of intent contradicted by consistent actual policy and practice would not be enough to support" government denial that a forum exists); *Hopper v. City of Pasco*, 241 F.3d 1067, 1075 (9th Cir. 2001) ("[A]n abstract policy statement purporting to restrict access to a forum is not enough. What matters is what the government actually does—specifically, whether it consistently enforces the restrictions on use of the forum that it adopted."); *Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5*, 941 F.2d 45, 47 (1st Cir. 1991) ("actual practice speaks louder than words").

TAMU's written policies for its Facebook Page demonstrate an intent to designate the interactive spaces of its Facebook Page as a public forum.

TAMU's social media policy broadly permits speech, and its few restrictions are routine in designated public forums. *See* Answer (ECF Dkt. 35) ¶ 25. *See also* Walter Decl. Exh. 13 (TAMU's Social Media Policy). These rules simply provide that TAMU may remove content that "violates the terms of service," "contains personally identifying information or sensitive personal information," "contains offensive terms that target protected classes," "is threatening, harassing or discriminatory," "incites or promotes violence or illegal activities," "contains information that reasonable could compromise public safety," and advertising, political endorsements and campaigning, and content that violates another's intellectual property rights. *Id.* These speech categories are typically prohibited in even traditional public forums. *See, e.g.*, *Hall v. Bd. of Sch. Comm'rs of Mobile Co.*, 681 F.2d 965, 971 (5th Cir. 1982) ("In a public forum, the state may restrict expression which is obscene, consists of fighting words, or which poses an imminent danger of grave evil."); *White Buffalo Ventures, LLC v. University of Texas at Austin*, 420 F.3d 366, 378 (5th Cir. 2005) (finding it unnecessary to decide public forum status because the commercial speech at issue was constitutionally proscribable); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 872 (N.D. Tex. 2004) (explaining that unprotected speech may be restricted even in a public forum).

Indeed, the Fifth Circuit has found university facilities to be designated public forums despite similar lists of prohibited speech. *See Justice for All*, 410 F.3d at 768-69 (finding designated forum status despite rules barring "obscenity, defamation, harassment, commercial solicitation, and incitements to violate the law"); *Hays Cty. Guardian*, 969 F.2d at 117 (finding designated forum status despite bans on speech that was "obscene, vulgar, or libelous" or that contained "impermissible solicitation"). *See also Smith v. Tarrant County College Dist.*, 694 F.

14

Supp. 2d 610, 625 (N.D. Tex. 2010); *Roberts*, 346 F. Supp. 2d at 861-62; *Pro-Life Cougars v. University of Houston*, 259 F. Supp. 2d 575, 582 (S.D. Tex. 2003) (all finding certain aspects of university campuses to be designated public forums despite rules against some categories of speech and/or speakers).

TAMU has configured its Facebook Page to reflect this generally open policy. TAMU chose the most open options Facebook makes available. It allows anyone to comment and post, *See* Answer (ECF Dkt. 35). at ¶ 17, and forgoes potential geographic and age restrictions. *Id.* at ¶¶ 39, 16.

## 2. TAMU's Intent to Designate a Public Forum Is Shown By How, in Practice, It Operates the Interactive Elements of the Facebook Page.

On issues unrelated to its dog laboratory, TAMU allows a heterogeneous array of speakers and viewpoints in the interactive elements of its Facebook Page. Answer (ECF Dkt. 35) ¶¶ 20-24, 27-30. The Page provides a space for the public to speak about University policy and engage in national debates. It has become a place for "exchanges of dueling presentations on topics of public concern." *Doe*, 168 F.3d at 820.

Regarding Visitors Posts, TAMU allows all manner of visitors to publish on all manner of controversies. *See* Answer (ECF Dkt. 35) ¶ 28. For example, community members published a post about the screening of a movie urging people to stop using plastic straws. *Id.* at ¶ 29. U.S. Senator Ted Cruz published a post about the termination of a TAMU program in China, addressing a foreign policy issue during an election year. *Id.* at ¶ 30.

Regarding Visitor Comments, TAMU likewise allows diverse speech by diverse speakers. *See* Answer (ECF Dkt. 35) ¶ 24. For example, in a TAMU post about the dog Reveille, comments criticized TAMU for acquiring her from a breeder instead of a rescue shelter. *Id.* at ¶ 24. Likewise,

in a TAMU post about university housing for autistic students, a comment urged opportunities for peer-to-peer interactions with other students. *Id.* at ¶ 24.

At an earlier stage in this case, TAMU admitted that it has had "little occasion to step in and moderate comments or visitor posts on its official Facebook page." *See* Defendant's Motion to Dismiss (ECF Dkt. 20) at 12.

Forums far less open than TAMU's have been held to be designated forums, notwithstanding formal policies to the contrary. In *Concerned Women for America*, 883 F.2d at 34, the court found that a library designated its auditorium as a public forum through the practice of "allowing diverse groups to use its auditorium," despite its stated policy to only allow meetings of outside groups with an educational purpose. The small number of forum users in *Concerned Women for America* included Navy recruiters, a program on AIDS, a luncheon and lecture on Alzheimer's, and a piano recital. *Id.*

### 3. The Nature and Purpose of the Interactive Elements of TAMU's Facebook Page Show Their Designation as Forums for Speech.

In addition to government intent, forum status turns on "the nature of the forum and its compatibility with the speech at issue." *Justice for All*, 410 F.3d at 765. This inquiry includes "the character of the place, the pattern of usual activity, [and] the nature of its essential purpose[.]" *Estiverne v. Louisiana State Bar Assn.*, 863 F.2d 371, 377, 378 (5th Cir. 1989).

As shown above, these considerations overwhelmingly support that TAMU has designated the interactive spaces of its Facebook Page as public forums for free speech. TAMU is using the interactive elements of its Facebook Page exactly as Facebook intended – Facebook is designed to allow as many people as possible to communicate with as many other people as possible – and exactly as people and organizations around the world use it. Few communications channels are more compatible with the kind of speech at issue here.

Indeed, the only federal appellate court to consider the issue found the comments section of a government Facebook Page to be a public forum because it bore "the hallmarks of a public forum." *Davison*, 912 F.3d at 682. The page was "'compatib[le] with expressive activity.'" *Id.* (quoting *Cornelius*, 473 U.S. at 802). The government official administering the Page "'intentionally open[ed the public comment section of the Chair's Facebook Page] for public discourse,' inviting 'ANY Loudoun citizen' to make posts to the comments section of the Chair's Facebook Page—the interactive component of the page—'on ANY issues, request, criticism, complement or just your thoughts.'" *Id.* (bracketed text in original; citations omitted; quoting *Cornelius*, 473 U.S. at 802). Moreover, the administrator "placed no restrictions on the public's access to the page or use of the interactive component of the Chair's Facebook Page. And, in accordance with [the administrator's] invitation, the public made numerous posts on matters of public concern." *Id.*

### D.     TAMU's Automatic and Manual Content Censorship Fails First Amendment Scrutiny.

As set forth above, PETA has proved viewpoint discrimination, which is barred regardless of the nature of the forum. But even if this Court were only to find content discrimination, TAMU fails the strict scrutiny that applies to such restrictions in a designated public forum.

"[R]egulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). *See Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic."). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or

purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Reed*, 135 S. Ct. at 2227. "Laws singling out a small number of speakers for onerous treatment are inherently suspect." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 638 (5th Cir. 2012).

Content discrimination cannot seriously be disputed here. TAMU admits that it automatically blocked the words "PETA" and "lab" from the interactive spaces of TAMU's Facebook Page. *See* Answer (ECF Dkt. 35) ¶ 1. The record shows that TAMU automatically blocked many more words associated with PETA's campaign against the dog lab, including "cruelty" and "abuse." *Id*. at 39. This censorship silences not only PETA, but any speech that names PETA, as well as other individuals who simply wish to discuss TAMU's lab with other Facebook visitors. No other group is singled out for censorship in this way. *See* Answer (ECF Dkt. 35) ¶ 39.

The manual removal of posts pertaining to PETA's campaign against the dog lab is also content discrimination. *See* Answer (ECF Dkt. 35) at ¶ 43.

Content based restrictions on speech must satisfy strict scrutiny: thus, TAMU must prove its censorship of the Visitor Posts and Visitor Comments is "narrowly tailored to promote a compelling Government interest," and that no "less restrictive alternative would serve the Government's purpose." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799-800 (2011). Any "'curtailment of [the First Amendment] must be actually necessary to the solution.'" *Mance v. Sessions*, 896 F.3d 699, 705 (5th Cir. 2018) (quoting *Brown*, 564 U.S. at 799). Any restriction on speech must directly advance the governmental interest, be neither overinclusive nor underinclusive, and be the least speech-restrictive alternatives can be available to serve the government's interest. *Reno v. ACLU*, 521 U.S. at 874; *Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427,

439–40 (5th Cir. 2014) (quoting *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir.2005) (en banc)).

To prove a compelling interest, the government "'must specifically identify an 'actual problem' in need of solving.'" *Mance*, 896 F.3d at 705 (quoting *Brown*, 564 U.S. at 799). The government must likewise offer "*actual evidence*, not just conjecture," that the speech restriction it imposed was the least restrictive means available to solve the actual problem. *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 476 (5th Cir. 2014) (emphasis in original).

Here, TAMU cannot satisfy strict scrutiny. It has failed to identify a compelling governmental interest that supports its ban on speech mentioning PETA and the labs from the interactive parts of its Facebook Page, let alone offer evidence to prove that there was an actual problem in need of solving. Nor can it show that its censorship is the least speech-restrictive means of accomplishing a governmental interest it may now conjure post-hoc.

## IV. Even If the Interactive Elements of TAMU's Facebook Page Are Limited Public or Nonpublic Forums, PETA Still Prevails, Because Its Speech Falls Within Any Limitations, and TAMU's Speech Restraints Are Not Reasonable.

PETA is entitled to summary judgment even if this Court were to conclude that the interactive elements of the TAMU Facebook Page are either limited public or nonpublic forums.

### A. PETA and Its Speech Fall Within Any Limits TAMU Has Imposed.

Even when the government limits a forum "for certain groups or the discussion of certain topics," it (1) may not discriminate on the basis of viewpoint, as discussed above, and (2) "must respect the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829. *See also Cornelius*, 473 U.S. at 806 ("Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created . . . the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he

19

espouses on an otherwise includible subject."). As the Fifth Circuit has explained, "speech for which the forum is designated is afforded protection identical to the protection provided to speakers in a traditional public forum." *Hays Cty. Guardian*, 969 F.2d at 116.

Those within the limitation must not be excluded, because doing so raises the specter of viewpoint discrimination. As the Supreme Court held in *Lamb's Chapel,* 508 U.S. at 396-97, a school district unlawfully engaged in viewpoint discrimination when it excluded a church from presenting films teaching family values (a subject otherwise permissible in the forum) from a Christian perspective.

Here, even if the interactive spaces of TAMU's Facebook Page were a limited public forum, PETA and its speech fall within any limits that TAMU has imposed on that forum. TAMU has opened its Facebook Page to a wide array of speech about the university and its programs. PETA's speech falls well within this norm. Its speech, and the speech of its supporters mentioning PETA and its criticism of the dog labs, is speech about the university and is thus consistent with the purpose of the forum.

### B. Even If the Interactive Elements of TAMU's Facebook Page Are Nonpublic Forums, TAMU's Censorship Is Not Reasonable.

Even in a nonpublic forum, "the State must draw a reasonable line. . . . [T]he State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1888 (2018). Thus, the Supreme Court just this past term struck down a speech restriction in a nonpublic forum because of the "unmoored use" of a subject matter limitation, "combined with haphazard interpretations" of that limit, which resulted in "confusing line-drawing problems." *Id.* at 1888-89. The Court explained:

> It is "self-evident" that an indeterminate prohibition carries with it "[t]he opportunity for abuse, especially where [it] has received a virtually open-ended interpretation." [*Bd. of Airport Comm'rs v.* ]*Jews for Jesus*, 482 U.S. [569,] 576 [(1987); see *Heffron v.*

> *International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (warning of the "more covert forms of discrimination that may result when arbitrary discretion is vested in some governmental authority").

*Id.* at 1891. The Court called for the State to "employ a more discernible approach" if it truly wished to exclude certain speech from a nonpublic forum. *Id.*

The prohibition against unbridled discretion in excluding speech from nonpublic forums has long been a "matter of consensus among the courts of appeals." *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1068 (4th Cir. 2006).

TAMU has failed to articulate any sensible, viewpoint-neutral basis for distinguishing PETA's speech from the private speech it permits in the Visitor Comments and Visitor Posts on its Facebook Page. Thus, PETA has shown that TAMU violated the First Amendment, even if the disputed forums are non-public.

## V.    TAMU Violated PETA's First Amendment Right To Petition Government for Redress of Grievances.

By blocking PETA's ability to post to the interactive spaces of TAMU's Facebook page, TAMU violates PETA's First Amendment right "to petition the Government for a redress of grievances." U.S. Const. amend. I.

The First Amendment's separate rights to speak and to petition are not identical, and are analyzed differently. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). For example: "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Id.* The right to petition applies even if the petitioning does not occur in a public forum. *Mirabella v. Villard*, 853 F.3d 641, 655 (3d Cir. 2017) (petition via email). The right to petition extends to "all departments of the Government," *California Motor Transp. Co. v.*

*Trucking Unlimited*, 404 U.S. 508, 510 (1972), including TAMU, a public university. The Supreme Court recently recognized that social media is well-suited for exercising the right to petition: "on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner." *Packingham*, 137 S. Ct at 1735.

While directed at the government, petitions also rally public support, as "[p]etitions contribute to the 'public airing' of disputes." *Mirabella*, 853 F.3d at 654-55 (quoting *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 532 (2002)). Indeed, the right of petition is especially salient when, as here, the petition "seek[s] to advance political, social, or other ideas of interest to the community as a whole." *Guarnieri*, 564 U.S. at 395.

Government violates the right to petition when, as here, it bars someone from communication with that entity. *Mirabella*, 853 F.3d at 650-51. It also violates the right to petition by excluding some viewpoints from a channel of petitioning. *Id.* at 655

PETA seeks to post messages on TAMU's Facebook Page calling on TAMU to close its dog lab. This is the essence of First Amendment petitioning. PETA's campaign aims to persuade TAMU to close its dog lab, by means of a digital channel virtually custom-made for petitioning government bodies. *See* Answer (ECF Dkt. 35) ¶ 33-34.

By barring PETA from using its Facebook page to communicate to TAMU, an avenue of communication available to all other speakers, TAMU has violated PETA's right to petition.

**CONCLUSION**

TAMU has unconstitutionally censored speech by and about PETA by exercising viewpoint discrimination, imposing a prior restraint, imposing content- and viewpoint-based restrictions on speech in a designated public forum, and suppressing PETA's right to petition the

government for a redress of grievances. The material facts are not disputed. This court should issue summary judgment in favor of PETA.

DATED: March 27, 2019                                Respectfully submitted,

*/s/ David Greene*
DAVID GREENE*
*Attorney-in-Charge for Plaintiff*
California Bar No. 160107
ADAM SCHWARTZ*
California Bar No. 309491
CAMILLE FISCHER*
Maryland Bar No. 201612130192
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
415.436.9333 telephone
415.436.9993 facsimile
davidg@eff.org
*Admitted *pro hac vice*

GABRIEL WALTERS*
District of Columbia Bar No. 1019272
PETA Foundation
1536 16th Street NW
Washington, DC 20036
202.483.7382 telephone
gabew@petaf.org

CHRISTOPHER ROTHFELDER
Texas Bar No. 2408470
Southern District No. 2449594
Rothfelder & Falick, L.L.P.
1201 Louisiana St., Suite 550
Houston, TX 77002
713.220.2288 telephone
crothfelder@rothfelderfalick.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PEOLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,<br><br>     Plaintiff,<br><br> v.<br><br>MICHAEL K. YOUNG, in his official capacity as President of Texas A&M University,<br><br>     Defendant. | Civil Action No. 18-cv-1547 |

## DECLARATION OF GABRIEL WALTERS

1. I, Gabriel Walters, am over the age of eighteen. The testimony given in this declaration is from my personal knowledge. If called upon, I could testify competently to the contents of this declaration.

2. I am counsel to People for the Ethical Treatment of Animals, Inc. ("PETA"). I am counsel of record in the captioned case.

3. PETA obtained Texas A&M University's ("TAMU") Facebook Page "Settings" by filing a request for records under the Texas Public Information Act ("TPIA"). A true and correct copy of TAMU's Facebook Page Settings is attached at Exhibit 14.

4. TAMU has a social media policy, which is public and on the University website at https://www.tamus.edu/marcomm/socialmedia/public/. A true and correct copy of this page is attached as Exhibit 13.

5. The Congressional Management Foundation, a nonpartisan nonprofit focused on research and education for members of the United States Congress, surveyed members of Congress' use of

social media and published the results at http://www.congressfoundation.org/storage/documents/CMF_Pubs/cmf-social-congress-2015.pdf. A true and correct copy of this page is attached as Exhibit 1.

6.      Facebook's 2018 First Quarter Press Release is available at https://investor.fb.com/investor-news/press-release-details/2018/Facebook-Reports-First-Quarter-2018-Results/default.aspx. A true and correct copy of this page is attached as Exhibit 2.

7.      Facebook's 2018 First Quarter Earning Slides is available at https://s21.q4cdn.com/399680738/files/doc_financials/2018/Q1/Q1-2018-Earnings-Presentation-(1).pdf. A true and correct copy of this page is attached as Exhibit 3.

8.      Facebook's Help Center page titled "Your Profile and Settings" is available at https://www.facebook.com/help/239070709801747/?helpref=hc_fnav. A true and correct copy of this page is attached as Exhibit 4.

9.      Facebook's Help Center page titled "Friending" is available at https://www.facebook.com/help/1540345696275090?helpref=hc_global_nav. A true and correct copy of this page is attached as Exhibit 5.

10.     Facebook's Help Center page titled "Your Home Page" is available at https://www.facebook.com/help/753701661398957/?helpref=hc_fnav. A true and correct copy of this page is attached as Exhibit 6.

11.     Facebook's Help Center Page titled "What is Town Hall?" is available at https://www.facebook.com/help/278545442575921?helpref=faq_content. A true and correct copy of this page is attached as Exhibit 7.

12.     Facebook's Help Center Page titled "Create and Manage a Page" is available at https://www.facebook.com/help/135275340210354/?helpref=hc_fnav. A true and correct copy of this page is attached as Exhibit 8.

13.     Facebook's Help Center Page titled "Like and Interact with Pages" is available at https://www.facebook.com/help/1771297453117418/?helpref=hc_fnav. A true and correct copy of this page is attached as Exhibit 9.

14.     Facebook's Help Center page titled "Banning and Moderation" is available at https://www.facebook.com/help/248844142141117/. A true and correct copy of this page is attached as Exhibit 10.

15.     Facebook's Help Center page titled "Publishing" is available at https://www.facebook.com/help/182487968815949/?helpref=hc_fnav. A true and correct copy of this page is attached as Exhibit 11.

16.     Facebook's Help Center page titled "Insights" is available at https://www.facebook.com/help/794890670645072/?helpref=hc_fnav. A true and correct copy of this page is attached as Exhibit 12.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 27, 2017


_____

Gabriel Walters

3