UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,<br><br>                Plaintiff,<br><br>    v.<br><br>MICHAEL K. YOUNG, in his official capacity as President of Texas A&M University,<br><br>                Defendant. | Civil Action No. 18-cv-1547 |

## PLAINTIFF'S MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

DAVID GREENE*
*Attorney-in-Charge for Plaintiff*
California Bar No. 160107
ADAM SCHWARTZ*
California Bar No. 309491
CAMILLE FISCHER*
Maryland Bar No. 201612130192
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
415.436.9333 telephone
415.436.9993 facsimile
davidg@eff.org

*Admitted *pro hac vice*

GABRIEL WALTERS*
District of Columbia Bar No. 1019272
PETA Foundation
1536 16th Street NW
Washington, DC 20036
202.483.7382 telephone
gabew@petaf.org

CHRISTOPHER ROTHFELDER
Texas Bar No. 2408470
Southern District No. 2449594
Rothfelder & Falick, L.L.P.
1201 Louisiana St., Suite 550
Houston, TX 77002
713.220.2288 telephone
crothfelder@rothfelderfalick.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 2

I.    Social Media Is the 21st Century's Town Square, a Tool for Free Expression Among Many People, and Governments Use it for that Purpose ....................................................2

II.   TAMU's Facebook Page Contains Interactive Spaces for Free Expression.......................3

III.  TAMU Censored PETA from the Interactive Spaces of Its Facebook Page. .....................4

ARGUMENT ....................................................................................................................... 5

I.    TAMU Discriminates Against PETA's Viewpoint, Which Is Unconstitutional Even in Nonpublic Forums. ...........................................................................................................6

     A.    The First Amendment Forbids Viewpoint Discrimination in All Types of Government Forums. ..................................................................................................6

     B.    TAMU Censors PETA's Viewpoint from Its Facebook Page..............................7

II.   TAMU's Automatic Content Censorship Is an Unconstitutional Prior Restraint...............7

III.  The Interactive Spaces of the TAMU Facebook Page Are Designated Public Forums, and TAMU Unlawfully Censors Content in these Forums. ......................................................9

     A.    The Relevant Forum Is Not TAMU's Entire Facebook Page, But Particular Interactive Components of It. ................................................................................9

     B.    Designated Public Forums Exist Where a Wide Variety of Speech Is Permitted, Though It Need Not be Limitless. .......................................................................11

     C.    The Visitor "Comments" and "Posts" Sections of TAMU's Facebook Page Are Designated Public Forums.................................................................................13

          1.    TAMU's Intent to Designate a Forum Is Shown by Its Social Media Policy and Page Settings....................................................................................13

          2.    TAMU's Intent to Designate a Public Forum Is Shown By How, in Practice, It Operates the Interactive Elements of the Facebook Page. ........15

          3.    The Nature and Purpose of the Interactive Elements of TAMU's Facebook Page Show Their Designation as Forums for Speech. ................................16

     D.    TAMU's Automatic and Manual Content Censorship Fails First Amendment Scrutiny.............................................................................................................17

IV.  Even If the Interactive Elements of TAMU's Facebook Page Are Limited Public Or Nonpublic Forums, PETA Still Prevails, Because Its Speech Falls Within Any Limitations, and TAMU's Speech Restraints Are Not Reasonable..................................19

     A.    PETA and Its Speech Fall Within Any Limits TAMU Has Imposed. .................19

     B.    Even If the Interactive Elements of TAMU's Facebook Page Are Nonpublic Forums, TAMU's Censorship Is Not Reasonable...............................................20

V.   TAMU Violated PETA's First Amendment Right To Petition Government for Redress of Grievances................................................................................................................. 21

CONCLUSION................................................................................................................. 22

# TABLE OF AUTHORITIES

## Cases

*Alexander v. United States*,
   509 U.S. 544 (1993) ........................................................................................ 8

*Arkansas Educ. Television Comm'n v. Forbes*,
   523 U.S. 666 (1998) ............................................................................ 6, 10, 12

*BE&K Constr. Co. v. NLRB*,
   536 U.S. 516 (2002) ...................................................................................... 23

*Borough of Duryea v. Guarnieri*,
   564 U.S. 379 (2011) ................................................................................ 22, 23

*Brown v. Entm't Merchants Ass'n*,
   564 U.S. 786 (2011) ...................................................................................... 19

*California Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972) ...................................................................................... 22

*Catholic Leadership Coalition of Tex. v. Reisman*,
   764 F.3d 409 (5th Cir. 2014) .......................................................................... 8

*Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*,
   470 F.3d 1062 (4th Cir. 2006) ...................................................................... 22

*Chiu v. Plano Indep. Sch. Dist.*,
   260 F.3d 330 (5th Cir. 2001) ........................................................ 6, 10, 12, 13

*Concerned Women for American Education & Legal Defense, Foundation, Inc. v. Lafayette County*,
   883 F.2d 32 (5th Cir. 1989) ............................................................. 13, 16, 17

*Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*,
   447 U.S. 530 (1980) ...................................................................................... 18

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
   473 U.S. 788 (1985) ..................................................................... 11, 12, 17, 20

*Davison v. Randall*,
   912 F.3d 666 (4th Cir. 2019) ................................................................ passim

*Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*,
   760 F.3d 427 (5th Cir. 2014) ........................................................................ 19

*Doe v. Santa Fe Indep. Sch. Dist.*,
   168 F.3d 806 (5th Cir. 1999) ................................................................ passim

*Estiverne v. Louisiana State Bar Assn.*,
    863 F.2d 371 (5th Cir. 1989) ............................................................ 17

*Fairchild v. Liberty Indep. Sch. Dist.*,
    597 F.3d 747 (5th Cir. 2010) ...................................................... 12, 13

*Forsyth Cty., Ga. v. Nationalist Movement*,
    505 U.S. 123 (1992) ......................................................................... 8

*Freedman v. Maryland*,
    380 U.S. 51 (1965) ........................................................................... 9

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ......................................................................... 8

*Gay Student Services v. Texas A&M Univ.*,
    737 F.2d 1317 (5th Cir. 1984) ......................................................... 7

*Good News Club v. Milford Central Sch.*,
    533 U.S. 98 (2001) ........................................................................... 7

*Gordon v. Houston*,
    79 F. Supp. 3d 676, (S.D. Tex. 2015) .............................................. 6

*Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5*,
    941 F.2d 45, 47 (1st Cir. 1991) ..................................................... 14

*Hall v. Bd. of Sch. Comm'rs of Mobile Co.*,
    681 F.2d 965 (5th Cir. 1982) ......................................................... 15

*Hays Cty. Guardian v. Supple*,
    969 F.2d 111 (5th Cir. 1992) ........................................... 12, 13, 15, 20

*Heffron v. International Soc. for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981) ....................................................................... 21

*Hopper v. City of Pasco*,
    241 F.3d 1067 (9th Cir. 2001) ....................................................... 14

*Justice for All v. Faulkner*,
    410 F. 3d 760 (5th Cir. 2005) .......................................... 10, 13, 15, 17

*Knight First Amendment Inst. at Columbia University v. Trump*,
    302 F. Supp. 3d 541, 572 (S.D.N.Y. 2018) .............................. 3, 4, 6, 11

*Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988) ......................................................................... 8

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993) ............................................................................... 12, 13, 20

*Lowrey v. Texas A&M Univ. System*,
    11 F. Supp. 2d 895 (S.D. Tex. 1988). ......................................................... 6

*Mance v. Sessions*,
    896 F.3d 699 (5th Cir. 2018) ...................................................................... 19

*McAllen Grace Brethren Church v. Salazar*,
    764 F.3d 465 (5th Cir. 2014) ...................................................................... 19

*McCutcheon v. FEC*,
    134 S. Ct. 1434 (2014) ................................................................................ 6

*Minnesota Voters Alliance v. Mansky*,
    138 S. Ct. 1876 (2018) ................................................................................ 21

*Mirabella v. Villard*,
    853 F.3d 641 (3d Cir. 2017) ...................................................................... 22, 23

*N.W. Enters. v. City of Houston*,
    352 F.3d 162 (5th Cir. 2003) ...................................................................... 9

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) .................................................................................... 8, 9

*New York Times Co. v United States*,
    403 U.S. 713 (1971) .................................................................................... 9

*Niemotko v. Maryland*,
    340 U.S. 268 (1951) .................................................................................... 8

*Org. for a Better Austin v. Keefe*,
    402 U.S. 415 (1971) .................................................................................... 8

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ................................................................................ 2, 22

*Pro-Life Cougars v. University of Houston*,
    259 F. Supp. 2d 575 (S.D. Tex. 2003) ...................................................... 15

*Putnam Pit, Inc. v. City of Cookeville*,
    221 F.3d 834 (6th Cir. 2000) ...................................................................... 6

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) .................................................................................... 7

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) ............................................................................. 18

*Reno v. American Civil Liberties Union*,
  521 U.S. 844 (1997)............................................................................. 2, 19

*Republican Party of Minn. v. White*,
  416 F.3d 738 (8th Cir.2005) ................................................................... 19

*Ridley v. Massachusetts Bay Transp. Auth.*,
  390 F.3d 65 (1st Cir. 2004)................................................................... 7, 14

*Roberts v. Haragan*,
  346 F. Supp. 2d 853 (N.D. Tex. 2004) .................................................... 15

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995)............................................................................. 6, 20

*Smith v. Tarrant County College Dist.*,
  694 F. Supp. 2d 610 (N.D. Tex. 2010) .................................................... 15

*State of Texas v. Knights of Ku Klux Klan*,
  58 F.3d 1075 (5th Cir. 1995) .................................................................... 10

*Time Warner Cable, Inc. v. Hudson*,
  667 F.3d 630 (5th Cir. 2012) .................................................................... 18

*United States v. Playboy Entm't Grp.*,
  529 U.S. 803 (2000)................................................................................. 19

*White Buffalo Ventures, LLC v. University of Texas at Austin*,
  420 F.3d 366 (5th Cir. 2005) .................................................................... 15

## <u>Other Authorities</u>

*United Nations E-Government Survey 2016: E-Government in Support of Sustainable
  Development*, U.N. Sales No. E.16.II.H.2 ................................................ 2

## INTRODUCTION

Defendant Texas A&M University (TAMU) is unconstitutionally blocking a critic from participating in a forum for community engagement created and maintained by TAMU. TAMU ensures that mention of the critic and its criticism does not appear in the forum, creating the false impression that TAMU's actions are beyond public reproach. This is classic viewpoint discrimination, rarely, if ever, permissible under the First Amendment.

That this forum exists because TAMU has created a Facebook page and allowed the public to post comments to the page does not change this hornbook result. Like government bodies around the nation, TAMU uses its Facebook page not only to provide information to the public, but also to create a forum for people to express themselves, to TAMU and to each other, on myriad subjects related to the University, including University controversies.

Plaintiff People for the Ethical Treatment of Animals (PETA) is the critic that TAMU has blocked. It seeks to use these interactive public parts of TAMU's Facebook page to express its views on a TAMU issue of significant public concern: whether TAMU's dog lab is cruel and should be closed.

TAMU uses two methods to censor PETA's viewpoint. First, TAMU automatically blocks third-party content from its Facebook page that contains banned words like "PETA" and "lab." Second, if this digital filter misses any unwanted views, TAMU manually deletes them.

In doing so, TAMU violates the First Amendment in five distinct ways. First, TAMU has censored PETA's speech because TAMU disagrees with PETA's viewpoint, which is forbidden in every kind of forum. Second, TAMU has created an unlawful prior restraint. Third, TAMU has designated its Facebook page as a public forum, but TAMU's exclusion of PETA's message is not content neutral and does not survive the scrutiny required in a designated forum. Fourth, even if

1

TAMU's Facebook page is a limited public forum or a nonpublic forum, PETA's speech falls within any limits, and TAMU's exclusion of PETA is not reasonable. Fifth, TAMU's censorship regime violates PETA's right to petition the government for a redress of grievances.

## STATEMENT OF FACTS

I.     **Social Media Is the 21st Century's Town Square, a Tool for Free Expression Among Many People, and Governments Use It for That Purpose.**

Social media has changed the way that people all over the world connect and communicate. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997), and social media in particular." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). Facebook was designed for the very purpose of facilitating communication and human interaction online. *See* https://www.facebook.com/pg/facebook/about/.

Governments use social media for this very purpose: to engage in two-way communication with the public, and facilitate communications among members of the public. *See United Nations E-Government Survey 2016: E-Government in Support of Sustainable Development*, U.N. Sales No. E.16.II.H.2, at 65-68.[1] They don't just use social media to disseminate their own information to the public. Rather, they also create "interactive spaces" where members of the public can talk back to the government and communicate with each other. *See Davison v. Randall*, 912 F.3d 666, 686-88 (4th Cir. 2019) (addressing the "interactive component" of a public official's Facebook page, the comments section); *Knight First Amendment Inst. at Columbia University v. Trump*, 302

---

[1] *Available at* http://workspace.unpan.org/sites/Internet/Documents/UNPAN97453.pdf.

F. Supp. 3d 541, 572 (S.D.N.Y. 2018) (addressing the reply section of the president's Twitter feed), *appeal pending*, No. 18-01691 (2nd Cir.).

## II.    TAMU's Facebook Page Contains Interactive Spaces for Free Expression.

TAMU's Facebook page includes at least three distinct elements. Two are interactive, that is, they allow for a back-and-forth discussion among numerous speakers.

First, TAMU regularly posts information about educational opportunities, research programs, and athletics, as well as profiles about students and other members of the TAMU community on its Facebook Page. *See* Answer (ECF Dkt. 35) ¶ 19.[2] This is the only content displayed if the page is viewed in the "Home" setting. *Id*. at ¶ 20.

Second, the University's social media policy and Facebook settings permit anyone, including current students, prospective students, alumni, and non-affiliated persons still interested in the University, to post text and other media in the "Visitor Posts" section of TAMU's page. *See* Answer (ECF Dkt. 35) ¶ 28. Visitors can publish such posts in two distinct ways: (1) by posting directly on TAMU's page, or (2) by posting in their own timeline and tagging TAMU (that is, by including "@TAMU" in the text) in the post.[3] *Id*. at ¶ 17. TAMU could disable all visitor posts, but has not done so. *See id*. at ¶¶ 17, 39. *See also* Walters Decl. Exh. 14 (TAMU's Facebook Page "Settings"). Visitors will see each other's posts if they view the page in the "Posts" setting. *See* Answer (ECF Dkt. 35) ¶ 20.

Third, guests can add content to the Facebook page by commenting on both TAMU's own posts and the guest posts. *See* Answer (ECF Dkt. 35) ¶¶ 17, 24. Comments are an easy way for visitors to offer opinions on TAMU's posts, ask questions about TAMU's policies, and respond to

---

[2] The Answer corresponds to the same paragraphs in the First Amended Complaint (ECF Dkt. 17).
[3] For example, Senator Ted Cruz tagged TAMU in a post about foreign relations and education policy, and it appeared in the Posts feed. *See* Answer (ECF Dkt. 35) at ¶ 30.

information and opinions in visitor posts. *Id.* Comments allow multiple Facebook users to express

their views to other users on a single post. *See Davison*, 912 F.3d at 686 (explaining the comments

function on a government Facebook page). Newer comments respond to older comments, as well

as the original post. The comments appear directly below a post, with a few of the most popular

comments usually appearing in a compressed preview and visitors having the ability to click to see

more comments or change the order of the comments they see. *See* Walters Decl. Exh. 10

(Facebook Help Center, Banning and Moderation) at p. 1. TAMU can turn off all comments, but

has not done so. *See* Answer (ECF Dkt. 35) ¶ 24. *See also* Walters Decl. Exh. 10 (Facebook Help

Center, Banning and Moderation) at p. 2. TAMU could place geographic restrictions on comments,

but has not. *See* Answer (ECF Dkt. 35) ¶ 39. *See also* Walters Decl. Exh. 14 (TAMU's Facebook

Page "Settings").

Comments are a popular element on TAMU's Facebook page. *See* Answer (ECF Dkt. 35)

¶ 24. Some posts have hundreds of comments. *Id.* Visitor comments on TAMU's posts, and Visitor

Posts, sometimes include discussion of TAMU policies and decisions. *Id.*

This case concerns the second element (visitor posts) and third element (visitor comments)

of TAMU's Facebook page. They are the "interactive components," *Davison*, 912 F.3d at 686, and

"interactive spaces," *Knight First Amendment Inst.*, 302 F. Supp. 3d at 572, that other courts have

found to be public forums.

### III.   TAMU Censored PETA from the Interactive Spaces of Its Facebook Page.

In 2016, PETA began an advocacy campaign against TAMU's dog lab, in which

researchers use live canines to study a canine form of Duchenne Muscular Dystrophy ("DMD").

This campaign has included letters to governmental officials and funding agencies, protests of

Board of Regents' meetings, and a video by political commentator Bill Maher. *See* Answer (ECF

Dkt. 35) ¶ 33.

TAMU censored PETA's own speech and speech about PETA itself and the dog labs in two ways.

First, Visitor Posts and Comments containing words or phrases TAMU selected are automatically blocked from the University's Facebook page. *See id.* at ¶¶ 38-39. *See also* Walters Decl. Exh. 14 (TAMU's Facebook Page "Settings"). Facebook gives Page administrators the ability to create a customized list of "blocked" words, which prevents the publication on that Page of posts and comments containing any of these words. *See* Answer (ECF Dkt. 35) ¶ 18. *See also* Walters Decl. Exh. 10 (Facebook Help Center, Banning and Moderation) at p. 1.

TAMU concedes that these block-triggering words include "PETA" and "lab." *See* Answer (ECF Dkt. 35) ¶ 1. A log of TAMU's Facebook Page settings shows that TAMU also chose to block other words associated with PETA's viewpoint including "abuse," "abusers," and "md" (the common abbreviation for "muscular dystrophy"). *Id.* at ¶ 39. *See also* Walters Decl. Exh. 14 (TAMU's Facebook Page "Settings").[4] No viewpoint other than PETA's was so targeted during this time period. Nearly all of the other words that TAMU automatically blocks are profanity or words commonly associated with automated spam. *Id.*

Second, TAMU has manually deleted PETA-generated posts from its Facebook page. *See* Answer (ECF Dkt. 35) ¶ 43. Content PETA has attempted to post to the TAMU Facebook Page has been removed, as well as content mentioning PETA and PETA's anti-dog lab campaign.

## ARGUMENT

TAMU bears the burden of proving that its censorship regime passes First Amendment muster. *Gordon v. Houston*, 79 F. Supp. 3d 676, 688 (S.D. Tex. 2015) (citing *McCutcheon v. FEC*,

---

[4] PETA obtained this particular settings log from TAMU by means of a request under the Texas Public Information Act. *See* Answer (ECF Dkt. 35), at ¶¶ 38, 40.

134 S. Ct. 1434, 1452 (2014)). Speech on public issues—like PETA's criticism of TAMU's experimentation on dogs—"is central to the First Amendment and enjoys special protection under the Constitution." *Lowrey v. Texas A&M Univ. System*, 11 F. Supp. 2d 895, 918 (S.D. Tex. 1988).

## I.     TAMU Discriminates Against PETA's Viewpoint, Which Is Unconstitutional Even in Nonpublic Forums.

### A.     The First Amendment Forbids Viewpoint Discrimination in All Types of Government Forums.

Because TAMU has censored PETA's speech because of the viewpoints it expresses, this court need not decide precisely what kind of forum TAMU has created within its Facebook page. "It is well settled that viewpoint discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001). Thus, in *Davison*, the Fourth Circuit declined to decide whether the comments section of a government official's Facebook Page was a traditional, designated, or limited public forum, because viewpoint discrimination was prohibited in each of them. 912 F.3d at 687. Indeed, viewpoint discrimination is also forbidden in nonpublic forums. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998).

Viewpoint discrimination is "an egregious form" of content discrimination, in which government targets not just a subject matter, but "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995), *quoted in Chiu*, 260 F.3d at 350. *See, e.g.*, *Knight First Amendment Inst.*, 302 F. Supp. 3d at 575; *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834 (6th Cir. 2000) (reversing summary judgment for a city that allegedly exercised viewpoint discrimination in deciding which groups could post links on the city's website).

Viewpoint discrimination need not be motivated by any nefarious intent, other than the intent to silence. Thus in *Davison*, the official removed a comment alleging corruption on the

school board from her Facebook page because she was concerned it was slanderous and "didn't want [the allegations] on the site." 912 F.3d at 687 (internal quotations omitted). The Fourth Circuit found that this "amply supports" a finding of viewpoint discrimination. *Id.*[5]

Viewpoint discrimination exists and is unconstitutional when a government eliminates any amount of speech on the basis of viewpoint, even if it also occasionally allows that viewpoint to appear. It is enough that the disfavored speaker is burdened more than other speakers who espouse favored viewpoints and face no censorship at all. *See Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 88 (1st Cir. 2004).

### B.    TAMU Censors PETA's Viewpoint from Its Facebook Page.

As set forth above, TAMU censors PETA's views in two ways—automatically and manually. See Answer (ECF Dkt. 35) ¶¶ 1, 43-46. This censorship is in response to and specifically designed to suppress PETA's criticism of the dog lab. It is thus unconstitutional.

## II.    TAMU's Automatic Content Censorship Is an Unconstitutional Prior Restraint.

TAMU's key word blocking of any comment including "PETA" or "lab" (or other blocked words) is a prior restraint, that is, an "administrative . . . order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotation marks omitted). Rather than wait until the comments have been posted and respond to any harm those comments may actually cause, TAMU forbids their publication from the start.

---

[5] *See also, e.g.*, *Good News Club v. Milford Central Sch.*, 533 U.S. 98 (2001) (striking down a policy of excluding religious viewpoints from a government forum); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (striking down a ban on "fighting words" that provoke violence on the basis of race and the like, but not fighting words that provoke violence on any other basis); *Gay Student Services v. Texas A&M Univ.*, 737 F.2d 1317, 1333 (5th Cir. 1984) (rejecting TAMU's refusal to recognize a pro-gay student group, though TAMU had recognized student groups with other views about gay rights).

Any system of prior restraint bears a heavy presumption of unconstitutionality, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990), and "carries a heavy burden of showing justification." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

Prior restraints require "narrowly drawn, reasonable and definite standards" to guide the censor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992) (citing *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951) (internal quotation marks omitted)). A prior restraint will be unconstitutional if it results from the exercise of excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988)).

Prior restraints must be necessary to further a governmental interest of the highest magnitude. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562-63 (1976) (finding that a criminal defendant's right to a fair trial was a sufficiently important governmental interest). The prior restraint will be *necessary* only if:

(1)     the harm to the governmental interest is highly likely to occur, *see id.* at 563, 565, 567 (approving of the trial court's finding of a clear and present danger of impairment of the defendant's fair trial rights, but cautioning against uncertainty); *see also New York Times Co. v United States*, 403 U.S. 713, 730 (1971) (per curiam; Stewart, J. concurring) (requiring absence of prior restraint to "surely result" in feared harm);

(2)     the harm will be irreparable, *New York Times*, 403 U.S. at 730;

(3)     no alternative exists for preventing the harm, *see Nebraska Press*, 427 U.S. at 563-65; and,

(4)      the prior restraint will actually prevent the harm. *See id.* at 565-66 ("We must also assess the probable efficacy of prior restraint on publication . . . .").

Moreover, prior restraints must contain certain procedural protections: (1) any restraint before judicial review occurs can be imposed for only a specified brief period of time during which the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3) the censor must bear the burdens of going to court and providing the basis to suppress the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003) (citing *Freedman v. Maryland*, 380 U.S. 51, 58–59 (1965)).

TAMU has not complied with any these substantive or procedural protections. Indeed, it did not even inform PETA that it had blocked words associated with PETA's campaign, explain its reasoning for doing so, prove that the keyword blocking was pursuant to narrowly drawn, definite and definite standards, attempt to justify it as being necessary to further a governmental interest of the highest magnitude, or offer PETA any avenue for prompt judicial review.

## III.    The Interactive Spaces of the TAMU Facebook Page Are Designated Public Forums, and TAMU Unlawfully Censors Content in These Forums.

TAMU has created designated public forums by opening the interactive spaces of its Facebook page for the general public to discuss events, policies, and issues related to the University. TAMU has engaged in content-based and viewpoint-based censorship of PETA's messages in these forums. This censorship is unconstitutional.

### A.      The Relevant Forum Is Not TAMU's Entire Facebook Page, But Particular Interactive Components of It.

Forum analysis operates on a precise level, focusing on specific spaces within a larger environment, and not on the environment as a whole: it is "not a simple 'all-or-nothing' proposition." *See Justice for All v. Faulkner*, 410 F. 3d 760, 766 (5th Cir. 2005) (citing *Arkansas Educ'l Telev'n Comm.*, 523 U.S. at 677-81) (explaining that a given forum may be designated for

one class of speaker or speech, and still "limited" with respect to others)). Thus, in one case, the relevant forum was not an entire school graduation event, but just "the portions of the commencement program allocated to the invocation and benediction." *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 819 (5th Cir. 1999), *aff'd*, 530 U.S. 290 (2000). Likewise, in *Chiu*, the relevant forum was a school's Math Night event and internal mail delivery system, not its entire building. 260 F.3d at 354-55.[6]

Consistent with this, the courts that have applied forum analysis to governmental social media pages have focused on the "interactive spaces" and "interactive components" of the government's social media presence, distinguishing those from the government's own speech on those sites. *See Davison*, 912 F.3d at 686 ("But the interactive component of the Chair's Facebook Page—the portion of the middle column in which the public can post comments, reply to posts, and 'like' comments and posts—is materially different. . . . [C]omments and posts by users cannot be mistaken for Randall's own speech because they identify the posting or replying personal profile or Page); *Knight First Amendment Inst.*, 302 F. Supp. 3d at 572 (identifying the relevant forum as "the interactive space of each tweet, as distinguished from the content of the tweet").

---

[6] As the Fifth Circuit explained in *State of Texas v. Knights of Ku Klux Klan*, 58 F.3d 1075, 1078 (5th Cir. 1995):

> In pinpointing the relevant forum, we must focus on the "access sought by the speaker." *Id.* We employ a "tailored approach" in determining what constitutes the forum within the confines of government property. *Id.* In *Cornelius,* the government wished to exclude certain groups from participating in a charitable fundraising drive conducted in the federal workplace. The Supreme Court defined the forum as the fundraising campaign rather than the government buildings which housed federal workers. *Id.* In *Perry Educ. Ass'n,* the Court defined the forum as the internal mail system of a public school rather than the school property. 460 U.S. at 44 . . . . Similarly, we define the forum in this case as the [adopt-a-highway] Program rather than the public highways.

PETA does not seek to speak on TAMU's Facebook page the way TAMU does, or in TAMU's own posts in particular. Rather, PETA only seeks to speak the way other members of the public do, in the two interactive spaces: (1) visitor posts, and (2) visitor comments on TAMU posts and visitor posts. These interactive spaces are designed to facilitate speech by many people, and TAMU by policy and practice has intentionally facilitated and permitted such private speech.

**B.    Designated Public Forums Exist Where a Wide Variety of Speech Is Permitted, Though It Need Not Be Limitless.**

A designated public forum is "a place or channel of communication [not traditionally open to assembly and debate] for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Doe*, 168 F.3d at 819 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985)).

Although designated public forums are sometimes characterized as allowing "general access," *Doe*, 168 F.3d at 819 (quoting *Cornelius*, 473 U.S. at 802), or being "open for indiscriminate public use," *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010) (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993)), a designated public forum will generally have some speaker or subject-matter restrictions. "Government property . . . does not automatically cease to be a designated public forum because the government restricts some speech on the property. Otherwise, the restriction of speech on government property would be self-justifying. The restriction would disprove any intent to create a designated public forum, and the failure to create a public forum would justify the restriction of speech." *Hays Cty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992).

Most basically, a designated public forum is generally open, with a few exceptions for closure, and a limited or nonpublic forum is generally closed, with a few exceptions for openness. *See Ark. Educ. Television Comm'n*, 523 U.S. at 679–80. The Supreme Court's public forum cases

> illustrate the distinction between "general access," . . . which indicates the property is a designated public forum, and "selective access," . . . which indicates the property is a nonpublic forum. On one hand, the government creates a designated public forum when it makes its property generally available to a certain class of speakers . . . . On the other hand, the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, "obtain permission," . . . to use it.

*Id.* at 679. The government may thus "designate a particular forum as appropriate for certain types of speech or for speech on particular topics," *Chiu*, 260 F.3d at 347, or "may designate a forum only for particular speakers or for the discussion of particular topics." *Doe*, 168 F.3d at 821.

A forum, even one with some content or speaker restrictions, remains a designated public forum as long as it is "heavily used by a wide variety of private organizations." *Lamb's Chapel*, 508 U.S. at 391. "Heavily used" does not require great numerosity of private speakers: in *Concerned Women for American Education & Legal Defense, Foundation, Inc. v. Lafayette County*, 883 F.2d 32, 34 (5th Cir. 1989), the Fifth Circuit found that the government "created a public forum by allowing diverse groups to use its auditorium," based on use by just seven organizations and one individual.

Thus, the Fifth Circuit, like other courts, has recognized designated public forums despite the presence of restrictions on both speakers and subjects. In *Justice For All*, 410 F.3d at 769, for example, the Fifth Circuit found the public spaces of the University of Texas's Austin campus to be designated public forums for students, even though the University imposed a "small number of enumerated content-based restrictions." The Fifth Circuit reached a similar result in *Hays Cty. Guardian*, 969 F.2d at 117, even though the public university in that case prohibited speech that was "obscene, vulgar, or libelous" or contained "impermissible solicitation."

### C.   The Visitor "Comments" and "Posts" Sections of TAMU's Facebook Page Are Designated Public Forums.

In determining whether the government has created a designated public forum, the Fifth Circuit looks to "(1) the government's intent with respect to the forum, and (2) the nature of the forum and its compatibility with the speech at issue." *Justice for All*, 410 F.3d at 765. The government's intent can be determined by both stated policy and the actual practice of the forum. *Doe*, 168 F.3d at 819. A stated policy alone is not determinative: "self-serving statements regarding the purpose of the meeting are not enough to prove 'intent.'" *Chiu*, 260 F.3d at 349 n.13. Rather, courts "push aside 'self-serving statements regarding the purpose of the meeting' for objective evidence leavened by common sense." *Fairchild*, 597 F.3d at 759. "[I]t is clear that the government's proffered intent does not govern [the public forum] inquiry, else it would be a limited inquiry indeed. . . . We must, therefore, view skeptically [the agency's] own self-serving assertion of its intent and examine closely the relationship between the objective nature of the venue and its compatibility with expressive activity." *Doe*, 168 F.3d at 820.[7]

The undisputed summary judgment record shows that the interactive spaces of TAMU's Facebook Page are designated public forums. This record includes TAMU's policies for its Facebook Page, TAMU's practice of using the interactive spaces of its Facebook Page as a public forum, and the basic nature of Facebook.

### 1.   TAMU's Intent to Designate a Forum Is Shown by Its Social Media Policy and Page Settings.

---

[7] *Accord Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3c 65, 76 (1st Cir. 2004) ("a statement of intent contradicted by consistent actual policy and practice would not be enough to support" government denial that a forum exists); *Hopper v. City of Pasco*, 241 F.3d 1067, 1075 (9th Cir. 2001) ("[A]n abstract policy statement purporting to restrict access to a forum is not enough. What matters is what the government actually does—specifically, whether it consistently enforces the restrictions on use of the forum that it adopted."); *Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5*, 941 F.2d 45, 47 (1st Cir. 1991) ("actual practice speaks louder than words").

TAMU's written policies for its Facebook Page demonstrate an intent to designate the interactive spaces of its Facebook Page as a public forum.

TAMU's social media policy broadly permits speech, and its few restrictions are routine in designated public forums. *See* Answer (ECF Dkt. 35) ¶ 25. *See also* Walter Decl. Exh. 13 (TAMU's Social Media Policy). These rules simply provide that TAMU may remove content that "violates the terms of service," "contains personally identifying information or sensitive personal information," "contains offensive terms that target protected classes," "is threatening, harassing or discriminatory," "incites or promotes violence or illegal activities," "contains information that reasonable could compromise public safety," and advertising, political endorsements and campaigning, and content that violates another's intellectual property rights. *Id.* These speech categories are typically prohibited in even traditional public forums. *See, e.g.*, *Hall v. Bd. of Sch. Comm'rs of Mobile Co.*, 681 F.2d 965, 971 (5th Cir. 1982) ("In a public forum, the state may restrict expression which is obscene, consists of fighting words, or which poses an imminent danger of grave evil."); *White Buffalo Ventures, LLC v. University of Texas at Austin*, 420 F.3d 366, 378 (5th Cir. 2005) (finding it unnecessary to decide public forum status because the commercial speech at issue was constitutionally proscribable); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 872 (N.D. Tex. 2004) (explaining that unprotected speech may be restricted even in a public forum).

Indeed, the Fifth Circuit has found university facilities to be designated public forums despite similar lists of prohibited speech. *See Justice for All*, 410 F.3d at 768-69 (finding designated forum status despite rules barring "obscenity, defamation, harassment, commercial solicitation, and incitements to violate the law"); *Hays Cty. Guardian*, 969 F.2d at 117 (finding designated forum status despite bans on speech that was "obscene, vulgar, or libelous" or that contained "impermissible solicitation"). *See also Smith v. Tarrant County College Dist.*, 694 F.

14

Supp. 2d 610, 625 (N.D. Tex. 2010); *Roberts*, 346 F. Supp. 2d at 861-62; *Pro-Life Cougars v. University of Houston*, 259 F. Supp. 2d 575, 582 (S.D. Tex. 2003) (all finding certain aspects of university campuses to be designated public forums despite rules against some categories of speech and/or speakers).

TAMU has configured its Facebook Page to reflect this generally open policy. TAMU chose the most open options Facebook makes available. It allows anyone to comment and post, *See* Answer (ECF Dkt. 35). at ¶ 17, and forgoes potential geographic and age restrictions. *Id.* at ¶¶ 39, 16.

### 2. TAMU's Intent to Designate a Public Forum Is Shown By How, in Practice, It Operates the Interactive Elements of the Facebook Page.

On issues unrelated to its dog laboratory, TAMU allows a heterogeneous array of speakers and viewpoints in the interactive elements of its Facebook Page. Answer (ECF Dkt. 35) ¶¶ 20-24, 27-30. The Page provides a space for the public to speak about University policy and engage in national debates. It has become a place for "exchanges of dueling presentations on topics of public concern." *Doe*, 168 F.3d at 820.

Regarding Visitors Posts, TAMU allows all manner of visitors to publish on all manner of controversies. *See* Answer (ECF Dkt. 35) ¶ 28. For example, community members published a post about the screening of a movie urging people to stop using plastic straws. *Id.* at ¶ 29. U.S. Senator Ted Cruz published a post about the termination of a TAMU program in China, addressing a foreign policy issue during an election year. *Id.* at ¶ 30.

Regarding Visitor Comments, TAMU likewise allows diverse speech by diverse speakers. *See* Answer (ECF Dkt. 35) ¶ 24. For example, in a TAMU post about the dog Reveille, comments criticized TAMU for acquiring her from a breeder instead of a rescue shelter. *Id.* at ¶ 24. Likewise,

in a TAMU post about university housing for autistic students, a comment urged opportunities for peer-to-peer interactions with other students. *Id.* at ¶ 24.

At an earlier stage in this case, TAMU admitted that it has had "little occasion to step in and moderate comments or visitor posts on its official Facebook page." *See* Defendant's Motion to Dismiss (ECF Dkt. 20) at 12.

Forums far less open than TAMU's have been held to be designated forums, notwithstanding formal policies to the contrary. In *Concerned Women for America*, 883 F.2d at 34, the court found that a library designated its auditorium as a public forum through the practice of "allowing diverse groups to use its auditorium," despite its stated policy to only allow meetings of outside groups with an educational purpose. The small number of forum users in *Concerned Women for America* included Navy recruiters, a program on AIDS, a luncheon and lecture on Alzheimer's, and a piano recital. *Id.*

### 3. The Nature and Purpose of the Interactive Elements of TAMU's Facebook Page Show Their Designation as Forums for Speech.

In addition to government intent, forum status turns on "the nature of the forum and its compatibility with the speech at issue." *Justice for All*, 410 F.3d at 765. This inquiry includes "the character of the place, the pattern of usual activity, [and] the nature of its essential purpose[.]" *Estiverne v. Louisiana State Bar Assn.*, 863 F.2d 371, 377, 378 (5th Cir. 1989).

As shown above, these considerations overwhelmingly support that TAMU has designated the interactive spaces of its Facebook Page as public forums for free speech. TAMU is using the interactive elements of its Facebook Page exactly as Facebook intended – Facebook is designed to allow as many people as possible to communicate with as many other people as possible – and exactly as people and organizations around the world use it. Few communications channels are more compatible with the kind of speech at issue here.

16

Indeed, the only federal appellate court to consider the issue found the comments section of a government Facebook Page to be a public forum because it bore "the hallmarks of a public forum." *Davison*, 912 F.3d at 682. The page was "'compatib[le] with expressive activity.'" *Id.* (quoting *Cornelius*, 473 U.S. at 802). The government official administering the Page "'intentionally open[ed the public comment section of the Chair's Facebook Page] for public discourse,' inviting 'ANY Loudoun citizen' to make posts to the comments section of the Chair's Facebook Page—the interactive component of the page—'on ANY issues, request, criticism, complement or just your thoughts.'" *Id.* (bracketed text in original; citations omitted; quoting *Cornelius*, 473 U.S. at 802). Moreover, the administrator "placed no restrictions on the public's access to the page or use of the interactive component of the Chair's Facebook Page. And, in accordance with [the administrator's] invitation, the public made numerous posts on matters of public concern." *Id.*

**D.    TAMU's Automatic and Manual Content Censorship Fails First Amendment Scrutiny.**

As set forth above, PETA has proved viewpoint discrimination, which is barred regardless of the nature of the forum. But even if this Court were only to find content discrimination, TAMU fails the strict scrutiny that applies to such restrictions in a designated public forum.

"[R]egulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). *See Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic."). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or

17

purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Reed*, 135 S. Ct. at 2227. "Laws singling out a small number of speakers for onerous treatment are inherently suspect." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 638 (5th Cir. 2012).

Content discrimination cannot seriously be disputed here. TAMU admits that it automatically blocked the words "PETA" and "lab" from the interactive spaces of TAMU's Facebook Page. *See* Answer (ECF Dkt. 35) ¶ 1. The record shows that TAMU automatically blocked many more words associated with PETA's campaign against the dog lab, including "cruelty" and "abuse." *Id*. at 39. This censorship silences not only PETA, but any speech that names PETA, as well as other individuals who simply wish to discuss TAMU's lab with other Facebook visitors. No other group is singled out for censorship in this way. *See* Answer (ECF Dkt. 35) ¶ 39.

The manual removal of posts pertaining to PETA's campaign against the dog lab is also content discrimination. *See* Answer (ECF Dkt. 35) at ¶ 43.

Content based restrictions on speech must satisfy strict scrutiny: thus, TAMU must prove its censorship of the Visitor Posts and Visitor Comments is "narrowly tailored to promote a compelling Government interest," and that no "less restrictive alternative would serve the Government's purpose." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799-800 (2011). Any "'curtailment of [the First Amendment] must be actually necessary to the solution.'" *Mance v. Sessions*, 896 F.3d 699, 705 (5th Cir. 2018) (quoting *Brown*, 564 U.S. at 799). Any restriction on speech must directly advance the governmental interest, be neither overinclusive nor underinclusive, and be the least speech-restrictive alternatives can be available to serve the government's interest. *Reno v. ACLU*, 521 U.S. at 874; *Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427,

439–40 (5th Cir. 2014) (quoting *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir.2005) (en banc)).

To prove a compelling interest, the government "'must specifically identify an 'actual problem' in need of solving.'" *Mance*, 896 F.3d at 705 (quoting *Brown*, 564 U.S. at 799). The government must likewise offer "*actual evidence*, not just conjecture," that the speech restriction it imposed was the least restrictive means available to solve the actual problem. *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 476 (5th Cir. 2014) (emphasis in original).

Here, TAMU cannot satisfy strict scrutiny. It has failed to identify a compelling governmental interest that supports its ban on speech mentioning PETA and the labs from the interactive parts of its Facebook Page, let alone offer evidence to prove that there was an actual problem in need of solving. Nor can it show that its censorship is the least speech-restrictive means of accomplishing a governmental interest it may now conjure post-hoc.

**IV.  Even If the Interactive Elements of TAMU's Facebook Page Are Limited Public or Nonpublic Forums, PETA Still Prevails, Because Its Speech Falls Within Any Limitations, and TAMU's Speech Restraints Are Not Reasonable.**

PETA is entitled to summary judgment even if this Court were to conclude that the interactive elements of the TAMU Facebook Page are either limited public or nonpublic forums.

**A.  PETA and Its Speech Fall Within Any Limits TAMU Has Imposed.**

Even when the government limits a forum "for certain groups or the discussion of certain topics," it (1) may not discriminate on the basis of viewpoint, as discussed above, and (2) "must respect the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829. *See also Cornelius*, 473 U.S. at 806 ("Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created . . . the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he

19

espouses on an otherwise includible subject."). As the Fifth Circuit has explained, "speech for which the forum is designated is afforded protection identical to the protection provided to speakers in a traditional public forum." *Hays Cty. Guardian*, 969 F.2d at 116.

Those within the limitation must not be excluded, because doing so raises the specter of viewpoint discrimination. As the Supreme Court held in *Lamb's Chapel,* 508 U.S. at 396-97, a school district unlawfully engaged in viewpoint discrimination when it excluded a church from presenting films teaching family values (a subject otherwise permissible in the forum) from a Christian perspective.

Here, even if the interactive spaces of TAMU's Facebook Page were a limited public forum, PETA and its speech fall within any limits that TAMU has imposed on that forum. TAMU has opened its Facebook Page to a wide array of speech about the university and its programs. PETA's speech falls well within this norm. Its speech, and the speech of its supporters mentioning PETA and its criticism of the dog labs, is speech about the university and is thus consistent with the purpose of the forum.

### B.   Even If the Interactive Elements of TAMU's Facebook Page Are Nonpublic Forums, TAMU's Censorship Is Not Reasonable.

Even in a nonpublic forum, "the State must draw a reasonable line. . . . [T]he State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1888 (2018). Thus, the Supreme Court just this past term struck down a speech restriction in a nonpublic forum because of the "unmoored use" of a subject matter limitation, "combined with haphazard interpretations" of that limit, which resulted in "confusing line-drawing problems." *Id.* at 1888-89. The Court explained:

> It is "self-evident" that an indeterminate prohibition carries with it "[t]he opportunity for abuse, especially where [it] has received a virtually open-ended interpretation." [*Bd. of Airport Comm'rs v.* ]*Jews for Jesus*, 482 U.S. [569,] 576 [(1987); see *Heffron v.*

20

*International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (warning of the "more covert forms of discrimination that may result when arbitrary discretion is vested in some governmental authority").

*Id.* at 1891. The Court called for the State to "employ a more discernible approach" if it truly wished to exclude certain speech from a nonpublic forum. *Id.*

The prohibition against unbridled discretion in excluding speech from nonpublic forums has long been a "matter of consensus among the courts of appeals." *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1068 (4th Cir. 2006).

TAMU has failed to articulate any sensible, viewpoint-neutral basis for distinguishing PETA's speech from the private speech it permits in the Visitor Comments and Visitor Posts on its Facebook Page. Thus, PETA has shown that TAMU violated the First Amendment, even if the disputed forums are non-public.

## V. TAMU Violated PETA's First Amendment Right To Petition Government for Redress of Grievances.

By blocking PETA's ability to post to the interactive spaces of TAMU's Facebook page, TAMU violates PETA's First Amendment right "to petition the Government for a redress of grievances." U.S. Const. amend. I.

The First Amendment's separate rights to speak and to petition are not identical, and are analyzed differently. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). For example: "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Id.* The right to petition applies even if the petitioning does not occur in a public forum. *Mirabella v. Villard*, 853 F.3d 641, 655 (3d Cir. 2017) (petition via email). The right to petition extends to "all departments of the Government," *California Motor Transp. Co. v.*

21

*Trucking Unlimited*, 404 U.S. 508, 510 (1972), including TAMU, a public university. The Supreme Court recently recognized that social media is well-suited for exercising the right to petition: "on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner." *Packingham*, 137 S. Ct at 1735.

While directed at the government, petitions also rally public support, as "[p]etitions contribute to the 'public airing' of disputes." *Mirabella*, 853 F.3d at 654-55 (quoting *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 532 (2002)). Indeed, the right of petition is especially salient when, as here, the petition "seek[s] to advance political, social, or other ideas of interest to the community as a whole." *Guarnieri*, 564 U.S. at 395.

Government violates the right to petition when, as here, it bars someone from communication with that entity. *Mirabella*, 853 F.3d at 650-51. It also violates the right to petition by excluding some viewpoints from a channel of petitioning. *Id*. at 655

PETA seeks to post messages on TAMU's Facebook Page calling on TAMU to close its dog lab. This is the essence of First Amendment petitioning. PETA's campaign aims to persuade TAMU to close its dog lab, by means of a digital channel virtually custom-made for petitioning government bodies. *See* Answer (ECF Dkt. 35) ¶ 33-34.

By barring PETA from using its Facebook page to communicate to TAMU, an avenue of communication available to all other speakers, TAMU has violated PETA's right to petition.

**CONCLUSION**

TAMU has unconstitutionally censored speech by and about PETA by exercising viewpoint discrimination, imposing a prior restraint, imposing content- and viewpoint-based restrictions on speech in a designated public forum, and suppressing PETA's right to petition the

government for a redress of grievances. The material facts are not disputed. This court should issue

summary judgment in favor of PETA.

DATED: March 27, 2019                           Respectfully submitted,

                                                */s/ David Greene*
                                                DAVID GREENE*
                                                *Attorney-in-Charge for Plaintiff*
                                                California Bar No. 160107
                                                ADAM SCHWARTZ*
                                                California Bar No. 309491
                                                CAMILLE FISCHER*
                                                Maryland Bar No. 201612130192
                                                Electronic Frontier Foundation
                                                815 Eddy Street
                                                San Francisco, CA 94109
                                                415.436.9333 telephone
                                                415.436.9993 facsimile
                                                davidg@eff.org
                                                *Admitted *pro hac vice*

                                                GABRIEL WALTERS*
                                                District of Columbia Bar No. 1019272
                                                PETA Foundation
                                                1536 16th Street NW
                                                Washington, DC 20036
                                                202.483.7382 telephone
                                                gabew@petaf.org

                                                CHRISTOPHER ROTHFELDER
                                                Texas Bar No. 2408470
                                                Southern District No. 2449594
                                                Rothfelder & Falick, L.L.P.
                                                1201 Louisiana St., Suite 550
                                                Houston, TX 77002
                                                713.220.2288 telephone
                                                crothfelder@rothfelderfalick.com
                                                *Attorneys for Plaintiff*